UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


| | | |
|---|---|---|
| P.J., et al., | : | CIVIL NO.: |
| Plaintiffs, | : | 291CV00180 (RNC) |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| BOARD OF EDUCATION, et al. | : | |
| Defendants. | : | December 17, 2004 |

**REPLY TO MEMORANDUM OPPOSING
AN AWARD OF COSTS, EXPERT FEES AND ATTORNEYS' FEES**

I.    **PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

The State defendants have filed a Memorandum in Opposition to Plaintiffs' Motion for

an Award of Costs and Attorneys' fees.  That Memorandum asserts, among other things, that

plaintiffs have waived any claim for costs and attorneys fees during the eight-year

implementation period and that the holding in *Buckhannon Board & Care Home, Inc. v. West

Virginia Department of Health and Human Resources*, 532 U.S. 598, 149 L.Ed. 2d 855, 121 S.

Ct. 1835 (2001) precludes any such award here.  These defenses, if accepted, will have far

reaching consequences on the future of this litigation.  As the merits of these defenses cannot be

assessed without an understanding of the history of the negotiations that produced the Settlement Agreement, the relevant background is set out below.

The trial in this matter was completed on March 6, 2000.  Shortly before the trial ended the parties agreed that they would attempt to negotiate a Settlement Agreement.   Plaintiffs' initial position statement was contained in a letter that was mailed to the Hon. Donna F. Martinez on February 17, 2000.  [Affidavit of David Shaw (Exhibit A), ¶ 1].  The first day of negotiations was scheduled before Magistrate Judge Martinez on February 28, 2000.  In order to facilitate the settlement process, the Magistrate Judge structured negotiations in two phases: Phase I, all substantive provisions addressing the merits with no consideration of fees and Phase II, the attorneys' fees. The negotiations on the substantive provisions that followed were lengthy and difficult.  Many drafts of a proposed settlement were circulated and modified. Copies of each draft were provided to the Magistrate Judge, counsel for the parties, and the plaintiffs.  [Affidavit of David Shaw (Exhibit A), ¶ 2]. None of the drafts circulated during the Phase I negotiations contained any provision related to fees.

The parties reached final agreement on the substantive provisions of a settlement during a settlement conference convened by Judge Martinez on October 16, 2000.  The final draft Settlement Agreement, containing all the changes negotiated on October 16, 2000, was incorporated into a draft Settlement Agreement dated November 1, 2000.  A copy of that

agreement is attached as Exhibit B hereto. [Affidavit of David Shaw (Exhibit A), ¶ 3].

After resolving the disputes on the substantive matters, the Court instructed plaintiffs to submit to the State, counsels' time records and statement of costs and attorneys' fees incurred to December 2000 in this lawsuit. Plaintiffs' counsel complied based on the understanding that negotiations over substantive matters were concluded.

Plaintiffs' letters to Attorney Urban dated November 28, 2000 and December 11, 2000 detailed the basis for plaintiffs' claim of $965,953.51 for costs, expert fees and attorneys' fees incurred to that date. [Exhibit C; Affidavit of David Shaw (Exhibit A), ¶ 5]. Those letters supplied counsels' time records for the period August 27, 1991 through November 28, 2000 as well as detailed back-up information to support plaintiffs' claim for expert fees and costs, totaling $141, 330, incurred up to November 28, 2000. The plaintiffs concluded their letter of November 28, 2000 with the following statement: "The total of all attorneys' fees, costs, and expert fees claimed for work performed to date in this litigation is $972,115.91." (Emphasis supplied.) [Exhibit C (letter dated November 28, 2000); Affidavit of David Shaw (Exhibit A), ¶ 5]. Plaintiffs supplied additional back-up information to support, correct and clarify the claim on December 11, 2000 and December 13, 2000. [Exhibits C and D; Affidavit of David Shaw (Exhibit A), ¶ 6].

Settlement negotiations were resumed in Magistrate Judge Martinez's chambers on

December 20, 2000 and March 20, 2001 to resolve the dispute surrounding the plaintiffs' claim for attorneys' fees and costs.  Plaintiffs were asked by the Magistrate Judge on December 20th to contact each of their experts to reduce the claim for expert fees, to reduce the attorneys' fees by accepting lower hourly rates, and to significantly reduce the claim for certain items, such as travel time.  [Affidavit of David Shaw (Exhibit A), ¶ 7].  During the negotiations that followed the time records of plaintiffs' counsel and statements of costs and expert fees were presented to the Court and the State defendants.  [Affidavit of David Shaw (Exhibit A), ¶ 8].  After difficult negotiations, the plaintiffs agreed to reduce their demand for expert fees, attorneys' fees and costs incurred through December 1, 2000 to $675,000 to settle the case.  [Affidavit of David Shaw (Exhibit A), ¶ 9].

Although there was one further session of negotiations on May 18, 2001, that session was limited to a discussion of the Attorney General's new demand for an upper limit on the duration of the Settlement Agreement.  No further negotiations or discussions about the settlement of plaintiffs' costs and attorneys' fees were held.  [Affidavit of David Shaw (Exhibit A), ¶ 10].

On May 18, 2001 the Court held another settlement conference to address a new demand by defendants.  Defendants represented at that settlement conference that the Litigation Committee in the Attorney General's Office would not approve the Settlement Agreement

unless one new demand was met – that a limitation be placed on the duration of the

implementation phase of the Settlement Agreement.  Attorney Joseph Rubin, a representative of

the Litigation Committee of the Attorney General's Office, joined Attorney Urban,

Commissioner Sergi, counsel for the plaintiffs and Margaret Dignoti, Executive Director of the

plaintiff, Arc/Connecticut, for these negotiations.  [Affidavit of David Shaw (Exhibit A), ¶ 11].

Plaintiffs vigorously opposed the reopening of negotiations and any limit on the jurisdiction of

the Court.  After a day of negotiations the parties agreed to specific new language on the

limitations that would be placed on the Court's jurisdiction and new dates for reporting and

implementation were agreed upon.  [Affidavit of David Shaw (Exhibit A), ¶12]

    Magistrate Judge Martinez instructed the parties that they were not to leave her

chambers until all of the agreed upon changes to the November 1, 2000 Settlement Agreement

were reduced to writing.  In furtherance of those instructions, Attorneys Urban, Rubin, Shaw

and Laski and representatives of the parties carefully reviewed and agreed to all changes to the

Settlement Agreement.  The agreed-upon changes were handwritten and copies were made for

all participants.  A copy of the November 1, 2000 Settlement Agreement, with the handwritten

agreed-upon changes, is attached as Exhibit E. [Affidavit of David Shaw (Exhibit A), ¶ 13].

Magistrate Judge Martinez requested that Attorney Urban incorporate the agreed-upon changes

into a final document and that a copy of that document be placed on her desk by Monday, May

21, 2001.  [Affidavit of Margaret Dignoti (Exhibit F), ¶ 8].  Plaintiffs' counsel requested a final

copy of the agreement as well.  [Affidavit of David Shaw (Exhibit A), ¶ 12].  Attorney Urban

promised that he would promptly revise the proposed Settlement Agreement dated November 1,

2000 to incorporate the agreed-upon changes as requested.  [Affidavit of David Shaw (Exhibit

A), ¶14].

Attorney Urban did not comply with the Magistrate Judge's instructions and did not

send plaintiffs a revised draft of the Settlement Agreement.  Plaintiffs heard nothing about the

case until June 6, 2001 when they learned that the Connecticut Legislature had approved the

Settlement Agreement on June 5, 2001.  [Affidavit of David Shaw (Exhibit A), ¶15; Affidavit of

Margaret Dignoti (Exhibit F), ¶ 11; Affidavit of Cathy Jortner (Exhibit G), ¶6].  Copies of the

documents recording the vote in the General Assembly and Senate are attached as Exhibits H

and I.  A copy of the transcript of the debate in the House on House Resolution No. 33 is

attached as Exhibit J. [Affidavit of David Shaw (Exhibit A), ¶16].

Plaintiffs' counsel called Attorney Urban on June 6, 2001 and requested a copy of the

Settlement Agreement that had been approved by the Connecticut Legislature.  On June 7, 2001

Attorney Urban faxed a copy of the Settlement Agreement draft approved by the legislature to

Attorney Shaw. [Exhibit K; Affidavit of David Shaw (Exhibit A), ¶¶ 17, 18].  Upon counsel's

review of Exhibit K, plaintiffs learned that opposing counsel had inserted a new Section X in

the proposed Settlement Agreement that plaintiffs had never seen prior to June 7, 2001.  The

prior draft of the agreement did not contain a provision on attorneys' fees.  The new language in

Section X states that the State of Connecticut agrees to "a one-time payment of $675,000 in

attorneys' fees and costs."  [Affidavit of David Shaw (Exhibit A), ¶19].  Plaintiff organizations

had approved the Settlement Agreement negotiated during the May 18, 2001 Settlement

Conference.  [Affidavit of Cathy Jortner (Exhibit G), ¶ 5; Affidavit Margaret Dignoti (Exhibit

F), ¶ 10].  These organizations were shocked to learn that the State had unilaterally inserted

Section X after the negotiations were over.  [Affidavit of Margaret Dignoti (Exhibit F), ¶ 13;

Affidavit of Cathy Jortner (Exhibit G), ¶ 7].  Section X was unacceptable to plaintiffs because

this new language was never part of the negotiations, because this language arguably could be

construed as a prospective waiver of any right class counsel had to reimbursement for costs,

expert fees and attorneys' fees during the implementation phase of the litigation, and because

such a prospective waiver would seriously undermine class counsel's ability to enforce the

Settlement Agreement. [Affidavit of Cathy Jortner (Exhibit G), ¶9; Affidavit of Margaret

Dignoti (Exhibit F), ¶¶14-16]

On June 8, 2001 plaintiffs' counsel wrote to Attorney Urban to object to this new

language he had unilaterally inserted in the settlement draft.  (Exhibit L.)  A copy of that letter

was sent to the Court. That letter records plaintiffs' objection to the new Section X and requests

that the parties work together to clarify the fact that our negotiation of the $675,000 was based

entirely on attorneys' fees, expert fees and costs incurred up to December 1, 2000, and that fees,

costs and expert fees that might be incurred in the future related to enforcement activity were

never a part of the negotiations.  [Exhibit L; Affidavit of David Shaw (Exhibit A), ¶ 20].

Attorney Urban's oral response was that the Attorney General's Office could not alter a

Settlement Agreement once it had been submitted and approved by the Legislature and that the

new Section X was inserted by him, in part, to preclude any award of attorneys' fees for time

spent enforcing the Settlement Agreement.  [Affidavit of David Shaw (Exhibit A), ¶ 20].

On June 14, 2001 plaintiffs' counsel wrote a letter to inform the Magistrate Judge that

Attorney Urban's insertion of Section X into the Settlement Agreement after negotiations were

over brought the parties to an impasse, and created the unfortunate situation that the

Connecticut General Assembly approved a version of the Settlement Agreement that plaintiffs

had never seen.  [Exhibit M; Affidavit of David Shaw (Exhibit A) ¶ 22].  Plaintiffs represented

in that letter that the negotiated $675,000 settlement figure was arrived at with the assistance of

the Court to cover costs, attorneys' fees and expert fees incurred up to December 1, 2000 and

that at no time was a waiver of attorneys' fees, costs or expert fees relating to future work on

the Settlement Agreement raised or discussed.  The Court never indicated that such an issue was

on the table.  Plaintiffs also indicated that if defendants had demanded that plaintiffs waive

attorneys' fees for enforcement activity plaintiffs would not have agreed to the $675,000 figure. (Exhibit M, p. 3; Affidavit of David Shaw, (Exhibit A) ¶ 23)

Defendants' response, Exhibit N, acknowledged that there were never any discussions during the negotiations about the payment of attorneys' fees for enforcement activity and that there was never any agreement on the language in Section X. Defendants represented further that plaintiffs should not be heard to complain about the new language because the State had not included any estimates of the amount of attorneys' fees that might be incurred during the implementation phase in its calculation of the total cost of the litigation. (Exhibit N, p. 2; Affidavit of David Shaw (Exhibit A), ¶¶ 24, 25)

On August 16, 2001 Judge Martinez convened a settlement conference to address these differences. Attorneys Shaw, Laski, and Urban as well as Commissioner Sergi and the Executive Director of plaintiff Arc/Connecticut, Margaret Dignoti, were in attendance. During that conference Attorney Urban agreed with Magistrate Judge Martinez that Section X of the proposed Settlement Agreement was added by Mr. Urban after the parties had reached a negotiated agreement during the May 18, 2001 settlement conference in her chambers. Attorney Urban also agreed with the Magistrate Judge that the version of the Settlement Agreement approved by the Litigation Committee and the Connecticut Legislature contained the provision on attorneys' fees (Section X) that plaintiffs had never seen and that the

settlement agreed to by plaintiffs and defendants made no mention of attorneys' fees.  [Affidavit of David Shaw (Exhibit A), ¶ 27].  Attorney Urban also agreed that the draft of the Settlement Agreement containing the new Section X was sent to plaintiffs on June 7, 2001, two days after the Connecticut Legislature approved the document.  Plaintiffs represented that they could not agree to the new Section X because:  1) there is a well-recognized right to recover attorneys' fees and costs for reasonable and necessary actions taken by class counsel to monitor, implement and  enforce an order of a federal court, 2) that the state was well aware of this, and in fact in at least two recent negotiations had insisted on language that would have limited the amount of attorneys' fees and costs during the implementation phase but no such demand was made here, and 3) that there was no way to estimate the amount of attorneys' fees or costs that might be incurred as such amounts depended entirely on the extent to which defendants implement the orders of the Court.  [Affidavit of David Shaw (Exhibit A), ¶ 27].  Defendants also indicated during those negotiations that the estimated cost of the implementation of the Settlement Agreement is $2,410,000, nearly $100,000 less than what would be needed to make prior legislative approval mandatory under Connecticut General Statutes §3-125a.  [Affidavit of David Shaw (Exhibit A), ¶ 29; Affidavit of Margaret Dignoti (Exhibit F) ¶ 7].

At the Judge Martinez's urging, plaintiffs wrote to Attorney Urban on August 17, 2001 and proposed specific language that the plaintiffs would accept in a side letter to resolve this

dispute.  Plaintiffs requested that the Attorney General write a letter to the Magistrate Judge

containing the following clarifying language:

> The state of Connecticut does not interpret the language in Section X
> 'one-time payment' as constituting a waiver by plaintiffs of costs and
> attorneys' fees to which they may by otherwise entitled under law.  The
> State preserves any defenses it has except that it will not assert or argue
> that any language in the agreement constitutes or is a waiver to any
> claims for costs and attorneys' fees to which the plaintiffs are entitled
> under law.

(Exhibit O.).  On September 7, 2001 defendants indicated they would not agree to provide any

such assurances.  (Exhibit P.)  On September 9, 2001 plaintiffs wrote to the Court asking that

the matter be referred back to the Court for a decision on the merits.  (Exhibit Q.)

On October 19, 2001 the plaintiffs filed a Motion to Enforce and Implement Settlement

Agreement.  [Doc. ## 431, 432].  The plaintiffs argued in that Motion that the Settlement

Agreement negotiated and agreed to by the parties under the constant supervision of the

Magistrate Judge was enforceable.  The Court held a pretrial conference to discuss the

proceedings on the Motion to Enforce Settlement Agreement on November 19, 2001.  [Doc.

#445].  During that pretrial conference Attorney Urban represented that it was not the State's

intention in inserting Section X in the Settlement Agreement to preclude an award of costs and

Attorneys' fees for work during the remedial phase of the litigation.

….

MR. URBAN: I just want to say that I think it's incorrect to look at this situation and say the plaintiffs don't have an avenue to get compensation if they are able to establish the State isn't living up to the terms of this agreement if it should be executed.  As we stated all along, of course if the Court adjudicates us in contempt for not meeting the terms of the agreement, they're going to be entitled to their fees

The agreement also calls for the plaintiffs to get data at State expense and so forth.  But, you know, that was all part of the package that we thought that of course if a motion for contempt was brought and Your Honor or somebody working on your behalf found us in contempt, that we would of course be paying the reasonable costs of that action.

But to portray it as though there can be no enforcement unless, you know, this agreement allows for future fees without a finding of contempt is – I don't think does service to what we thought we had agreed to and what can be done under what is there already.

[Transcript of the Chambers Conference (11/19/01)(Exhibit R), pp. 17, 18].

THE COURT:
....

Now, we have heard from Mr. Urban just now, you say for the first time, Mr. Shaw, that this document that has been approved by the general assembly would permit you to seek an award for fees and costs associated with an enforcement action in the nature of a petition seeking to hold the State in contempt.  Not having heard that before, I gather you didn't realize that was the case. ...
....

[Transcript of Chamber Conference (11/19/01)(Exhibit R), p. 44].
....

MR. URBAN:  That's what we said all along.  If absent a finding of contempt by the court, there shall be no further fees.

12

MR. LASKI:  That's a little bit too narrow.  Under contempt, fees, basically is a sanction – part of a sanction for contempt.  …

THE COURT:  You used the phrase "substantial non-compliance" which is, I think, the phrase one sees in this field.  Is that the concept that you have in mind, Mr. Urban?

MR. URBAN:  We had in mind the concept of contempt.

THE COURT:  How does that differ from substantial non-compliance?

MR. URBAN:  I'm not certain as I sit here.

THE COURT:  To my mind there's little difference between the two.  And certainly not enough difference to justify scuttling everything that you've done.

MR. SHAW:  And, 95 percent of these motions that are filed for enforcement purposes will be settled, hopefully.  I mean, we don't want to have a contempt trial….
        ….

THE COURT:  Do you have an objection to try to nail down this part of it with the magistrate judge?

MR. URBAN:  No.  I can't promise what the Management Committee and the Attorney General – I can't promise because I'm just the middle guy here.  I'm the messenger.  But I certainly will convey that.

THE COURT:  It sounds like we have clarified the problem and it reduces itself, as far as I can tell, to whatever substantive difference might or might not exist between the substantial non-compliance standard and the contempt standard.

> If there's no difference, then we have an agreement.  And to the extent there is some difference there, I think we ought to be able to find common ground.
>
> ….
>
> THE COURT:  I don't mean to cut you off.  I'm going to call the magistrate judge and tell her about our discussion and ask her to get together with you to see if this can be resolved.
>
> ….

[Transcript of Chambers Conference, (11/19/01)(Exhibit R), pp. 48 – 51].

As the transcript reflects, the Court referred the matter back to the Magistrate Judge for further negotiations.

Magistrate Judge Martinez held a settlement conference on February 8, 2002.  [Doc. #452].  During that meeting Attorney Urban agreed, subject to the approval of the Connecticut General Assembly, that, in order to resolve the Motion to Enforce Settlement Agreement and settle the lawsuit, the defendants would not interpret Section X of the Settlement Agreement as a waiver of the right of class counsel to seek reimbursement of costs, expert fees and attorneys' fees incurred in connection with the remedial phase of the litigation.  [Affidavit of David C. Shaw (Exhibit A) ¶ 37] The essence of that agreement is documented in a letter written to Attorney Shaw by Attorney Urban on February 13, 2002, and copied to the Magistrate Judge. That letter indicates that the following agreements were reached during that negotiating session:

> The language we agreed to, pending our discussions with the legislative leadership is:

> "The defendants do not interpret Section X of the draft agreement to preclude the Court from awarding reasonable attorneys' fees and costs to the plaintiffs upon a finding by the Court that the defendants had failed to substantially comply with the consent decree. The parties agree to be bound by controlling law on the issue of attorneys' fees and costs."

> Once we have heard from the leadership, we will report back to you.

[Exhibit S].

On March 1, 2002 Attorney Urban wrote another letter to Attorney Shaw with a copy to the Magistrate Judge indicating that he had obtained the necessary approval from the General Assembly to the settlement language proposed in Mr. Urban's letter dated February 13, 2002. The relevant text of that letter states:

> The defendants have now received the necessary authorization referred to in our last letter of February 13, 2002.

> Thus, please be advised that the defendants do not interpret Section X of the draft agreement to preclude the Court from awarding reasonable attorneys' fees and costs to the plaintiffs upon a finding by the Court that the defendants had failed to substantially comply with the consent decree. The parties agree to be bound by controlling law on the issue of attorneys' fees and costs.

[Exhibit T.]

Based on these representations the parties executed the Settlement Agreement on March 28, 2002 and filed it with the Court. [Exhibit U.]

As contemplated by the Settlement Agreement and expressly stated by its terms, the plaintiffs have participated in the implementation phase of this litigation. Class counsel has participated in every meeting convened by the Expert Advisory Panel, and have submitted detailed written comments to the Panel on each of the three Annual Reports defendants have filed with the Court. [Exhibits V, W and X]. In each case plaintiffs have argued that the defendants have failed to implement the Settlement Agreement.

The Expert Advisory Panel has submitted two detailed reports to the Court on January 30, 2004 and September 30, 2004. (Exhibits Y and Z.) The findings expressed in those reports are adequately summarized in the following quotation from the September 30th Report:

> In our January, 2004 report the EAP expressed concern that the CSDE's Second Annual Report on P.J. showed little to no measurable success toward progress on the five goals [of the Settlement Agreement]. Regrettably, we conclude that the third annual report …continues to reflect little or no measurable progress.

Expert Advisory Panel Report to The United States District Court of September 30, 2004 (Exhibit Y), p. 1.

On October 4, 2004 plaintiffs filed a Motion for an Award of Costs and Attorneys' Fees incurred during the period following the negotiation of the Settlement Agreement – 1/3/01 – 9/24/04. [Doc. ## 482, 483]. The plaintiffs assert they are entitled to reimbursement for costs and attorneys' fees incurred during three distinct periods of time: From November 29, 2000 to

March 20, 2002 for negotiating plaintiffs' fee claim to that date and securing a final Settlement

Agreement after defendants' unilateral changes to the test caused the negotiations to break

down; from March 21, 2002 through May 22, 2002 for drafting a Notice to the proposed

settlement to the class and securing a Court Order approving the Settlement Agreement; and

June 4, 2002 through September 24, 2004 for implementation and monitoring contemplated by

the Settlement Agreement.

On November 17, 2004 the defendants filed a memorandum in opposition to the Motion.

[Doc. # 485]. In that brief defendants argue that plaintiffs are not entitled to reimbursement for

costs or attorneys' fees incurred for three reasons: First, defendants argue that by agreeing to

Section X of the Settlement Agreement plaintiffs waived all claims to costs and attorneys' fees

incurred. Second, defendants assert that plaintiffs are not entitled to reimbursement for any

costs or attorneys' fees incurred because they are not prevailing parties under *Buckhannon*

*Board and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S.

598, 610 (2001). Third, defendants argue that fees and costs should not be awarded because the

claim is "excessive and improper."

Plaintiffs submit this Reply brief to respond to the defendants' argument that plaintiffs

have waived their right to all costs and attorneys' fees in this litigation after December 31,

2000, and to clarify that as the prevailing party in this lawsuit plaintiffs are entitled to a fully

compensatory award of costs and attorneys' fees under controlling law

## II.    ARGUMENT:

### 1.  Plaintiffs Have Not Waived Their Right To Reimbursement For Attorneys' Fees and Costs Incurred in During the Implementation Phase.

Defendants argue on page 3 of their memorandum that by agreeing to the language in

Section X of the Settlement Agreement that states that "[t]he Defendants shall make to the

Plaintiffs … a one-time payment of $675,000 in attorneys' fees and costs…", and the language

in Section XI that states that "[t]his agreement contains the complete and sole agreement of the

parties", plaintiffs have "explicitly waived" any and all right to claim reimbursement for costs

and attorneys' fees during the eight-year remedial phase of this litigation.

The defendants rely primarily on *Evans v. Jeff D.*, 475 U.S. 717 (1986).  *Evans v. Jeff D.*

does not support defendants' position, however.  In *Evans*, plaintiffs' attorney was employed by

the Idaho Legal Aid Society, Inc., a private, nonprofit corporation that provides free legal

services to qualified low-income persons.  *Evans v. Jeff D.*, 475 U.S. at 721. Shortly after the

defendants filed their answer, and before substantial work had been done on the case, the parties

entered into settlement negotiations.  They were able to reach agreement concerning that part of

the complaint relating to educational services with relative ease and, then entered into a

stipulation disposing of that part of the case.  The stipulation provided that each party would bear "its own attorneys' fees and costs thus far incurred."  *Id*.  The Court entered an order approving the partial settlement shortly thereafter.  *Id*.

Subsequently, the parties settled the remainder of the lawsuit.  This aspect of the settlement contained the following provision: "Plaintiffs and defendants shall each bear their own costs and attorney's fees thus far incurred."  *Id* at 722.  The Court concluded from reviewing the correspondence between counsel and the record that the attorney initially rejected offers of settlement containing a fee waiver, but ultimately determined that his ethical obligation to his clients mandated acceptance of the proposal containing the fee waiver.  *Id*. Plaintiff's counsel then filed a motion with the court urging it to accept the settlement except for the provision on costs and attorney's fees.  *Id*.  The district court rejected counsel's argument that defendants had exploited his ethical obligation to his client to obtain the fee waiver, approved the settlement and rejected counsel's request for costs and attorneys' fees.  *Id*. at 723. The Court of Appeals reversed and invalidated the fee waiver, based on its obligation to approve settlements of class actions and the strong federal policy embodied in the Civil Rights Attorneys Fees Act requiring an award of costs and attorneys' fees for prevailing parties.  *Id*. at 734, 725.

The Supreme Court reversed, holding that the Civil Rights Attorneys' Fees Act does not require disapproval of a stipulation seeking to settle a civil rights class action under Rule 23 when the settlement is expressly conditioned on waiver of statutory eligibility for attorney's fees. *Id*. at 729, 730. The Court noted that such waivers may be voidable where a state's practice of insisting on fee waiver's in civil rights cases is involved, when the defendants have "no realistic defense on the merits," or if the waiver was part of a "vindictive effort…to teach counsel that they had better not bring such cases." *Id*. at 739, 740. The Court also noted that fee waivers may be precluded there as "the situation presents a grossly unfair choice to the plaintiff and his/her counsel, and permitting such offers to be made would seriously undermine the purpose of the shifting provisions. *Id.* at 740 n. 32. The Court found it unnecessary to address these exceptions however, because there was an insufficient factual basis in the record. *Id*. at 740, 741.

It is readily apparent that this case is distinguishable. First, it is obvious that the explicit waiver of costs in *Evans v. Jeff D*. (i.e. Each party shall bear "its own attorneys' fees and costs thus far incurred.") is not present here. Section X of the Settlement Agreement provides:

X.  <u>Payment</u>

The defendants shall make to the Plaintiffs in *P.J. et. al. v. State of Connecticut Board of Education, et. al,* a one-time payment of $675,000 in attorneys' fees and costs, payable to

Attorney David Shaw, attorney for the Plaintiffs, within ninety
(90) days of the effective date of the approval of this Agreement.