UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P.J., et al., | : | CIVIL NO. |
| *Plaintiffs,* | : | 291CV00180(RNC) |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, et al. | : | |
| *Defendants* | : | SEPTEMBER 28, 2007 |

## <u>DEFENDANTS' MEMORANDUM IN OPPOSITION<br>TO PLAINTIFFS' "MOTION TO COMPEL"</u>

The defendants in the above action respectfully submit this memorandum in opposition to

plaintiff's "Motion to Compel," (Doc. #532) and accompanying memorandum (Doc. #533).[1]  As

the Exhibits attached to Plaintiffs' Motion to Compel demonstrate, defendants have made every

reasonable effort to provide plaintiffs with the information and data requested consistent with the

parties' Settlement Agreement, directives of the United States Department of Education

("USDOE"), and fair resource allocation.

I. <u>Nature of the Case</u>

This discovery dispute is rooted in a Special Education lawsuit brought "in 1991 by five

school-aged children with mental retardation and their families against the Connecticut State

Board of Education, the State Commissioner of Education and certain local school districts

alleging violation of 20 U.S.C. § 1412(a)(5)(A)." <u>See</u> Settlement Agreement dated February 28,

2002, attached as Exhibit 1.  On December 13, 1993 the case was certified as a class action as to

the claims against the state defendants.  The court defined the class as: "All mentally retarded

---

[1] This memorandum is being filed in accordance with, <u>inter alia</u>, D. Conn. L. Civ. R. 37 which sets forth the specific procedures to be followed in discovery disputes.  Respectfully, plaintiffs' Memorandum in Support of their Motion to Compel contains many statements about what defendants have or have not done since the Settlement Agreement. Although defendants disagree with most of these statements, in order to be consistent with the requirements of Local Rule 37 defendants have largely declined to address those statements.

school-age children in Connecticut who have been identified as needing special education and who, on or after February 20, 1991, are not educated in regular classrooms." Doc. # 224. On February 28, 2002, following years of litigation and a trial, the parties settled.

Relative to this discovery issue, the Settlement Agreement provides: "[t]he jurisdiction of the Court for enforcement of this Agreement will end five (5) years from the empanelling of the Expert Advisory Panel (EAP) called for in section IX [of the Settlement Agreement], except that the Court, for a period of eight (8) years from empanelling of the EAP, shall have jurisdiction to entertain Plaintiffs' motions for substantial non-compliance with this Agreement." See Exhibit 1. Additionally, the Settlement Agreement provides that the plaintiffs shall have the right to collect data relating to the students in the class "to the extent allowed by state and federal statute." See Exhibit 1.

II. Items of Discovery Sought/Opposed

    A. Interrogatory #3

Plaintiffs' "Motion for Disclosure and Production" dated March 30, 2007 interrogatory #3 states: "Please explain why each set of the students listed in Exhibit A appear, disappear and reappear in the data set." See Plaintiffs' Memorandum in Support, Exhibit A at 3.

Reason Why the Request Should be Allowed or Disallowed:

This request should be disallowed at this time for two reasons: (1) As explained in the defendants' answers dated May 21, 2007 and July 2, 2007, prior to 2006, the manner in which the data in defendants' possession was compiled does not allow defendants to provide an answer to this interrogatory without a massive dedication of personnel; (2) the only way at this time to provide plaintiffs with the information necessary to complete this answer would require CSDE to

release confidential information on non-class members to the plaintiffs[2]; the release of this confidential information is unnecessary because the defendants have repeatedly informed plaintiffs that they are working on a longitudinal database that will answer this and related questions. This database, to be completed this fall, will be shared with the defendants and the sharing of it will not, unlike the plaintiffs' request, violate any state or federal privacy laws.

First, defendants explained in their first response that Exhibit A represented 2727 instances of students moving in and out of the dataset, not 2727 students. See Plaintiffs' Memorandum in Support of Motion to Dismiss dated August 21, 2007 ("Memo in Support"), Exhibit B. Defendants also stated that they could not confirm either the instances or the number of students who actually move "in and out" of Exhibit A because we did not know what analytic procedure was used by plaintiffs to create Exhibit A. Defendants did acknowledge that the example of ACAMPA1207882 was accurate.

Defendants received a letter from plaintiffs dated June 19, 2007 and responded via letter on July 2, 2007. See Memo in Support, Exhibits C and D. Defendants confirmed in their letter that the plaintiffs' analysis presented in Exhibit A is correct based on defendants knowledge of the process plaintiffs used to create the analysis and the information available to the plaintiffs for conducting the analysis. What defendants tried to clarify was that student data would appear to be missing because the plaintiffs only have data for students who were reported as "active" students with an intellectual disability receiving services under an Individualized Educational Program ("IEP") in that given year. These are the data defendants use to report out on progress on the settlement agreement. Students who have exited or who changed disability were not

---

[2] Plaintiffs "acknowledge that production of all data on class members may mean that databases containing identifying information about class members and non class members will have to be produced." Memo in Support at 7 (emphasis added). Defendants respectfully submit that the wholesale turning over of "all data" will definitely provide plaintiffs with identifying information on class members and non class members.

previously provided to the plaintiffs because: 1) the Least Restrictive Environment ("LRE") data for students who have exited does not factor in to an assessment of progress on those indicators (e.g., if a student is not actively receiving services under an IEP, then that student's data is not figured into our calculation of mean time with nondisabled peers); 2) in the Personal Computer Integrated Special Student Information System ("PCI"), active students may also have inactive or exited records, so within a given year, determining who is exited (has no active record) and who has two records, one with an exit code and one without, is a manual cleaning process that is not typically done at the state; and 3) in order to determine which class members have been reported under a different disability in subsequent years of data, you need to match the records of class members against the entire database for special education students in subsequent year(s) of data. Plaintiffs' requests would require us to release information on non-class members to the plaintiffs, a likely violation of FERPA. See Doc. # 504; Letter from AAG Ralph Urban to Attorney Shaw, dated May 25, 2004 with attached letter from LeRoy S. Rooker, Director, Family Policy Compliance Office, U.S. Department of Education, Exhibit 2.

In defendants' July 2, 2007 letter, defendants informed plaintiffs that the longitudinal analysis of class members being created by the defendants will provide the plaintiffs with what they need to answer their questions regarding how many class members have changed disability category and/or been permanently exited from the PCI database without violating FERPA.[3] See Memo in Support, Exhibit D at 5 ("Once we extract the information from the all student dataset in our Longitudinal Analysis of Class Members, we will release this information to the plaintiffs. This will yield a dataset that will enable a true depiction of Class Members placement, programs and disability labels over time to the greatest extent that the data will permit.") A far less drastic

---

[3] See Letter from AAG Ralph Urban to Attorney Shaw, dated May 25, 2004 with attached letter from LeRoy S. Rooker, Director, Family Policy Compliance Office, U.S. Department of Education, Exhibit 2.

release of information is therefore available to the plaintiffs. Notwithstanding plaintiffs

statement that they "do not have confidence that any such analysis will be independent, timely[4]

or will address plaintiffs' many concerns about the CSDE databases[5]" it is submitted that,

consistent with the rules governing discovery disputes, this court should first allow defendants to

produce to plaintiffs the longitudinal analysis being created. Again, this analysis will have the

benefit of providing plaintiffs with the information they require without the releasing of

confidential information.[6]

    B. Interrogatory #4

    Interrogatory #4 states

        The data also reveals that many students appear in the data set for one or more
        years, then exit the data never to return. Please identify each student who has so
        appeared and then exited the data set.

---

[4] Respectfully, defendants have been inundated with requests from plaintiffs that have consumed much of CSDE's time that could otherwise be spent on forwarding the goals of, inter alia, the Settlement Agreement. For example, since the filing of this motion to compel defendants have shared two more sets of information pursuant to discovery requests, as well as two boxes of materials responsive to an August 10, 2007 FOIA request made by plaintiffs' counsel. Defendants understand and respect their obligation when such requests are made, but plaintiffs must recognize that such requests require CSDE to divert other efforts to fulfilling those requests.

[5] In fact, there is a strong argument to be made that the longitudinal analysis defendants are preparing will be far more reliable than a similar analysis plaintiffs would produce if given access to all students. This is so as a result of the status of some of the data that will be "cleaned" by CSDE as it prepares the longitudinal analysis. An example illustrates this point: in 2002, there is a student who was reported in PCI as having an intellectual disability. The student's Compid was reported as SMITHB0212851. Districts reported names in PCI for the first time in 2002, and the name corresponding to this student is BEN SMITH. In 2003, a student with ID was reported with the Compid SMITHP0212851, and the name corresponding to the student is PAUL SMITH. There is no Compid or record for BEN SMITH in 2003 and there is nothing in PAUL SMITH's 2003 record to indicate that he has a twin. A call to the school revealed that SMITHB0212851 in 2002 and SMITHP0212851 in 2003 are in fact the same student. For several years the district used the student's official first name BEN and in one year they switched to using the student's middle name, PAUL which was then accidentally entered as his official name in one year of data.

If you just do a straight match of these two year's records, it would appear that SMITHB0212851 (BEN SMITH) disappears in 2003 and SMITHP0212851 (PAUL SMITH) is newly identified in 2003 as having an intellectual disability in 2003. Although this student's data was appropriately and accurately represented in the 2002 and 2003 aggregate data, when you try to track the student's status over time, without accounting for this data entry error, the conclusion could be drawn that we "lost track" of the student, when in fact we have not.

[6] Plaintiffs cite to various cases in an effort to support their contention that confidential information should be turned over to them. For purposes of complying with Local Rule 37, defendants have in this section of their brief chosen to stress this alternative route. However, the cases cited by plaintiffs are discussed infra.

<u>Reason Why the Request Should be Allowed or Disallowed:</u>

As stated above, this interrogatory will be answered via the Longitudinal Analysis of class members as referenced in defendants' July 2, 2007 letter. Put another way, it can only be answered via the manual matching and cleaning of student records over time using each of the entire PCI databases compiled annually 1998-2005 for the reasons noted above. Again, because defendants are working to create the longitudinal analysis that will give plaintiffs the answers they seek, CSDE does not believe it would be prudent or appropriate to release to plaintiffs the confidential information of non-class members that would allow plaintiffs to make this determination on their own. <u>See</u> Exhibit 2.

C. <u>Interrogatory #5</u>

For each student identified in response to interrogatory 4, please provide the following information:
a. Exit date;
b. Exit reason (categories in Handbook p. 27);
c. On exit reason, please identify which class members were reclassified into another disability type, and the IDEA disability category into which each such class member was reclassified into; and
d. For class members who no longer receive special education (exit reason = 4), please explain why. If this information is not available in the PCI data, please explain why not.

<u>Reason Why the Request Should be Allowed or Disallowed:</u>

Again, except for item "d." this request will also be answered by the Longitudinal Analysis of class members as referenced in defendants July 2, 2007 letter. Defendants respectfully assert that this request be disallowed at this time and that item "d." be disallowed entirely, for the reasons set forth below.[7]

---

[7] If the PCI database does not contain information explaining why students have received exit code 4, part "d" of this interrogatory requires CSDE to explain why. This explanation is given <u>infra</u>.

Item "d." will not be informed by the Longitudinal Analysis because "exit reason 4" is a code that is used to indicate a student is no longer receiving special education services under an Individualized Educational Program ("IEP"). Interrogatory #5, part d. requests that defendants explain how/why that decision was made for each class member. Defendants' data system does not collect the specifics of <u>how</u> that decision was reached and thus defendants are unable to answer the question. A student receives an exit code of 4 because an IEP team determined the student no longer required special education or because a parent withdrew the student from Special Education.

An analogy provides further information as to why defendants are unable to provide further information: When a student is reported as graduated, exit code 1 is used. If someone wanted to know what requirements the student met in order to graduate, CSDE would be unable to provide that information. CSDE doesn't collect how many credits and in what courses the student earned credits to graduate, but merely records the exit code on the basis of the school districts' representations.

With respect to exit reason 4, CSDE does not necessarily have further information on that student other than that, by definition, a student can be reported as exiting with a code of 4, no longer receiving special education, if the student was served in special education during the previous reporting year but at some point during that 12-month period, an IEP team determined the student no longer required special education or was withdrawn from special education by a parent. Students with an exit code of 4 are students who no longer have an IEP and are receiving all their educational services from a general education program. Thus, the confidential information in the PCI database for all students with a disability that is being requested by the plaintiffs will not further inform Interrogatory #5 d. Once a student receives a code of 4, that

student is removed from subsequent year's PCI databases (as that database only records data on students with disabilities) and no further data is collected to explain why the student received a code 4.

D. Request for Production 4

Request for Production 4 provides: "4. Produce all data or students who have been exited, whether from the PCI data base or other CSDE data bases."

Reason Why the Request Should be Allowed or Disallowed:

On August 31, following the filing of plaintiffs' Motion to Compel defendants provided the plaintiffs with any student record in the PCI database years 1998-2005 where the reported disability was Intellectually Disabled ("ID") and where there was an exit code reported. See Exhibit 3, attached. There is not a one to one correspondence between these students and those that have permanently exited the dataset because students can have both an exited record and an active record (e.g., Student exits district A with an exit code of moved and then enrolls in District B where there is then an active record created for that student.). In other words, some of the students NOT in plaintiff's Exhibit A (those students that have an active record over the years 1998-2005 and do not disappear from the dataset over time) may still have an exit record in the data that were provided on September 1. Determining who is a "true" exit (exits never to return) and who is a student who, for example, moves from one district to another but is always reported as having an intellectual disability across time, will, too, be handled by the Longitudinal Analysis of Class Members.

III. Additional Reasons Plaintiffs' Motion Should be Denied

A. The Court Lacks Jurisdiction to Entertain Plaintiffs' Motion

As noted above, the Settlement Agreement provides "[t]he jurisdiction of the Court for enforcement of this Agreement will end five (5) years from the empanelling of the Expert Advisory Panel (EAP) called for in section IX [of the Settlement Agreement], except that the Court, for a period of eight (8) years from empanelling of the EAP, shall have jurisdiction to entertain Plaintiffs' motions for substantial non-compliance with this Agreement." The EAP was empanelled more than five years before the filing of plaintiffs' motion. See Letter of July 22, 2002 from Anne Louise Thompson to the EAP, attached as Exhibit 4 ("Thank you all for joining us in Connecticut to implement the Settlement Agreement in the case of P.J., ET AL v STATE OF CONNECTICUT, BOARD OF EDUCATION, ET AL."). Accordingly, by agreement of the parties as reflected in the Settlement Agreement the only matter on which the court continues to have jurisdiction is a motion for "substantial non-compliance."

Plaintiffs have filed a discovery motion to this court not permitted under the Settlement Agreement. Because the underlying motion is clearly separate and distinct from a motion for "substantial non-compliance"[8] and is not addressed by the Settlement Agreement, the court lacks jurisdiction[9] to entertain it. See In re Air Crash Disaster at JFK Int'l Airport, 687 F.2d 626, 629 (2d Cir. 1982).

B.    Under the Settlement Agreement Plaintiffs Are Not Entitled to the Materials They Seek

Plaintiffs argue that "[i]t is well established that state and federal statutory privileges, such as those involved here, do not necessarily preclude the disclosure of documents and data in

---

[8] As is discussed infra, if the court determines that plaintiffs' filing is proper, the Settlement Agreement provides that plaintiffs shall have the right to collect data relating to students in the class "to the extent allowed by state and federal statute." Plaintiffs are clearly seeking materials not permitted by federal statute. See Plaintiffs' Memorandum in Support at 7 – 11; Exhibit 1.

[9] Additionally, Federal Rule of Civil Procedure 37 requires that a motion to compel "disclosure or discovery... shall be made to the court in which the action is pending." (Emphasis added.) As noted above and as is reflected on the docket sheets, this case is not "pending" and thus the Settlement Agreement – as agreed to by both parties -- defines the role of the court.

9

federal civil rights lawsuits." Memorandum in Support at 7-8. However, this argument misses the mark. Assuming plaintiffs are permitted to file discovery motions – a point defendants do not concede -- the Settlement Agreement is a contract, and the law clearly provides that "settlement agreements are contracts and must therefore be construed according to general principles of contract law." Red Ball Interior Demolition Corp v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999). Again, the Settlement Agreement unambiguously provides that the plaintiffs shall have the right to collect data relating to the students in the class "to the extent allowed by state and federal statute…." Exhibit 1, § I.3.

While a district court may enforce a settlement agreement when it properly retains jurisdiction to do so, see supra, such retention of jurisdiction does not empower the court to modify the agreements terms, absent special circumstances such as material breach or duress. In re Air Crash Disaster, 687 F.2d at 629. If the terms of a settlement agreement are unambiguous, "courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Palmdessa, 173 F.3d at 484.

Under principles of contract law, the plaintiffs' motion raises several issues. Namely, does the Settlement Agreement contractually bind the defendants to provide plaintiffs' counsel personally identifiable information when counsel have been provided essentially all other data and will receive more data in the future? Defendants believe the plain wording of Section I.3 of the Settlement Agreement establishes the defendants are not so bound.[10]

---

[10] In their brief, plaintiffs assert "Defendants obviously cannot argue they have made adequate progress based on data that overlooks one-third of the class or that is based on count of students that is inaccurate." Memo in Opposition at 6. Defendants respectfully submit that this is not "obvious" because the five goals listed in the Settlement Agreement do not address these issues. Plaintiffs fail to cite which portion of the Settlement Agreement is violated by a reduction in class size.

Even assuming, arguendo, the defendants are so bound under the Settlement Agreement it's quite possible that those provisions would be void for violating public policy or law, namely, the Family Educational Right to Privacy Act, 20 U.S.C. § 1232g, and the regulations promulgated thereunder ("FERPA"), as determined by the USDOE.  See, e.g., Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 20 (1979) (No enforcement of contract that violates, and therefore is void under Investment Advisors Act of 1940); NLRB v. Sheet Metal Workers Local 38, 575 F.2d 394 (2d Cir. 1978)(interest arbitration provision in contract is unenforceable to the extent it applies to nonmandatory bargaining subject); Wheelabrator Environmental Systems v. Galante, 136 F. Supp. 2d 21 (D. Conn. 2001).  And, finally, if the contract requires providing such personally identifiable information, and such a requirement is not void, do these circumstances warrant the Court ordering the extraordinary remedy of specific performance?  See Lucente v. IBM, 310 F.3d 243, 262 (2d Cir. 2002)(Before extraordinary remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice); accord Leasco Corp. v. Taussig, 473 F.2d 777, 786 (2d Cir. 1972).

As stated previously by defendants and reflected in the attached letter from USDOE, USDOE – taking into account the Settlement Agreement – has forbade the defendants from disclosing personally identifiable information regarding the students at issue, absent written notice to parents and guardians, with sufficient time for parents and guardians to object (and by implication a record keeping system to keep track and honor such objections).  See Exhibit 1. Here, plaintiffs seek access to the confidential records of some 72,000 students in the 1998 database with an increasing number of newly identified students in each subsequent year through the 2005 database.  At the very least, in order to fulfill this request and be consistent with

USDOE directives the defendants would have to contact the appropriate parents and guardians of each of these students since 1998-2005. Based on resources as well as the lack of contact information for the vast majority of the students CSDE is unable to perform this Herculean task.[11] Contact information (phone number, address, etc.) on all students with disabilities was not collected during the years of data which are being requested, 1998-2005, except that obtained as a result of "active" class members. The collection of contact information for all students with disabilities began in 2006. And, even if defendants could perform this task, given the extensive work already performed on the Longitudinal Database – which will in almost all respects answer the plaintiffs questions – it is respectfully submitted that the Longitudinal Database is a much more viable and appropriate option.

Plaintiffs argue:

The defendants' response is unacceptable to plaintiffs. This Court ordered the implementation of this Settlement Agreement on May 22, 2002. Paragraph I.2. of the Settlement Agreement requires defendants to prepare and distribute to the parties and the court a list of public school students in Connecticut who carry the label of either mental retardation or intellectual disability and to update that list annually. The defendants have failed to meet this requirement of the Settlement Agreement. Despite the complaints of the [EAP] and plaintiffs over the past five years, the defendants have failed to provide and update a list of class members...

Motion to Compel at 2-3 ¶6. Contrary to plaintiffs' assertion, the Settlement Agreement required that the defendants "prepare and distribute to the parties and the court a list . . . ; such list shall be updated periodically." Exhibit 1, § I.3 (Emphasis added.) A list was provided by defendants each year a report was filed with the court as Appendix G consistent with what was permissible under state and federal statutes (specifically FERPA). By adding each new year's list

---

[11] Again, it must be noted that defendants have a viable alternative: plaintiffs can wait several weeks for the completion of the Longitudinal Analysis.

to the prior year's list, all class members were updated and provided to the plaintiffs on an annual basis (2002-2005)

When the issue of providing student identifiable information was settled in 2005 the plaintiffs were then given this information with class member student identifiable information that were identified as ID on December 1 of each year 1998 through 2005 through the PCI databases provided.

### C.    The Cases Cited by Plaintiffs are Inopposite

Plaintiffs argue that they have a compelling need for personal identifying information on every student receiving special education in the State of Connecticut since 1998 in order to adequately represent the class members. See Memo in Support at 7-11. Plaintiffs then cite several cases in support of their statement that "[f]ederal courts have repeatedly allowed broad discovery on issues involving client confidentiality when the need for disclosure outweighs privacy concerns."[12] Memo in Support at 8.

Plaintiffs extensively cite Lora v. Bd of Ed. of the City of New York, 74 F. R. D. 565 (E.D.N.Y.1977) in support of their motion. In fact, the decision rendered in Lora is inapposite to plaintiffs' claim. In Lora, Judge Weinstein ultimately ruled that the psychiatric and social work records of school children that would be made available to the plaintiffs' experts would be non-identifiable. The Lora case clearly cannot be used to argue for the release of identifiable information on tens of thousands of Connecticut's children. Plaintiffs' extensive discussion of the four pronged test described in the Lora decision is therefore irrelevant when the material being requested does not meet the basic confidentiality standard protected in the Lora order.

---

[12] Again, as discussed supra, the need for disclosure here is severely diminished by the fact that defendants have proposed an alternative disclosure procedure – the longitudinal database – whereby no confidential material will be released.

Plaintiffs also cite <u>Burka v. NY Transit Authority</u>, 110 F.R.D. 660, 663-664 as relevant with respect to requiring state privilege to be recognized "where this can be accomplished at no substantial cost to federal substantive and procedural policy." Defendants respectfully submit that the wholesale release of the entire data base for every student receiving special education in Connecticut since 1998 with personally identifying information without consent or opportunity for objection on the part of the students and their parents/guardians clearly cannot be accomplished without substantial violation of FERPA and its accompanying regulations. 20 U.S.C. § 1232g.

Finally, Plaintiff's cites <u>Doe v. Meacham</u>, 126 F.R.D. 444, 449-450 (D. Conn. 1989) and notes that the court required psychologist-patient communications for HIV-infected inmates be disclosed to plaintiff in discovery. However, here, unlike <u>Meacham</u>, the material requested by the plaintiffs is not confined to either one group of students or to one specific type of information. <u>Meacham</u> would only apply here if the plaintiffs had sought the personal health record of <u>every inmate confined in the State of Connecticut over a period of 8 years</u>. The scope of information and the numbers of individuals whose rights would be affected by such a disclosure are therefore unparalleled in any of plaintiffs' legal arguments.

Accordingly, and for the reasons stated above, the defendants respectfully urge the Court to deny plaintiffs' motion.

DEFENDANTS
STATE OF CONNECTICUT ET AL

RICHARD BLUMENTHAL
ATTORNEY GENERAL

/s/ Darren P. Cunningham

Darren P. Cunningham
Assistant Attorney General
Federal Bar No. ct25380
P. O. Box 120
Hartford, CT 06141-0120
Tel.: (860) 808-5210
Fax: (860) 808-5385

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure on this 28th day of September, 2007, first class postage

prepaid to:


The Honorable Donna Martinez
United States Magistrate Judge
450 Main Street
Hartford, CT 06103

David C. Shaw, Esq
34 Jerome Avenue
Suite 210
Bloomfield, CT 06002

Frank Laski, Esq
Mental Health Legal Advisors Committee
294 Washington St.
Suite 320
Boston, MA 02108


/s/ Darren P. Cunningham
Darren P. Cunningham
Assistant Attorney General

Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P.J., ET AL | : | CIVIL ACTION NO. |
| *Plaintiffs* | : | 291CV00180 (RNC) |
| | : | |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| BOARD OF EDUCATION, ET AL | : | |
| *Defendants* | : | FEBRUARY 28, 2002 |

## SETTLEMENT AGREEMENT

## INTRODUCTION

This case was filed in 1991 by five school-age children with mental retardation and their families against the Connecticut State Board of Education, the State Commissioner of Education and certain local school districts alleging violation of 20 U.S.C. § 1412(a)(5)(A). Later, four statewide associations of persons with disabilities were granted the status of intervening parties.

On December 13, 1993 this case was certified as a class action as to plaintiffs' claims against state defendants. The court defined the class as: "All mentally retarded school-age children in Connecticut who have been identified as needing special education and who, on or after February 20, 1991, are not educated in regular classrooms." C.A.R.C. v State of Connecticut Board of Education, 2:91CV00180 (JAC), Ruling on Motion to Reconsider Denial of Motion for Class Certification, slip op. at 6 (D. Conn. December 13, 1993).

The state defendants deny the allegations in the plaintiffs' Amended Complaint in this case and admit no liability for the actions claimed therein. All parties to this litigation seek a resolution that is consistent with the requirements of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., its implementing regulations, and any other relevant federal law, and the provisions of state law and regulations.

The parties acknowledge and agree that each class member has an equal right to a free, appropriate public education. The defendants share with the LEAs the obligation to ensure that "to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (20 U.S.C. § 1412(a)(5)(A)) See also, C.F.R. § 300.550 through 300.552 regarding least restrictive environment. The parties agree to the following to implement these rights and obligations.

I.   **Class Membership**

1.   The parties agree that all school-age children labeled mentally retarded on or after February 20, 1991 who are not educated in regular classrooms will be class members as well as all students with the label "Intellectual Disability/Mental Retardation" who are not educated in the regular classroom. Students who either graduate or reach maximum age for eligibility for special education ("age out") will no longer be

considered class members. No student will lose his status as a class member due to the re-naming or re-labeling of his/her disability category from mental retardation to intellectual disability.

2.  The defendants shall prepare and distribute to the parties and the court a list of public school students in Connecticut who on or after December 1, 1999 carry the label of either mental retardation or intellectual disability and who are eligible for special education; such list shall be updated periodically.

3.  The plaintiffs shall have a right to collect data relating to the students identified in number 2. above and to challenge the adequacy of that list. CSDE shall cooperate with the plaintiffs to gain access to data and files relating to class members, to the extent allowed by state and federal statute, for all purposes relating to the enforcement and implementation of this Agreement. As with all other aspects of this Agreement, Plaintiffs' right to this data and these files shall end should the court end its jurisdiction and dismiss this matter as provided under Section III below.

**II.   Goals and Outcomes**

The parties agree that the desired outcomes for educational programs for students with mental retardation or intellectual disability consist of five main overall goals stated below.

1.  An increase in the percent of students with mental retardation or intellectual disability who are placed in regular classes, as measured by the federal definition (eighty (80) percent or more of the school day with non-disabled students).

2.  A reduction in the disparate identification of students with mental retardation or intellectual disability by LEA, by racial group, by ethnic group or by gender group.

3. An increase in the mean and median percent of the school day that students with mental retardation or intellectual disability spend with nondisabled students.

4. An increase in the percent of students with mental retardation or intellectual disability who attend the school they would attend if not disabled (home school).

5. An increase in the percent of students with mental retardation or intellectual disability who participate in school-sponsored extra curricular activities with non-disabled students.

Within sixty (60) days of the Court's approval of this agreement, the defendants will establish statewide and individual LEA baseline data for the main goals stated above with the exception of the goal related to home school and the goal related to participation in extra-curricular activities. The baseline data for the goals related to participation in extra-curricular activities and home school will be established as a result of the December 2001 data collection. All baseline data and data relating to changes from baseline will be provided to the plaintiffs and members of the expert panel. The defendants commit to achieving meaningful continuous improvement annually with respect to goals #1 and #4 and continuous improvement with respect to goals #2, #3, and #5. Reporting will begin September 30, 2002 for goals #1 through #3. With respect to goals #4 and #5 reporting will begin as of June 30, 2003.

## III.  Continuing Jurisdiction

1. The jurisdiction of the Court for enforcement of this Agreement will end five (5) years from the empanelling of the Expert Advisory Panel (EAP) called for in section IX,

4

except that the Court, for a period of eight (8) years from empanelling of the EAP, shall have jurisdiction to entertain Plaintiffs' motions for substantial non-compliance with this Agreement. In no event shall the Court's jurisdiction over this Agreement exceed eight (8) years beyond the empanelling of the EAP. The Defendants shall cooperate with the Plaintiffs' reasonable requests to provide existing data to enable Plaintiffs to assess compliance during the five-to-eight year period.

For a period of four (4) years after the effective date of this agreement, the Defendants shall prepare an annual written report which:

> a.  identifies CSDE activities related to the five stated goals and implementation of this Agreement for the prior school year;
>
> b.  reports on all statewide and district-by-district data related to class members; and
>
> c.  reports on the documented progress on each stated goal.

The report will also set forth CSDE's proposed activities for the next school year to implement this agreement. The annual report will be submitted to the Court, the Expert Advisory Panel (EAP), and the Plaintiffs for review no later than June 30th of each year, except for the first report. The first report shall be submitted September 30, 2002; the final report will be submitted June 30, 2005. The parties will meet annually to discuss CSDE implementation and ways to effectively increase progress towards the achievement of each of the stated goals. See *Section IX, Expert Advisory Panel* for related information. The annual reporting

requirements of this paragraph shall terminate in June of 2005 unless the Court issues further orders extending the reporting period.

2. The Defendants shall have the right at any time to move or petition the Court for an end to the Court's jurisdiction and for dismissal of the matter based on the Defendants' substantial compliance with the terms of this Agreement.

## IV. Responsibility

1. The Connecticut State Board of Education has issued a position statement with regard to the education of children with disabilities. The Parties agree that this position statement (attached to this agreement) reflects the intent of IDEA.

2. The Defendants will issue a policy letter from the Commissioner of Education within ninety (90) days of the Court's approval of this Agreement, which reiterates the Board position and which affirms the right of each child with mental retardation or another disability to be educated with non-disabled children to the maximum extent appropriate.

In addition, the Defendants will issue a policy memorandum from the Chief of the Bureau of Special Education and Pupil Services of the Connecticut State Department of Education (CSDE) that reiterates the individual student decision-making process that must be followed by the Planning and Placement Team (PPT) with regard to identification of the least restrictive educational environment for each child who has mental retardation and other disabilities, including the requirement that the PPT consider the placement of the student in regular classes with supplementary aids and services.

The policy memorandum shall inform LEAs that the CSDE shall conduct oversight activities to ensure that class members, whenever appropriate, are placed in regular classes, in home schools, and in extracurricular activities with appropriate supplemental aids and services, that promising practices are used with regard to instruction in regular classes, and that, whenever appropriate, class members who are placed out of district will be returned to their home districts.

The policy memorandum shall inform LEAs of the joint state and local obligation to work towards the greater successful inclusion of students with mental retardation in all aspects of the school program through actions such as placement in home schools and regular classes, participation in extracurricular activities with appropriate supplementary aids and services, and use of promising practices with regard to instruction in regular classes.

The policy letter and policy memorandum will be forwarded together with a copy of this Settlement Agreement to each superintendent of schools, each member of the school board of each LEA, each IDEA hearing officer, and each teacher preparation program in Connecticut.

## V.    Program Compliance Review (Monitoring)

1.  CSDE will establish a targeted, data-based monitoring system to facilitate continuous improvement in each of the stated goals of this Agreement. The monitoring system established by the defendants shall enable defendants to collect, analyze, and use quantitative and qualitative information and data to identify problems and provide

consistent feedback to all LEAs on their performance in achieving the five stated goals of this Agreement.

2. In addition, state defendants will monitor the participation and progress of students with mental retardation or intellectual disability in the general curriculum, use of out-of-district placements, and use of, in CSDE's judgement, promising practices with respect to the education of class members with non-disabled students. State defendants will also monitor the availability of supplementary aids and services to support the regular class placements of such students and the implementation of hearing officers' final decisions related to LRE for such students.

3. The focus of monitoring activities will be continuous improvement. Districts that are not making satisfactory progress toward the stated goals established pursuant to this agreement, or found deficient as a result of monitoring established pursuant to paragraph #2, will receive a focused monitoring by the defendants designed to identify and provide solutions to the district's failure to make progress.

4. As part of its Program Compliance Review (PCR) for 2002-2003, the CSDE will include those LEAs (approximately 8-12 in the first year of the implementation of this agreement) most in need, as determined by CSDE in its annual review of data related to the stated goals of this agreement. This focused monitoring activity in the eight to twelve LEAs in year one is not meant to exclude other LEAs from monitoring activities required by this agreement.

Activities for the identified districts will include the following:

a. Review of relevant data reflecting identification and placement of students with mental retardation or intellectual disability;

b. On-site visits;

c. Annual development by each district of an improvement plan related to the stated goals of this agreement;

d. Customized training of district staff in principles and strategies of effective and promising instruction in regular classes; and

e. Monitoring of districts' efforts toward achieving continuous improvement on the five goals stated in this agreement consistent with Section II.

## VI.  Technical Assistance

1. To support full implementation of IDEA throughout Connecticut and to fully implement this Agreement, the Defendants shall:

   1. design and implement a system of technical assistance to be made available to all LEAs to enable them to extend and improve education in regular classes for students with mental retardation or intellectual disability; and

   2. utilize federal professional development funds to provide, as a component of the system of technical assistance, a sufficient number of qualified specialists to assist LEAs in carrying out their training, supervision and support responsibilities specified in this Agreement.  These specialists shall possess, in the CSDE's

judgment, knowledge and skill in teaching students with mental retardation or intellectual disability in regular classes, and in assisting teachers and other personnel to accommodate and to support students with mental retardation or intellectual disability in regular classes.

2.  The State Commissioner of Education will designate a staff person, who in the Commissioner's judgment possesses appropriate professional qualifications and experience, with responsibility to design, implement, and coordinate all efforts under this agreement, including technical assistance. The designated staff person shall be responsible for the progress in implementing the terms of this agreement and the good faith efforts of the CSDE in meeting the five stated goals set forth in Section II.  State defendants shall provide the designated staff person with the administrative support, consultants and other resources necessary to perform the functions set forth.  The designated staff person shall serve as the liaison to members of the Expert Advisory Panel.

3.  The EAP, established under Section IX below, will advise the CSDE and make recommendations regarding the establishment of technical assistance, the identification of and qualifications of specialists as well as the effectiveness and adequacy of the technical assistance provided to advance the goals of this Agreement.

## VII.   Parent Involvement

The state defendants, with the advice and assistance of the Connecticut Parent Advocacy Center, shall allocate funds for training programs to enable parents of class members to effectively advocate for the education of their children in least restrictive environments.   Such

programs shall provide for the continuing training of parents in the development of IEPs,

management and teaching activities and routines, and the development of active parent groups.

Continuing through June 30, 2005, the CSDE will allocate funds to the Connecticut

Parent Advocacy Center (CPAC) to conduct parent training focused on implementation of this

Agreement for class members and the implementation of 20 U.S.C. 1412(a)(5)(A). CPAC shall

work closely with other parent-centered groups, such as the Connecticut Coalition for Inclusive

Education, in the design and conduct of this training.

## VIII. Complaint Resolution Process

CSDE will establish and maintain a complaint resolution process to resolve complaints

pursuant to 34 C.F.R. § 300.660. The parties recognize that CSDE must seek to comply

with all directives of the U.S. Department of Education regarding what is required of the

complaint resolution process.

## IX.  Expert Advisory Panel (EAP)

State defendants shall establish an Expert Advisory Panel to advise the parties and the

Court regarding the implementation of this Agreement. This EAP will consist of four

individuals agreed to by the parties, with each party nominating two members, but with both

parties agreeing to all four individuals prior to agreement. The Expert Advisory Panel shall

have the following responsibilities:

1.  Advise and serve as a resource to CSDE with respect to implementation of all aspects
    of this agreement including the design and conduct of technical assistance, training and
    monitoring of LEAs. All advice and recommendations of the Expert Advisory Panel

shall be made by consensus and represent the collective judgment of the Panel as a whole. The CSDE will not be bound by either the individual or collective advice of the EAP. Individual members of the Expert Advisory Panel may, at the request of the CSDE, participate in the design and conduct of training, technical assistance and monitoring described in this Settlement Agreement.

2. Facilitate the defendants' compliance with this Agreement, identifying difficulties in compliance, facilitating resolution of compliance issues without court intervention, and referring to the court issues that cannot be resolved by discussion and negotiation.

3. receive the annual reports prepared pursuant to Section III (2) and will provide annual written comment to the Court, plaintiffs and defendants.

4. review annually and make recommendations relating to progress toward the goals stated in Section II, development of statewide technical assistance, targeted monitoring, complaint resolution, parent training, and next steps.

5. Collect and analyze data it deems necessary relating to class members and the implementation of this agreement. The parties shall jointly develop procedures and protocols that shall protect the confidentiality of client specific data and student records.

6. The State Commissioner shall convene the Expert Advisory Panel in Hartford within ninety (90) days of the effective date of this Agreement. Thereafter, the EAP will meet three (3) times per year and more often as necessary, with a schedule developed jointly by the EAP and the CSDE.

7. Members of the EAP shall be reimbursed by the state defendants for their reasonable expenses, subject to prior approval and regular state procedures.

8. Nothing in this agreement limits the EAP's ability to bring issues related to the implementation of this Agreement to the attention of the Court.

## X.  Payment

The Defendants shall make to the Plaintiffs in P.J., et al v. State of Connecticut Board of Education, et al, a one-time payment of $675,000.00 in attorneys' fees and costs, payable to Attorney David Shaw, attorney for the Plaintiffs, within ninety (90) days of the effective date of the approval of this agreement.

## XI.  Total Agreement

This agreement contains the complete and sole agreement of the parties.

Signatures:

_Theodore S. Sergi_  3/26/2002          _Ralph E. Urban_  3/26/02
Theodore S. Sergi          Date          Ralph E. Urban          Date
Commissioner                            Assistant Attorney General
CT State Department of Education          Office of the Attorney General


_____          _David C. Shaw_  3/28/02
Frank Laski          Date          David Shaw          Date
Attorney for the Plaintiffs          Attorney for the Plaintiffs

13

7. Members of the EAP shall be reimbursed by the state defendants for their reasonable expenses, subject to prior approval and regular state procedures.

8. Nothing in this agreement limits the EAP's ability to bring issues related to the implementation of this Agreement to the attention of the Court.

## X.    Payment

The Defendants shall make to the Plaintiffs in P.J., et al v. State of Connecticut Board of Education, et al, a one-time payment of $675,000.00 in attorneys' fees and costs, payable to Attorney David Shaw, attorney for the Plaintiffs, within ninety (90) days of the effective date of the approval of this agreement.

## XI.    Total Agreement

This agreement contains the complete and sole agreement of the parties.

Signatures:

_____
Theodore S. Sergi            Date
Commissioner
CT State Department of Education

_____
Ralph E. Urban              Date
Assistant Attorney General
Office of the Attorney General

_____
Frank Laski                  Date
Attorney for the Plaintiffs

_____
David Shaw                  Date
Attorney for the Plaintiffs

Exhibit 2



RICHARD BLUMENTHAL
ATTORNEY GENERAL

55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120

Office of The Attorney General
## State of Connecticut

Tel. ( 860) 808-5210
Fax (860) 808-5385

May 25, 2004

David C. Shaw, Esq.
34 Jerome Avenue
Suite 210
Bloomfield, CT 06002

RE:  P.J. et al v. CSBE et al

Dear Attorney Shaw:

I am in receipt of your letter dated May 11, 2004.

As we indicated in our recent meeting with you and the Expert Advisory Panel, the data that your May 11 letter refers to was provided to you and the Expert Advisory Panel as a large appendix to the second annual report, so you already have the data, with each student identified by a unique number. The data also shows exit changes (graduated, moved, deceased, aged out, dropped out, no longer labeled), but as yet does not show reclassifications (i.e., intellectual disability to a different disability category), which, as George Dowaliby explained at the last EAP meeting, the Department is working on tracking. Current limitations of the Department's annual data reporting system requires that this be done manually. The Department expects preliminary data on this to be ready later this calendar year, when it will be shared with all the appropriate parties. I frankly do not understand why you need names, since with unique identifying numbers you can do all the statistical and other analyses you might need or want.

As you know, the Settlement Agreement at Section I.3. requires the State Department of Education to "cooperate with the plaintiffs to gain access" to the list *"to the extent allowed by state and federal statute,* for all purposes related to the enforcement and implementation of this Agreement." (Emphasis added). The U.S. Department of Education's FERPA Compliance Office has instructed CSDE in writing (copy attached) that prior to making personally identifiable information from education records (in this instance the names) available to the plaintiffs under the Settlement Agreement, CSDE must comply with the notice requirements in 34 CFR §99.31(a)(9). Having provided plaintiffs with all the data, with unique student identifiers so that plaintiffs could analyze the data any way they wished, CSDE did not undertake the cumbersome and expensive task of seeking to contact every parent or guardian to inform them of the intended disclosure of personally identifiable information, in "sufficient time to permit the parent or eligible student to take appropriate action," as required by USDOE's letter. Such a cumbersome

David C. Shaw, Esq.
May 25, 2004
Page 2

task would be time consuming, and would take away from the substantive work those assigned to this matter are doing to try to further the goals of the Agreement.

Providing personally identifiable information also concerns the defendants because we have had at least one instance where data clearly marked as preliminary and confidential and provided to the EAP, plaintiffs' counsel and plaintiffs' organizations have shown up in the hands of third parties. This would be even more troubling were it to occur with personally identifiable educational record information.

Perhaps at this point you could articulate why you feel you need names, in addition to the unique numerical identifiers, so that if CSDE is going to expend its time and resources to comply with the USDOE's mandate on this issue, it can at least understand what further purpose would be served or how it would enhance anyone's understanding of the data or its usefulness. In the meantime, if you require another copy of the data already provided by unique numerical identifiers, we would be pleased to provide it again.

Finally, please let me know soon how you want to effectuate what was agreed upon regarding moving back the date of the EAP's next report. I presume we can do that by a stipulated motion.

Thank you for your consideration of our concerns, and your attention to these matters.

Very truly yours,

Ralph E. Urban
Assistant Attorney General

cc: Frank Laski, Esq.



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF MANAGEMENT

Mr. George P. Dowaliby, Chief                                    **NOV   4 2002**
Bureau of Special Education and Pupil Services
Connecticut State Department of Education
25 Industrial Park Road
Middletown, Connecticut 06457

Dear Mr. Dowaliby:

This is in follow-up to your recent discussions with JoLeta Reynolds, Office of Special
Education Programs (OSEP), and Ellen Campbell of my staff, regarding the applicability of the
Family Educational Rights and Privacy Act (FERPA) to certain disclosures of personally
identifiable information on students in response to a settlement agreement in a class action
lawsuit. On May 22, 2002, the United States District Court for the District of Connecticut
entered an order approving all the terms of the settlement agreement in P.J. et al. v. State of
Connecticut Board of Education, et al., Docket No. 2:91CV00180(RNC). This Office
administers FERPA and is responsible for providing technical assistance to educational agencies
and institutions on the law. 20 U.S.C. § 1232g; 34 CFR Part 99. We have coordinated with
OSEP in providing this response to you. As explained more fully below, we believe that the
Connecticut State Department of Education (CDSE) may comply with the requirements of the
settlement agreement, without violating FERPA, if certain conditions are met.

You have explained that, as part of the court ordered and approved settlement, the CDSE is
required to disclose certain information about members of the class with the classmembers'
attorneys. Additionally, a prior protective order was entered by the Court in the case (dated
December 11, 1992) which prohibits the classmembers' counsel from further disclosing
personally identifiable information regarding classmembers to other parties. You state that the
information that will be shared may include the student's name, address, date of birth, grade,
school, data collected by the CDSE on the time the student spends with nondisabled peers, and
information about the student's educational program and activities.

From the information you provided this Office, it also appears that, under the February 28, 2002,
settlement agreement, the CDSE agreed to prepare and distribute to the parties and the court, and
update regularly, a list of public school students in the State who on or after December 1, 1999,
carry the label of "mental retardation" or "intellectual disability" and who are eligible for special
education. The agreement also allows plaintiffs to challenge the accuracy of the list and to
collect data regarding these students. CDSE has agreed to cooperate with the plaintiffs to gain
access to data and files relating to class members, "to the extent allowed by state and federal
statute," for all purposes related to the enforcement and implementation of the agreement.
Plaintiffs' rights to the data end when the court terminates its jurisdiction over the matter, which
may continue for up to eight years after establishment of an expert advisory panel (EAP).

Page 2 – Mr. George P. Dowaliby

The Individuals with Disability Education Act (IDEA) assigns responsibility to State educational agencies (SEAs) for ensuring that the requirements of IDEA are met and that all educational programs for children with disabilities, including all such programs administered by any other State or local agency, are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities and that these programs meet the educational standards of the SEA. State support and involvement at the local level are critical to the successful implementation of IDEA. In fact, the IDEA statute, in relevant part, states the following:

> (a) IN GENERAL- A State is eligible for assistance under this part for a fiscal year if the State demonstrates to the satisfaction of the Secretary that the State has in effect policies and procedures to ensure that it meets each of the following conditions:

> \*      \*      \*      \*      \*

> > (11) STATE EDUCATIONAL AGENCY RESPONSIBLE FOR GENERAL SUPERVISION-
> > > (A) IN GENERAL- The State educational agency is responsible for ensuring that-
> > > (i) **the requirements of this subchapter are met**; and
> > > (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State or local agency-
> > > > (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
> > > > (II) meet the educational standards of the State educational agency.
> > > (B) LIMITATION- Subparagraph (A) shall not limit the responsibility of agencies in the State other than the State educational agency to provide, or pay for some or all of the costs of, a free appropriate public education for any child with a disability in the State.
> > > (C) EXCEPTION- Notwithstanding subparagraphs (A) and (B), the Governor (or another individual pursuant to State law), consistent with State law, may assign to any public agency in the State the responsibility of ensuring that the requirements of this part are met with respect to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons.

20 U.S.C. § 1412(a)(11). (Emphasis added.)

FERPA is a Federal law that protects a parent's privacy interest in his or her child's "education records." In particular, FERPA provides that an educational agency or institution may not have a policy or practice of denying parents the right to: inspect and review their children's education records; seek to amend education records; or consent to the disclosure of information from education records, except as provided by law. The term "education records" is defined as:

> [T]hose records, files, documents, and other materials, which (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

Page 3 – Mr. George P. Dowaliby

20 U.S.C. § 1232g(a)(4). See also 34 CFR § 99.3 "Education records." Moreover, the records of a student which pertain to services provided to that student under IDEA are "education records" under FERPA and are subject to the confidentiality provisions under IDEA (see 34 CFR § 300.560-300.576) and to all of the provisions of FERPA.

As a practical matter, FERPA generally would not apply to the records of an SEA. This is because FERPA defines "education records" as information directly related to a "student," which itself is defined as excluding a person who has not been in attendance at the educational agency or institution. 20 U.S.C. § 1232g(a)(4) and (a)(6). Since students generally are not in attendance at an SEA, it follows that FERPA does not generally apply to the SEA's records. However, FERPA does provide parents with the right to inspect and review education records maintained by the SEA within 45 days of receipt of a request. 20 U.S.C. § 1232g(a)(1)(B).

FERPA permits educational agencies and institutions, such as LEAs and their constituent schools, to disclose education records to SEAs and other State educational authorities without a parent's prior written consent under certain conditions. The most common exception that relates to disclosures to a State educational authority is found in 34 CFR § 99.31(a)(3) and § 99.35. Under this exception to the prior written consent provision, an educational agency or institution may disclose education records, or personally identifiable information from such records, without prior written consent, when the disclosure is, subject to the requirements of § 99.35, to authorized representatives of State and local educational authorities. 20 U.S.C. § 1232g(b)(3) and (5); 34 CFR § 99.31(a)(3). FERPA provides that disclosures under this exception be made only when authorized representatives of the State or local educational authority are conducting an audit or evaluation of Federal or State supported education programs, or for the enforcement of or compliance with Federal legal requirements which relate to those programs. Disclosures by LEAs to SEAs with regard to students receiving services under IDEA fit the condition concerning the enforcement of or compliance with Federal legal requirements which relate to a Federal education program.

Although FERPA provides that a third party receiving personally identifiable information from education records may redisclose the information on behalf of the agency or institution under certain conditions, without prior written consent, this provision does not generally apply to SEAs. That is because FERPA provides that information from education records which is disclosed to authorized representatives of State educational authorities must be protected in a manner that does not permit personal identification of individual students by anyone except the officials identified in 34 CFR § 99.31(a)(3) and must be destroyed when no longer needed for the purposes for which it was collected. 20 U.S.C. § 1232g(b)(3); 34 CFR § 99.35.

Another exception that applies to educational agencies and institutions, such as LEAs, permits the nonconsensual disclosure of education records when the disclosure is made in compliance with a lawfully issued subpoena or court order if the educational agency or institution makes a reasonable attempt to notify the parent or eligible student of the order or subpoena in advance of

Page 4 – Mr. George P. Dowaliby

compliance. 20 U.S.C. § 1232g(b)(2)(B); 34 CFR § 99.31(a)(9). Section 99.32 of the FERPA regulations generally requires that an educational agency or institution maintain a record of all requests for access to and disclosures from education records. However, such recordation would not be required when the disclosure was made in compliance with a judicial order or subpoena, so long as the school was successful in its attempt to notify the parent or eligible student of the order or subpoena in advance of compliance.

The regulations also provide that the general limitations on redisclosure under 34 CFR § 99.33 do not apply to records that have been disclosed pursuant to a court order or lawfully issued subpoena. Once an institution determines that the subpoena or judicial order is valid and makes a reasonable attempt to provide advance notice in sufficient time to allow the parent or eligible student to take appropriate action, the institution is not responsible for taking any further action to protect the records against redisclosure. In your situation, however, a prior protective order was entered by the court in the case, prohibiting further disclosure of personally identifiable information regarding classmembers to other parties without prior written authorization from CDSE or the court.

CDSE and certain local school districts were named as defendants in the litigation and are represented as parties to the settlement agreement. We view CDSE as acting as agent for all school districts that are required to report information about special education students under the specific terms of the settlement agreement inasmuch as only school districts maintain the necessary information. FERPA would allow school districts to use CDSE as their agent for purposes of disclosing personally identifiable information from education records, without consent, in accordance with the terms of the settlement agreement under § 99.31(a)(9) of the regulations. CDSE or the school districts must comply with the notice requirements in § 99.31(a)(9) in advance of disclosing any information. The notice should allow sufficient time to permit the parent or eligible student to take appropriate action. If they are not successful in their attempts to notify parents as required, then the school district must record the disclosure as required under § 99.32 of the regulations.

I trust this is responsive to your inquiry and adequately explains the scope and limitations of FERPA, as it applies to your situation.

Sincerely,

LeRoy S. Rooker
Director
Family Policy Compliance Office

cc:    JoLeta Reynolds
       OSEP

Exhibit 3

# STATE OF CONNECTICUT
## *DEPARTMENT OF EDUCATION*



August 31, 2007

David C. Shaw, Esq.
34 Jerome Avenue
Suite 210
Bloomfield, CT 06002-2463

Dear Attorney Shaw:

Enclosed, please find databases containing the dates and reasons for class members' exit from public schools and/or special education in the year in which the exit information was reported to the state for students reported as having an intellectual disability as of December 1st in the years 1998 through 2005. This information is being provided as per the **Defendant's Responses to Plaintiff's Motion for Disclosure and Production** dated May 22, 2007. Below, you will find information that may be helpful to your understanding of the data we have provided.

- The enclosed databases were created by extrapolating from the CSDE's data on all students with disabilities collected on December 1st of each year from 1998 through 2005. Included in the databases are those students who were reported as having an intellectual disability, but whose student record also indicated that they:

  1) exited from Connecticut public schools (e.g. graduated with a diploma); or
  2) exited from an individual school district (e.g. moved); or
  3) exited from special education (e.g. no longer received special education). The data reflects an exit that occurred sometime between December 2nd of the previous and December 1st of the year in which the data were collected year, inclusive.

- From 1998 through 2002, a district could report a student as exited for any of the eight reasons:

  1) = Graduated with diploma
  2) = Received a certificate of completion or fulfillment of IEP
  3) = Dropped out
  4) = No longer receives special education
  5) = Deceased
  6) = Reached maximum age
  7) = Moved, known to be continuing
  8) = Moved, not known to be continuing

- As of 2003, districts were instructed to no longer report students as exiting due to moved, not known to be continuing (exit code 8). The PCI data manager informed districts, via e-mails and training sessions with district personnel, that if a student record was entered with exit code 8, the student would be re-classified as a drop-out. Although there are instances of students reported with an exit code of 8 after 2003, for the purposes of state and federal reporting, these students were considered dropouts.

- As of 2005, the terminology used to describe for exit reason 4 was changed from "No longer receives special education" to "transferred to regular education".

Box 2219  •  Hartford, Connecticut  06145
*An Equal Opportunity Employer*

David Shaw, Esq.
August 31, 2007
Page 2

- Upon reviewing the materials that the defendants have previously provided to plaintiffs, the CSDE recognized that it had not provided an updated version of the PCI Handbook, which was created in 2005, which provides further clarification of the changes to data elements described above. The 2005 version of the PCI Handbook is enclosed. Many of the students who have records contained in the enclosed databases also have records contained in the Class Member databases previously provided to the plaintiffs.

- There may not be a one-to-one correspondence between the students listed in any given year as an exit in the enclosed databases and the students listed in Plaintiff's Exhibit A of the March 20, 2007 Motion for Disclosure and Production. The students listed in Plaintiff's Exhibit A may have missing data points due to any one of several reasons:

  a. the student was exited in the year that the Plaintiff's have noted missing data; since Plaintiff's have only received the "active" record for Class Members in any given year, they would not have access to the "inactive" or exited record and thus would have determined the data to be missing;
  b. the student was reported as an active student with an Intellectual Disability under a different COMPID;
  c. no data on the student were reported to the state in that year; and
  d. the student was reported as having a disability other than an intellectual disability.

- The enclosed data will only provide exit reasons and dates for the students' listed in Exhibit A if the data are missing due to reason a noted above. The Longitudinal Analysis of Class Members, referred to in the defendant's letter to the plaintiffs dated July 2, 2007, will provide information on Class Members across all year's 1998-2006 even if data are missing in plaintiff's Exhibit A due to reasons A through D noted above.

- As per an agreement reached between the plaintiffs and the defendants, names and other identifying information have been redacted for students whose parents requested that their child's information not be released to the plaintiff's. The word REDACTED with an additional character is used in the place of a student's COMPID, although the REDACTED records do not refer to the same students across years. The CSDE has the ability to link these records back to its database.

The enclosed data were compiled by Connecticut State Department of Education employee Heather Levitt Doucette. If there are any questions regarding the databases, please contact me at (860) 713-6867.

Sincerely,

Heather Levitt Doucette
Bureau of Accountability, Compliance
and Monitoring

HLD:bd

cc: Darren A. Cunningham, Esq.
    Ann Louise Thompson

Enclosure

Exhibit 4

# STATE OF CONNECTICUT
### DEPARTMENT OF EDUCATION



To:        Len Burrello, Alan Coulter, Sharon Freagon and Wayne Sailor

From:      Anne Louise Thompson

Date:      July 22, 2002

RE:        August Expert Advisory Panel Meeting

Cc:        George P. Dowaliby, Chief


Thank you all for joining us in Connecticut to implement the Settlement Agreement in the case of P.J., ET AL v STATE OF CONNECTICUT, BOARD OF EDUCATION, ET AL (hereafter referred to as the Settlement Agreement).

As I have discussed with each of you on Monday, we will be meeting in Hartford, Connecticut on Tuesday, August 13- Wednesday, August 14. I anticipate that we will be meeting during the afternoon of the 13th and no later than 4:00 PM on the 14th. Therefore, flights can be arranged for Tuesday morning arrival with a Thursday evening departure. The meeting will be occurring at a location within 30 minutes of Bradley International Airport. I will be forwarding hotel and ground transportation arrangements to you shortly, along with other logistical details regarding meals and honorariums.

I anticipate that we will finalize the agenda for our meeting as we approach the date, so please expect this information shortly.

My colleagues and I are looking forward to your arrival in August to begin your work to advise and serve as a resource to the CSDE!


Anne Louise Thompson
Education Consultant
Connecticut State Department of Education (CSDE)
Bureau of Special Education and Pupil Services (BSEPS)
25 Industrial Park Road
Middletown, CT 06457
860-807-2030 (phone)
860-807-2047 (fax)
annelouise.thompson@po.state.ct.us