UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| P.J., et al., | : | CIVIL NO. |
| Plaintiffs, | : | 291CV00180 (RNC) |
| v. | : | |
| | : | |
| STATE OF CONNECTICUT, et al. | : | |
| Defendants | : | APRIL 15, 2008 |

## MEMORANDUM IN SUPPORT OF MOTION FOR ORDERS TO REMEDY SUBSTANTIAL NON-COMPLIANCE WITH SETTLEMENT AGREEMENT

## I.     FACTS:

The Plaintiffs move, pursuant to Section III.1 of the Settlement Agreement, for a finding that the Defendant, Connecticut Department of Education ("CSDE"), is in substantial non-compliance with the Settlement Agreement entered in this matter, and that remedial orders are necessary to protect class members and achieve full implementation of the Settlement Agreement.

This matter was tried to the Court from January 18, 2000 through February 28, 2000. Following the trial, a series of settlement conferences were convened before Hon. Donna Martinez. Following negotiations during the period February 28, 2000 through April 5, 2002, the parties entered into a Settlement Agreement, and on April 5, 2002, the Court entered an

order approving preliminarily the proposed Settlement Agreement. On May 22, 2002, following the Fairness Hearing, the Court found the Settlement Agreement to be a fair and reasonable settlement as to all members of the class. The Settlement Agreement was approved and entered by the Court on May 22, 2002. [Doc. ## 462, 463].

Section III of that Settlement Agreement provides that the Court has jurisdiction to enforce the Settlement Agreement for five years from the date the Expert Advisory Panel ("EAP") was empanelled pursuant to Section IX of the Settlement Agreement. Section III of the Settlement Agreement provides further that the Court shall have jurisdiction to entertain Plaintiffs' motions for substantial non-compliance with the Agreement for a period of eight years from the empanelling of the EAP. The EAP was empanelled on August 13, 2002.

During the period August 13, 2002 through May 16, 2007, the Defendants prepared and submitted to the Court four annual reports. Those reports described the efforts CSDE made to implement the Settlement Agreement and assessed the progress made toward implementing the Settlement Agreement. The Plaintiffs prepared and submitted comments to the Defendants and the EAP on each of these Annual Reports and requested corrective action to address areas of non-compliance. The Defendants did not respond directly to any of the Plaintiffs' comments or requests for corrective action.

The EAP prepared and submitted four reports to the Court. Those reports were submitted after considering the Defendants' Annual Reports and Plaintiffs' comments. In each of those reports the EAP concluded that the Defendants were not in compliance with the Settlement Agreement and urged Defendants to take corrective action. Although the Defendants accepted some of the EAP's suggestions, most of its recommendations were rejected and appropriate corrective action was never taken.

The Plaintiffs submitted their comments to Defendants on the Defendants' First Annual Report on October 18, 2002. (Exhibit A.) The Plaintiffs commented that the Defendants failed to take appropriate action to implement the Settlement Agreement. With respect to the identification of members of the class, the Plaintiffs asserted that the Defendants failed to provide and update a list of class members, as required by Section I, paragraph 2 of the Settlement Agreement, and had improperly eliminated from the class all students with mental retardation or intellectual disability that school districts had reclassified. Exhibit A, pp. 1-3. Plaintiffs also expressed alarm concerning the data showing that 421 class members had been exited from the class. With respect to compliance with the five goals of the Settlement Agreement, the Plaintiffs questioned the accuracy of the data used by CSDE and requested a process to verify the accuracy of the data. *Id.*, p. 5. Further, the Plaintiffs commented that the

3

Defendants were focusing all of their monitoring efforts on eight school districts, and were ignoring the other 161 school districts as well as many class members who had been placed in segregated schools. Plaintiffs pointed out that Defendants failed to make any meaningful effort to provide Technical Assistance to School Districts and training of parents as required by the Settlement Agreement. *Id.* at 10-12. Finally, Defendants failed to make any meaningful effort to monitor the use of promising practices as it relates to educating class members in regular classes. *Id.* at 12-13. Defendants did not respond to Plaintiffs' comments.

The First EAP Report to the Court was submitted on November 3, 2003—more than one year after this Court's approval of the Settlement Agreement. (Exhibit B.) The EAP indicated that there had been "little to no measurable success" in implementing the Settlement Agreement and that CSDE had established no criteria to assess progress. Exhibit B, p. 2. The EAP stated its concern that insufficient State resources had been made available to implement the Settlement Agreement. *Id.* at 2 -3, 5. The EAP indicated that the CSDE had such low expectations of local school districts that significant progress under the Settlement Agreement would not be achieved. *Id.* at 4. The EAP also found that the training and technical assistance provided to local school districts was inadequate. *Id.* at 5. The EAP recommended that CSDE implement a back-up system of technical assistance with skilled educators able to respond to

4

requests from individual districts or parents for technical assistance for individual children and their teachers. *Id.* at 10, 11. In order to focus the Defendants on the standard of meaningful progress, the EAP established the following benchmarks against which it would measure progress in future reports:

> 1) that 90% of students with intellectual disabilities/mental retardation would be placed in their home schools by 2005; 2) that 75% mean time would be spent by class members with non-disabled students by 2005; 3) that 40% of class members would be placed in regular classes (79% or more of the school day) by 2005, and 80% of class members would be placed in regular classes by 2007; and 4) that the percentage of class members participating in extracurricular activities in each school should be equal to or exceed the percentage of typical students' participation.

*Id.* at 6-7.

The EAP also recommended that the Defendants disaggregate the data each year to measure progress by racial and ethnic groups and by age to identify trends and deficiencies that needed to be addressed. *Id.* at 8. The EAP also recommended that CSDE conduct a thorough analysis of the data to ensure that class members did not migrate to other disability groups. *Id.* at 8. CSDE did not adopt the EAP benchmarks or implement most of the other EAP recommendations.[1]

---

[1] Plaintiffs supported the EAP report as the basis upon which the needed changes could be implemented, and recommended the EAP consider additional recommendations in the areas of Technical Assistance, disparate

On January 30, 2004, the EAP submitted its second report to the Court. (Exhibit C.) In that report, the EAP concluded that "little to no measurable progress" had been achieved in implementing the Settlement Agreement. (Exhibit C, p. 2.) It indicated that the State had exhibited "only modest intentions to address the significant challenges to violations of state and federal law." *Id.*, p. 2. The EAP indicated further:

> The lack of improvement...have yielded minimum progress at both the State and local levels. We have grave reservations about the resources being allocated with little return on the movement of students to the desired ends. This conclusion applies to all five goals of the Settlement Agreement.

(Exhibit C, p. 2.)

The EAP indicated in this regard that the CSDE had accepted only 38% of the EAP's written consensus recommendations and only 50% of the recommendations that flowed during the actual meetings of the EAP with the CSDE. (Exhibit C, p. 3.)

The EAP also concluded that CSDE had unacceptably low expectations of local school districts, and that the training and technical assistance provided to local school districts was unacceptable. *Id.* at 5, 6.

On September 10, 2004, the Plaintiffs submitted comments on the Third Annual Report to the EAP. (Exhibit D.) The Plaintiffs asserted that no meaningful progress had been made

---

identification based on race and ethnicity, and Focused Monitoring. (Exhibit B-1, pp. 10-12.)

toward meeting the five goals of the Settlement Agreement. *Id.* at 1-8. With respect to class membership, the Plaintiffs reiterated their concern that they had still not been provided with a list of class members, that the class had been reduced in size by 623 class members, without explanation or analysis, and that CSDE continued to assume that all students with intellectual disabilities that had been placed or reassigned to other disability categories were not class members. *Id.* at 9-10. Plaintiffs objected to the Defendants' failure to follow the recommendations of the EAP and its failure to verify the accuracy of and analyze the data on placement of class members. *Id.* at 15-20. Plaintiffs also reiterated their concerns that CSDE ignored the requirement of establishing a statewide system of technical assistance and to provide proper training to parents. *Id.* at 20-26. Once again, the Defendants did not respond to the Plaintiffs' comments.

The EAP filed its third report to the Court on September 30, 2004. (Exhibit E.) The EAP concluded that CSDE had not made reasonable progress in implementing the Settlement Agreement, and that the class had been reduced in size, without explanation, analysis or plan of action, by an alarming 30.5%. *Id.* at 5, 8. According to the EAP, the lack of monitoring and oversight of local school districts and the lack of leadership were substantial factors in the lack meaningful progress. *Id.* at 13-14.

On July 26, 2005, the Plaintiffs submitted their comments on the Fourth Annual Report. (Exhibit F.) Plaintiffs asserted that CSDE was not in compliance with the Settlement Agreement and set forth twelve specific areas of non-compliance. First, CSDE had ignored the benchmarks established by the EAP to assess progress. CSDE never asked local school districts to base their performance on the EAP benchmarks, and never offered any analysis as to whether those benchmarks would or should be achieved. Second, the Defendants asserted that progress had been made toward moving class members into regular classrooms without taking into account the fact that their data showed that the class had been reduced in size from 4103 to 3174 class members by 2004.[2] Third, Defendants had never provided an accurate class list to the Plaintiffs as explicitly required by the Settlement Agreement, and had never provided an accurate accounting of all class members. Fourth, much of the improvement in the number of students placed in regular classes appeared to have more to do with changes in the CSDE definition of when a child could be considered to be in a regular class, rather than real change in the attitudes or approach in local school districts. Fifth, little or no effort had been made to require that local school districts to return class members from segregated schools to public schools. Sixth, much of the improvement in the goals of the Settlement Agreement was

---

[2] The size of the class was further reduced to 2794 according to the 2006-2007 data. *See* Exhibit K.

minimal, especially when considered in conjunction with the disappearance of more than one-third of the class. Seventh, the Plaintiff indicated that Defendants trivialized the meaning of the goal relating to disproportionate identification of students by race, ethnicity and gender by simply reclassifying students, rather than by requiring programs to help students catch-up who had been excluded from academic programs due to improper identification based on race, ethnicity or gender. Eighth, the size of the class continued to be reduced through reclassification of students to other disability classifications, and other inappropriate exiting of students from the class with no follow-up or corrective action taken by CSD. Ninth, the CSDE had made no effort to implement the Settlement Agreement in all but 24 school districts in the state. Tenth, the CSDE data system continued to be highly questionable and CSDE had not made any attempt to verify the accuracy of the data it was using to report on compliance with the Settlement Agreement. Eleventh, the CSDE failed to take any meaningful action to implement the requirements of Section VI of the Settlement Agreement that required CSDE to establish a statewide system of technical assistance available to all school districts. *Id.* at 16-26. Twelfth, the CSDE failed to provide adequate parent training as required by the Settlement Agreement.

The EAP filed its fourth report to the Court September 30, 2005. (Exhibit G.)  The

EAP noted inadequate progress, including continued lack of adequate progress in meeting the CSDE benchmarks, and reliance on segregated schools to educate class members, particularly those placed in segregated RESC centers. Id at 11. Also, the EAP indicated that it was important for CSDE to verify the accuracy of its data, that the erosion in the class continued unabated, and that the technical assistance provided school districts was inadequate.

The EAP filed its fifth and final report with the Court on March 8, 2007. (Exhibit H.) The EAP concluded, as it had in its three previous reports, that progress toward achieving compliance was "unacceptably slow" and "shocking." Exhibit H, pp. 3, 7. The EAP noted that the progress that had been achieved was not evidenced in most of the 169 towns, and that there had even been slippage in some of the cities and towns where progress previously had been reported. *Id.* at 3. In some local school districts, the EAP noted that the lack of progress appeared to reflect outright defiance of the *PJ* Settlement Agreement. *Id.* at 3, 6. The EAP indicated that this lack of progress represented a "failure at the state level to demonstrate leadership in implementing the settlement agreement for all LEAs." *Id.* The EAP indicated that CSDE had failed to provide the technical assistance and training, focused monitoring and use of sanctions necessary to bring about meaningful progress in implementing the Settlement Agreement. *Id.* at 6. Finally, without continued external oversight, the EAP indicated that the

limited progress that had been made would not be sustained. *Id.* at 7. The EAP expressed

concern about class members who had been exited from the class or were in the class but not

receiving appropriate support services. The EAP also indicated that improved focused

monitoring and that a system for verifying the accuracy of the CSDE data on class members be

established. Exhibit H, p. 22. The EAP concluded with the following comment:

> [T]he leadership necessary to ensure minimum progress in all
> LEAs of the state has yet to be demonstrated. This report, while
> hopeful in several ways, is skeptical that Goals 1, 3, 4 and 5 of *PJ*
> will be realized in the near future or that the present level of
> progress maintained once substantial state assistance and
> independent oversight is no longer available.

Exhibit H, pp. 22, 23.

The CSDE did not respond to these criticisms or indicate if any changes would be made

as a result of recommendations of the EAP. Instead, on May 16, 2007 the CSDE announced

that external oversight of its efforts to implement the Settlement Agreement was no longer

needed and terminated the EAP.

Following this action, the Plaintiffs initiated discovery to assess Defendants'

compliance with the Settlement Agreement. Significant delays and opposition were

encountered. First, the Defendants refused to release data on the hundreds of students who had

been reclassified to another disability category or otherwise exited from the class on the ground

11

that such students were no longer class members. The requested data was produced only after a

Motion to Compel was filed with the Court and fully briefed. Second, Defendants indicated

they would not investigate or attempt to explain why some 600 students floated in and out of

the CSDE data set on class members. Third, Defendants refused to make their employees,

experts, and contractors available to answer the questions of Plaintiffs' experts relating to the

technical assistance, and training provided to local school districts, and the monitoring and

oversight of local school districts provided by CSDE under the Settlement Agreement.

## II.    ARGUMENT:

### 1. The District Court Has Jurisdiction to Entertain Motions for Substantial Non-Compliance

Section III.1. of the Settlement Agreement provides the following description of the

Court's jurisdiction to enforce the Settlement Agreement:

> The jurisdiction of the Court for enforcement of this Agreement
> will end five (5) years from the empanelling of the Expert
> Advisory Panel (EAP) called for in section IX, except that the
> Court, for a period of eight (8) years from empanelling of the EAP,
> shall have jurisdiction to entertain Plaintiffs' motions for
> substantial non-compliance with this Agreement...

Settlement Agreement, Section III.1.

As the EAP was empanelled on August 13, 2002, this Court retains jurisdiction to

entertain motions for substantial non-compliance until at least August 13, 2010.  As the

Plaintiffs argue herein that the Defendants are in substantial non-compliance with Sections I, II,

III, IV, V, VI, VII and IX of the Settlement Agreement, the Court should schedule such

discovery as is necessary and a trial on Plaintiffs' Motion.

**2.  The Defendants Have Failed Take Necessary And Appropriate Steps to Implement Section I of the Settlement Agreement**

Section I of the Settlement Agreement defines the class as including students with the

label "Intellectual Disability/Mental Retardation" who are not educated in the regular

classroom. With regard to the most basic obligation to identify class members, Section I.2 of

the Settlement Agreement contains the following specific requirement:

> The Defendants shall prepare and distribute to the parties and the
> court a list of public school students in Connecticut who on or
> after December 1, 1999 carry the label of either mental
> retardation or intellectual disability and who are eligible for
> special education; such list shall be updated periodically.

Settlement Agreement, Section I.2.  The Agreement further provides that the Plaintiffs

have the right to collect data relating to the students identified in Section I.2. and to challenge

the adequacy of that list and that CSDE must cooperate with plaintiffs to gain access to data

and files for all purposes relating to the enforcement and implementation of this Agreement.

Settlement Agreement § I.3.

13

The Defendants have failed to comply with these requirements. First of all, Defendants have not prepared a list of class members and distributed that list to the Plaintiffs and the court and updated that list periodically. Plaintiffs indicated in their comments on October 18, 2002, and in their comments on each of the subsequent annual reports prepared pursuant to Section III of the Settlement Agreement, that the Defendants' failure to comply with this requirement made it impossible to verify class member status and greatly impaired Plaintiffs' ability to represent the class. After ignoring Plaintiffs concerns for over two years, CSDE indicated in correspondence dated May 25, 2004 that providing a list of student identification numbers in an appendix to the Second Annual Report fulfilled this requirement. Exhibit I. This listing of identification numbers did not fulfill the requirement in Section I as it did not provide sufficient information for plaintiffs to track class members from year to year, or to look behind assertions that the reclassification and exiting hundreds of students from the class violated the Settlement Agreement. Moreover, providing a list of identification numbers made it impossible for class counsel to advise parents whether their children were class members or not and whether they had rights under the Settlement Agreement. Exhibit J.

The computer data produced recently reveals the seriousness of this violation of the Agreement. For example, the most current data available when settlement negotiations were

conducted indicated that there were 4103 class members. Exhibit K. The preliminary data for

the 2006-2007 school year indicates that there are currently 2794 class members. The CSDE

has never investigated or explained why the class has been reduced in size by nearly one-third.

Moreover, it has never given Plaintiffs a list of class members that would have enabled

Plaintiffs to conduct their own independent assessment. Similarly, the newly created

longitudinal data base made available to Plaintiffs for the first time on December 18, 2007

indicates that at least 600 class members have floated in and out of the data base. Once again,

Defendants admit that this has occurred, but has conducted no investigation and provided no

explanation as to how so many class members could be included in the Defendants'

assessments one year, excluded the next, and included the year after that. Further, the data

shows that hundreds of class members have been assigned other disability labels and excluded

from CSDE's reports under the Settlement Agreement. The CSDE has never monitored local

school districts with regard to this problem or made an attempt to evaluate the accuracy of the

data provided by local school districts given the obvious inappropriate exclusion of hundreds of

class members from the data. Yet, despite this lack of monitoring and oversight with respect to

hundreds of class members, the CSDE reports each year that it has made progress toward

meeting the goals of the Settlement Agreement. Moreover, by not providing a list of class

members to plaintiffs it has deprived plaintiffs of the ability to call to the court's attention the fact that CSDE's representations that progress has been made under the Settlement Agreement are inaccurate and misleading.

Moreover, Section I of the Settlement Agreement requires Defendants to cooperate with Plaintiffs' reasonable requests to provide existing data to enable Plaintiffs to assess compliance. Section III underscores this requirement by indicating that "Defendants shall cooperate with the Plaintiffs' reasonable requests to provide existing data to enable Plaintiffs to access compliance during the five-to-eight year period." Given the problems in identifying class members, the flawed data base, the apparent lack of oversight and monitoring with respect to these problems, and the decision of the Defendants to terminate EAP oversight, the Plaintiffs, on October 29, 2007, requested that Defendants produce documents and data and discuss further discovery related to CSDE's monitoring and oversight activities. (Exhibit L.) After some delay a conference call to discuss Plaintiffs' request was held. Counsel for the parties, two of the Plaintiffs' experts and selected administrators from CSDE and Connecticut's Special Education Resource Center participated. During the call, Plaintiffs requested that CSDE make available CSDE personnel and CSDE contractors familiar with the technical assistance, training, monitoring and oversight activities of CSDE for interviews with Plaintiffs' experts. Plaintiffs'

experts also requested permission to interview selected school district personnel and parents.

Assistant Attorney General Darren Cunningham indicated that CSDE was reluctant to make

CSDE personnel and contractors available for interviews with Plaintiff's experts and requested

a description of the basis for the discovery request.  On November 5, 2007 the Plaintiffs

explained that under Sections I.3 and III.1 of the Settlement Agreement Defendants had a duty

to cooperate in such routine discovery requests and that under Rule 34, Fed. R. Civ. P., such

requests were routine and appropriate. (Exhibit M.) On December 7, 2007, the Defendants

made clear their refusal to make their employees and officials available to speak with Plaintiffs'

experts.  (Exhibit N, p. 1.)  According to that letter, CSDE's duty to cooperate in providing

information to class counsel and their experts about implementation of the Settlement

Agreement was limited to providing "data and files" and that the Court did not have the

authority to order such discovery unless a motion for substantial non-compliance was filed.

(Exhibit N, p. 2.)  Plaintiffs assert that Defendants' refusal to answer questions about its

monitoring and oversight activities and training and technical assistance they have provided

local school districts under the Settlement Agreement is in violation of Defendants' duty to

cooperate with Plaintiffs' reasonable requests for data to assess compliance.  As requests to

interview state officials about their efforts to implement a Settlement Agreement are routinely

granted under Rule 34, and are necessary to properly inform class counsel about the extent of compliance, the Defendants' refusal to make their employees, officials and contractors available is unreasonable and deprives Plaintiffs of the information they need to properly represent the class.

### 3. The Defendants Have Failed Take Necessary And Appropriate Steps to Implement Section II Of The Settlement Agreement.

Section II of the Settlement Agreement requires the Defendants CSDE to make adequate progress each year on the following five goals:

> 1. An increase in the percent of students with mental retardation or intellectual disability who are placed in regular classes, as measured by the federal definition eighty (80) percent or more of the school day with non-disabled students.
>
> 2. A reduction in the disparate identification of students with mental retardation or intellectual disability by LEA, by racial group, by ethnic group or by gender group.
>
> 3. An increase in the mean and median percent of the school day that students with mental retardation or intellectual disability spend with nondisabled students.
>
> 4. An increase in the percent of students with mental retardation or intellectual disability who attend the school they would attend if not disabled (home school).
>
> 5. An increase in the percent of students with mental retardation or intellectual disability who participate in school sponsored extra curricular activities with non-disabled students.

Settlement Agreement Section II.

The Settlement Agreement requires that within sixty (60) days of Court approval, the Defendants would establish statewide and individual LEA baseline data for goals one, two and three, and that baseline data for goals four and five would be established as a result of the December 2001 data collection. *Id.* All baseline data was to be provided to Plaintiffs and members of the EAP. *Id.* Defendants are required to make meaningful continuous improvement annually with respect to Goals #1 and #4 and to make continuous improvement with respect to Goals ## 2, 3 and 5. *Id.*

According to the data collected by CSDE under the Settlement Agreement, the status of progress on the five goals of the Settlement Agreement is as follows:

Goal #1:

Under the Settlement Agreement, Defendants were required to make meaningful continuous improvement annually in placing children with intellectual disabilities in regular classes. The data produced by CSDE indicates that at the time the Settlement Agreement was approved (i.e. May 22, 2002) 11.1% of the class, or 409 class members, were in regular classes. (Exhibit K.) The preliminary data for 2006-2007 indicates that 44.4% of the class or 1240 class members were in regular classes. *Id.* This reflects an increase of 6.6% per year,

based on the CSDE data. This does not come close to meeting the EAP benchmark for adequate progress - that 40% of class members would be placed in regular classes (79% or more of the school day) by 2005, and 80% of class members would be placed in regular classes by 2007. Moreover, given the fact that CSDE's calculations do not take into account the loss of nearly one-third of the class, that at least 600 class members have floated in and out of the data base, and that hundreds of students have been removed from the CSDE analysis because they have been reclassified to other disability groups, the CSDE assertions as to progress on this goal are not valid. Further, the EAP noted in its fifth report to the Court that most of the change occurred in several large school districts with little or no change occurring in approximately 145 cities and towns in Connecticut. (Exhibit H, pp. 3-7.) The EAP characterized the extent of progress as "unacceptably slow" and "shocking." (Exhibit H, pp. 3, 7.)

Goal # 2:

This goal required a reduction in the disparate identification of students with mental retardation or intellectual disability by LEA, by racial group, by ethnic group or by gender group. LEAs have addressed this problem by reclassifying hundreds of minority children to other disability groups. CSDE has approved and encouraged this simplistic approach even

though it has resulted in the reclassification and removal of hundreds of minority children from the class without regard to the adequacy of their education program. CSDE's approach has trivialized this goal and deprived hundreds of children of the benefits of class membership based on their race, and ethnicity. Plaintiffs repeated requests that any reclassification to comply with this goal must assess and address the extent to which the improper assignment of the mental retardation label has deprived them of educational benefits under IDEA have been ignored. For these reasons, CSDE's response to Goal # 2 is cannot properly be characterized as progress.

Goal # 3:

The mean percent of the school day class members spend with non-disabled students has increased from 35.4% in 2001-2002 to 67.5% in 2006-2007. (Exhibit O.) The median percent of the school day that students with mental retardation or intellectual disability spend with nondisabled students increased from 31.7% in 2001-2002 to 75.8% in 2006-2007. *Id.* The benchmark established by the EAP for 2005 is 75% mean time would be spent by class members with non-disabled students by 2005. The change in this goal does not meet the criteria for continuous annual improvement for several reasons. First, it falls far short of the benchmark established by the EAP for determining whether adequate progress has been

made. Second, the alleged changes do not take into account the fact that over 1000 students, representing one-third of the class, have been eliminated from the CSDE calculations, at least 600 class members float in and out of the data and hundreds of children have been reclassified to other disability categories.

Goal # 4:

Goal # 4 required Defendants to make "meaningful continuous progress annually" in returning children to the schools they would attend if not disabled. According to CSDE data, 71.3% of the class attended their home schools in 2001-2002. Exhibit P. Preliminary data for 2006-2007 indicates that 86.7% of the class attended their home schools. This represents a 15.4% increase during a time when the class has decreased in size by 25%. Moreover, despite the requirement in Section IV that CSDE monitor local school districts to return class members placed in segregated schools to their home schools, the enrollment in segregated schools was reported in CSDE's Fourth Annual Report to have increased. Accordingly, the alleged progress on this goal, if any, cannot be characterized as "meaningful continuous progress annually."

Goal # 5:

This goal requires continuous improvement in the percent of students with mental

retardation or intellectual disability who participate in school sponsored extra curricular activities with non-disabled students. The CSDE data base reveals that the percentage of class members participating in extra curricular activities from 20.3% in 2001-2002 to 47.5% based on the preliminary 2006-2007 data. (Exhibit Q.) This represents a 27.2% increase over a five year period during which the class size was reduced by 25%. As noted by the EAP, this does not represent reasonable annual progress.

**4. The Defendants Have Failed Take Necessary And Appropriate Steps to Implement Sections IV and V Of The Settlement Agreement.**

Section IV of the Settlement Agreement requires the CSDE to issue policy statements that inform local school districts of their obligation to place children with intellectual disabilities in regular classes, in their home schools and in extracurricular activities with appropriate supplementary aids and services, that promising practices must be used with regard to instruction in regular classes, and that class members placed in out of district placements will be returned to their home districts whenever appropriate. Section V of the Settlement Agreement requires Defendants to set up a targeted, data-based monitoring system to facilitate continuous improvement in each of the state goals of the Settlement Agreement. The monitoring system must be designed to collect, analyze, and use quantitative and qualitative information and data to identify problems and provide consistent feedback to all LEAs on their

performance in achieving the five stated goals of the Agreement.  Settlement Agreement, § V.1.

In addition, the Defendants were required to provide the following monitoring and

oversight under the Settlement Agreement:

> 2.  In addition, state Defendants will monitor the
> participation and progress of students with mental retardation or
> intellectual disability in the general curriculum, use of out-of-
> district placements, and use of in CSDEs judgment, promising
> practices with respect to the education of class members with
> non-disabled students.  State Defendants will also monitor the
> availability of supplementary aids and services to support the
> regular class placements of such students…

> 3.  The focus of monitoring activities will be continuous
> improvement.  Districts that are not making satisfactory progress
> toward the state goals established pursuant to this agreement, or
> found deficient as a result of monitoring established pursuant to
> paragraph #2, will receive a focused monitoring by the
> Defendants designed to identify and provide solutions to the
> district's failure to make progress.

Settlement Agreement, § V. ¶¶ 2, 3.

As the EAP reports make clear, the Defendants have failed to meet these

requirements.  The EAP notes in its four reports to the Court, CSDE has failed to provide

any useful monitoring with respect to out-of-district placements.  (Exhibit H, p. 19.)

Further, it has failed to take action with regard to districts that have exhibited "outright

defiance" of the PJ Settlement Agreement and has failed to conduct meaningful oversight of

or promote progress in many of the smaller school districts.  Exhibit H, pp. 5, 6.

Plaintiffs' attempt to fully assess CSDE's monitoring and oversight activities has been undermined by Defendants' refusal to make their staff and officials available for interviews with Plaintiffs' experts.  Plaintiffs have good reason to believe that many students in the class have been placed in regular classes with inadequate supplementary aids and services, inadequate modifications to the general curriculum and inadequate use of promising practices.  As a result, many class members were placed in regular classes for only a brief period of time, only to be reassigned to other disability groups, and/or moved to segregated settings, often at the parents' urging or with their consent, because their child did not receive the supplementary aids and services necessary to provide access to a meaningful education.  This utter failure of monitoring and oversight and the resulting lack of implementation of a meaningful education in regular classes for most class members were noted by the EAP in its Fourth Report to the Court.

**5.  The Defendants Have Failed Take Necessary And Appropriate Steps to Implement Sections VI and VII Of The Settlement Agreement.**

Section VI.1 of the Settlement Agreement requires the Defendants to "[d]esign and implement a system of technical assistance to be made available to all LEAs to enable them to extend and improve education in regular classes for students with mental retardation or

intellectual disability." CSDE is further required to provide, "as a component of technical assistance, a sufficient number of qualified specialists to assist LEAs in carrying out their training, supervision and support responsibilities specified in this agreement." Section VI.3 specifically assigns to the EAP the duty to advise CSDE and make recommendations regarding the establishment of technical assistance, the identification of and qualifications of specialists as well as the effectiveness and adequacy of technical assistance provided to advance the goals of this Agreement." Section VII requires CSDE to provide continuing training of parents.

Plaintiffs' full assessment of the adequacy of CSDE's technical assistance and assignment of qualified specialists to support regular class placements has been hampered by Defendants' refusal to cooperate in discovery. However, based upon available information, Plaintiffs believe that Defendants' efforts under Section VI are woefully inadequate. With regard to the provision of technical assistance, CSDE has been aware that teachers, administrators, and paraprofessionals in public schools in Connecticut have received little or no formal training on placing children with mental retardation in regular classes. However, the technical assistance that has been provided is limited to the training of some professionals under the COACH's academy and the Student Assistance Response

Team (STAR).  Some additional general training on inclusion has been provided by the

State of Connecticut Special Education Resource Center.  Plaintiff objected to these

technical assistance initiatives because they were inadequate in their design and scope.  In

particular, only $250,000 per year was made available for the COACH's Academy and

STAR, and they failed to provide the individual on-site support local school districts needed

to place and properly support students with intellectual disabilities in regular classes.

Indeed, class members continue to be excluded from regular classes and public

schools, because LEAs do not have the technical assistance necessary to teach them a

modified general education curriculum and modify disruptive behavior where necessary.

Instead, CSDE authorizes the STAR team to evaluate a class member's program and write a

report, when requested by the parent and the school district, but it precludes the team from

providing the onsite training and technical assistance school professionals need to

implement regular class placements for class members.  The STAR budget is so limited that

only forty class members are evaluated per year.  Moreover, the recommendations of the

STAR teams are frequently not implemented by school districts leaving the child with an

inadequate segregated program and the family totally discouraged.  CSDE has made no

attempt to require LEAs to implement the recommendations of the STAR team or follow up

with school districts who fail to implement the STAR recommendations.

Also, CSDE has failed to provide "a sufficient number of qualified specialists to assist LEAs in carrying out their training, supervision and support responsibilities specified in this agreement." Instead, CSDE provided a list of independent consultants who were already fully engaged in consulting activities in public schools. CSDE provides no funding to ensure that a sufficient number of specialists are available. Parents attempting to address a critical problem, such as their child being excluded from school due to behavior, must try to convince their local school district to hire a consultant from the list who is already fully engaged with other school districts. As a result parents cannot find the qualified professionals needed to provide the training and technical assistance required to properly design and implement a program for their children, particularly if the child has a severe disability or behavior problem that has to be addressed. This does not come close to meeting the requirement that CSDE "provide" a "sufficient number of qualified specialists to assist LEAs to carry out the training, supervision and support responsibilities specified in the Settlement Agreement.

The EAP concluded that "[t]he range of technical assistance and training, focused monitoring and use of sanctions is … insufficient for the SDCE to meet the spirit of thee

goals (1, 3, 4, & 5) of the expressed in the EAP targets.  (Exhibit F, p. 6.)  Again, the CSDE

has ignored the comments of the Plaintiffs and the EAP and made token gestures which

leave parents with no alternative but to argue public school personnel are not properly

trained and request a hearing.

**5.  The Defendants Have Failed Take Necessary And Appropriate Steps to Implement
Section IX Of The Settlement Agreement.**

Section IX requires the Defendants to establish an Expert Advisory Panel to advise the

parties and the Court regarding the implementation of the Settlement Agreement.   Specifically,

the EAP is assigned the responsibility to:

> 1.  Advise and serve as a resource to CSDE with respect to
> implementation of al aspects of this agreement including the
> design and conduct of technical assistance, training and
> monitoring of LEAs....

> 2.  Facilitate the Defendants' compliance with this
> Agreement, identifying difficulties in compliance, facilitating
> resolution of compliance issues without court intervention, and
> referring to the court issues that cannot be resolved by discussion
> and negotiation.

> 3.  Receive the annual reports prepared pursuant to
> Section III(2) and will provide annual written comment to the
> Court, Plaintiffs and Defendants.

> 4.  Review annually and make recommendations relating
> to progress toward the goals stated in Section II, development of
> statewide technical assistance, targeted monitoring, complaint

resolution, parent training and next steps.

     5. Collect and analyze data it deems necessary relating to class members and the implementation of this agreement....

     6. The State Commissioner shall convene the Expert Advisory Panel in Hartford within ninety (90) days of the effective date of this Agreement. Thereafter, the EAP will meet three (3) times per year and more often as necessary, with a schedule development jointly by the EAP and CSDE.

     7. Members of the EAP shall be reimbursed by the state Defendants for their reasonable expenses, subject to prior approval and regular state procedures.

     8. Nothing in this agreement limits the EAP's ability to bring issues relate to the implementation of this Agreement of the attention of the Court.

Settlement Agreement, § IX.

The EAP was empanelled on August 13, 2002. CSDE authorized the EAP to attend three meetings annually in Connecticut, rarely more, and responded to some of its recommendations. But it never supported the benchmarks established by the EAP assess the adequacy of progress on the five goals of the Settlement Agreement, and never asked LEAs to compare their progress with the EAP benchmarks. Often, EAP recommendations were ignored. *See,* Exhibit H, pp. 10-20.

In its report to the Court dated February 2007, the EAP noted that based on data from

2001-2002 to 2005-2006, Connecticut showed "no significant progress" in implementing the requirement that class members be placed in their home schools, and that the progress against placement of class members in regular classes was inadequate. (Exhibit H, p. 6.) It noted that while the 24 target districts selected by CSDE had received extraordinary state-level assistance had made some progress, on the goals, it was inadequate and that progress for the state as a whole was inadequate. The EAP noted that little or no progress was made in the 145 cities and towns that had not received extraordinary intervention. *Id.* It noted that some school districts appeared to exhibit outright defiance of the *P.J.* Settlement making additional and yet untried interventions to deal with recalcitrant LEAs. *Id.* The EAP found the lack of sufficient progress "shocking" and indicative of the fact that many LEAs just do not take the goals of PJ seriously. *Id.* at 7. With respect to whether continuation of external oversight by the EAP is necessary the EAP offered the following opinions:

> **2.4 Momentum towards successful completion of the Settlement Agreement**
>
> To fully implement the intent of *PJ* requires a fundamental change in the culture of school in at state and local levels. Many essential elements have been developed but will need to be refined and sustained in LEAs. The EAP has commented on the limited progress made to date towards EAP Targets on Goals 1, 3, 4, and 5. In the past two years this progress has begun to evidence an encouraging momentum that, if continued will lead to successful completion of PJ. However, the state had not yet reached a critical

mass (i.e. sufficient number of LEAs meeting EAP Targets) necessary to achieve the fundamental change in the culture of schooling required to sustain the intent of *PJ*. The tipping point has not been reached and the danger of backsliding absent significant pressure and assistance from the CSDE looms large.

### 2.5 External Oversight has been critical to achieving the present level of progress.

The CSDE has supported the EAP, public forums, and other forms of input on the implementation of *PJ*. This independent feedback to CSDE and all LEAs is critical to marshalling the level of effort necessary to make progress on *PJ* goals. The EAP believes that its designation of targets for *PJ* goals, periodic meetings with CSDE, its annual reports including analyses of data and specific recommendations have been supportive, if not critical, to the progress made to date.

(Exhibit H, p. 7.)

Despite the EAP's assessment that the Settlement Agreement would not be implemented without external oversight, CSDE dismissed the EAP and terminated its functions on May 16, 2007. This unilateral action is in violation of the Settlement Agreement in that under the Settlement Agreement the EAP continues to have the responsibility to facilitate compliance, analyze data, report and make recommendations to the Court related to compliance. This unilateral action made further cooperative out-of-court efforts to bring CSDE's oversight and monitoring activities into compliance impossible and necessitated this request for Court

intervention.

**6. The Remedial Orders Necessary To Address Defendants' Noncompliance.**

As previously indicated, that Court held multiple conferences to assist the parties in reaching a settlement, participated in and effort to resolve the contested issues, and reviewed the settlement as required by Fed. R. Civ. P. 23(e). Also, a fairness hearing was held and the Court approved the Settlement Agreement immediately after the hearing. The resulting Settlement Agreement provides that the Court retains jurisdiction to enforce the Settlement Agreement for five years from the empanelling of the Expert Advisory Panel, and for eight years from empanelling of the EAP the Court retained jurisdiction to entertain Plaintiffs' motions for substantial non-compliance with the Agreement. Settlement Agreement, § III. Under these circumstances the district court has not only the power but the duty to enforce the Settlement Agreement which it has approved. *Meetings & Expositions, Inc. v. Tandy Corp.* 490 F.2d 714, 717 (2nd Cir. 1974)

In these circumstances Plaintiffs are entitled to remedial orders for deprivation of the rights of class members under 20 U.S.C. §§ 1412(a)(5)(A) and 1412(2)(B) and the Settlement Agreement. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in

equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.* 402 U.S. 1, *15, 91 S.Ct. 1267, **1276 (U.S.N.C. 1971). Moreover, Section 1415 of the IDEA authorizes a district court to award "such relief as the court determines is appropriate." In some circumstances, the scope of the remedy can extend beyond the scope of the original right. *See, Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed. 2d 554 (1971). "[I]t is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946) (footnote omitted). And, in *School Comm. of the Town of Burlington v. Dept. of Educ.,* the Supreme Court made clear that "equitable considerations are relevant in fashioning relief." 471 U.S. 359, 374, 105 S.Ct. 1996, 2005, 85 L.Ed.2d 385 (1985).

The remedial orders necessary to implement the Settlement Agreement include the following:

a. An order requiring Defendants to allow Plaintiffs' experts to interview employees and contractors of the Defendants regarding efforts they have made to implement the Settlement Agreement, and to cooperate fully with Plaintiffs' discovery relating to the adequacy of CSDE efforts to implement the Settlement Agreement.

b.  An order scheduling the completion of discovery and establishing a trial date on Plaintiffs' Motion to Enforce Settlement Agreement.

c.  An order appointing the EAP as Special Masters pursuant to Rule 53, Fed. R. Civ. P. to implement the duties and responsibilities established for the EAP under the Settlement Agreement and to exercise the powers specified in Rule 53.

d.  An order requiring the Defendants to fully implement the five goals of the Settlement Agreement with the oversight of the Special Masters by no later than  August 12, 2010.

e.  An order requiring the Defendants to provide monitoring and oversight of the implementation of the Settlement Agreement sufficient to implement the five goals of the Settlement Agreement, collect, analyze, and use quantitative and qualitative information and data to identify problems, verify and report on the accuracy of data and information provided by LEAs, and provide consistent feedback to all LEAs on their performance in achieving the five state goals of the Settlement Agreement.

f.  An order requiring the Defendants to monitor the participation and progress of students with mental retardation or intellectual disability in the general curriculum, use of out-of-district placement, and use of promising practices with respect to the education of class members with non-disabled students.

g. An order requiring the Defendants to monitor and assure through monitoring the availability of adequate supplementary aids and services and modifications to the general education curriculum to support regular classroom placements of class members.

h. An order requiring the Defendants to implement focused monitoring designed to identify and provide solutions where LEAs are not making satisfactory progress toward placing students with mental retardation or intellectual disabilities in regular classes with adequate supplementary aids and services and modifications to the general education curriculum.

i. An order requiring the Defendants to design and implement a system of technical assistance with the oversight of the special masters that is available to all LEAs to enable them to implement the requirements of the Settlement Agreement.

j. An order requiring the Defendants to provide with the oversight of the Special Masters a sufficient number of qualified specialists to assist LEAs in carrying out their training, supervision and support responsibilities specified the Settlement Agreement and to ensure that these specialists have considerable knowledge and skill in teaching students with mental retardation or intellectual disability in regular classes, and in assisting teachers and other personnel to accommodate and support students with mental retardation or intellectual disability in regular classes, including students with behavior problems and severe cognitive

disabilities.

k. An order requiring the Defendants to design and implement a system of training for parents of students with mental retardation to enable them to advocate for the education of they children in placing and properly supporting their children in the least restrictive environment.

l. An order requiring Defendants to implement a complaint resolution process that complies with 34 C.F.R. § 300.660.

m. An order that requires Defendants to provide to class counsel, the Special Masters, and the Court the name, address, identification number, school district, parent name and telephone number all students who were class members as of May 2002 and all students who have been identified as having intellectual disability or mental retardation since May 2002.

n. An order requiring Defendants to conduct an audit to identify all class members who have been assigned another disability classification improperly, and require the responsible LEA to identify and provide an appropriate remedial program for any child whose classification has been changed improperly.

o. An order requiring the Defendants to conduct an audit to identify all students with mental retardation or intellectual disabilities who have been exited from special education before they aged out from eligibility under state law even though they did not meet the same

graduation requirements as non-disabled students or receive adequate transition services and provide an appropriate remedial special education program for those students.

p. An order requiring the Defendants to conduct an audit to identify all students whose disability category was changed from intellectual disability to another disability category to meet Goal # 2 of the Settlement Agreement and ensure that an appropriate remedial educational program is provided for such children.

q. An order requiring Defendants to take all necessary and appropriate action to return all class members in segregated schools to regular classes in public schools with adequate supplementary aids and services whenever possible.

r. An order requiring Defendants to identify all class members who have been removed from regular classes because adequate supplementary aids and services and modifications to the general education curriculum were not provided and return those children to regular classes with adequate support services and modifications.

s. An order extending the jurisdiction of the court to May 22, 2012 or to such other date as the orders of this court can reasonably be implemented.

t. An order awarding costs and attorneys' fees to Plaintiffs for all work done not compensated thus far under the Settlement Agreement.

### III.     CONCLUSION:

For the foregoing reasons the plaintiffs request that the Court find that the Defendants

have not complied with the Settlement Agreement and enter the remedial orders requested in

Section II.6 of this brief.

PLAINTIFFS,

By_____          By_____
David C. Shaw, Esq.                  Frank J. Laski, Esq.
The Law Offices of David C. Shaw, LLC Mental Health Legal Advisors Committee
Fed. Bar No. ct05239                 Fed Bar No. ct 16180
34 Jerome Ave., Suite 210            399 Washington St., 4th Fl.
Bloomfield, CT 06002                 Boston, MA 02108
Tel. (860) 242-1238                  Tel. (617) 338-2345
Fax. (860) 242-1507                  Fax. (617) 338-2347
Email: dcshaw@cttel.net              Email: flaski@mhlac.org

**CERTIFICATION**

This is to certify that a copy of the foregoing was mailed first class, postage prepaid to counsel of record on April 15, 2008.

Darren P. Cunningham
Assistant Attorney General
State of Connecticut
P.O. Box 120
Hartford, CT 06141

_____
David C. Shaw, Esq.