UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

P.J., et al.,                        :

    Plaintiffs,                     :

V .                                  :   Case No. 2:91-CV-180(RNC)

STATE OF CONNECTICUT, et al.,        :

    Defendants.                     :

<u>MEMORANDUM</u>

In 1991, this litigation, known as "the PJ case," was
initiated under the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400 <u>et seq.</u>, on behalf of Connecticut
students with intellectual disabilities ("ID") against the
Connecticut State Board of Education, the State Commissioner of
Education and a number of local school districts.  The plaintiffs
alleged that the State's "hands-off" policy with regard to
placement decisions made by local school districts responsible
for educating children with intellectual disabilities resulted in
segregated placements of the plaintiffs in violation of the IDEA,
which requires states to ensure that, "to the maximum extent
appropriate," students with disabilities are educated with their
nondisabled peers.  20 U.S.C. § 1412(a)(5)(A).  In December 1993,
the case was certified as a class action.  <u>C.A.R.C. v. State of
Connecticut Board of Education</u>, 2:91-CV-180(JAC), Ruling On

Motion to Reconsider Denial of Motion for Class Certification,
slip op. at 6 (D. Conn. Dec. 13, 1993).

In 2000, after a number of claims had been resolved, a bench
trial was conducted.  The focus of the trial was the plaintiffs'
claim that the Connecticut State Department of Education ("the
Department" of "CSDE") was allowing local districts to illegally
segregate students with intellectual disabilities solely on the
basis of their disability classification instead of ensuring that
the districts' placement decisions took account of each student's
individual needs and abilities.  Following the trial, the parties
entered into settlement negotiations before any findings were
made as to liability.  As a result of the negotiations, the
parties reached a Settlement Agreement ("the Agreement" or "SA"),
which was approved by the Court on May 22, 2002.

As the Agreement itself states, the defendants continued to
deny the plaintiffs' allegations and admitted no liability.  See
SA at 2.  However, both sides wanted a resolution of the case
that was consistent with the requirements of the IDEA and its
implementing regulations.  Id.  To that end, the Department
agreed to pursue five goals to bring about a more inclusive,
integrated system of public education in Connecticut for students
with intellectual disabilities ("the PJ goals").  The Department
also agreed to take a number of actions in pursuit of the goals,

including monitoring and assisting local school districts, and providing the plaintiffs and the Court with information necessary to enforce the Agreement.  In addition, the Agreement provided for the creation of an Expert Advisory Panel ("EAP") to advise the parties and the Court regarding issues relating to implementation.

In entering into the Agreement, the State submitted to the Court's jurisdiction for a period of approximately eight years.[1] The parties agreed that the Court could act <u>sua sponte</u> to enforce any provision of the Agreement during the first five years.  The Agreement also provided, however, that the Court would be able to take enforcement action in the final three years only in the event of a showing by the plaintiffs of the defendants' substantial noncompliance.

The first five years passed without the Court exercising enforcement authority.[2]  On April 16, 2008, approximately one year after the conclusion of the initial five-year period, the plaintiffs filed a motion alleging substantial noncompliance. The motion was denied without prejudice based on indications that

---

[1] The parties agree that the eight-year period ended on August 12, 2010.

[2] The plaintiffs brought a number of motions alleging interference with their right to obtain data but those issues were resolved by agreement.

3

the parties might be able to resolve their differences, but no agreement was reached and the motion was re-filed on April 15, 2009. After a period of discovery, an evidentiary hearing was held in June 2010. Numerous witnesses testified and voluminous exhibits were admitted into the record. Following the evidentiary hearing, the plaintiffs' motion for substantial noncompliance was denied. This memorandum provides a statement of reasons for that ruling.

## I.  Summary

The parties agree that the touchstone of the substantial noncompliance inquiry is whether any noncompliance frustrated the Agreement's essential purposes. The Agreement's essential purposes are found in § II of the Agreement, entitled "Goals and Outcomes." Comparison of data from the 2002-2003 school year with data from the 2009-2010 school year demonstrates that significant progress was made toward each goal. Indeed, as a result of actions taken by the Department following approval of the Agreement, in 2008 Connecticut ranked second in the nation in terms of the percentage of students with the ID label who were placed in regular classes.[3] The Department urges that the

---

[3] Forty-three states reported data for 2008. Iowa ranked first among the forty-three, with just over sixty percent of students with ID in regular class placements. Connecticut was just under fifty percent, a number that grew to 50.7% during the 2009-2010 school year.

State's impressive ranking shows that the goals of the Agreement were met, if not surpassed.

The plaintiffs disagree.  They submit that a finding of substantial noncompliance is warranted because the Department failed to make sufficient progress toward the goals.  Central to the plaintiffs' position is a claim that the Agreement required the State to take measures to provide class members with meaningful access to the general curriculum rather than just more time in regular classes.  The State failed to substantially comply with this obligation, the plaintiffs contend, because site visits revealed that students with intellectual disabilities in integrated placements were excluded from the general curriculum, cut-off from the rest of the class, or educated exclusively by paraprofessionals.[4]  The plaintiffs urge that the State was required to do more to ensure students would have meaningful access to the general curriculum, for example, by giving general education teachers more job-embedded assistance.

The evidence presented by the plaintiffs concerning the results of their site visits, although troubling, is insufficient to support a finding of substantial noncompliance.  The essential purposes of the Agreement involved increasing integrated

---

[4] The plaintiffs collected this evidence by conducting eighty-four site visits in twenty-four schools that had been targeted by the defendants for focused monitoring.

placements for class members, rather than providing meaningful access to the general curriculum.  And although more job-embedded assistance likely would have produced more progress toward the goals in the Agreement, the Agreement did not require the State to provide such assistance.

The plaintiffs' allegations of substantial noncompliance are not without some support in the record.  The plaintiffs' have shown that the State failed to comply with certain aspects of the Agreement.  However, it is undisputed that the State complied with many of its obligations and the plaintiffs have not shown that the State's noncompliance frustrated an essential purpose of the Agreement.  Moreover, while the State's own data show that progress toward the goals slowed after 2007, it is undisputed that the State continued to make good faith efforts to pursue the goals in the face of recalcitrant districts and budget constraints.  Accordingly, a finding of substantial noncompliance is unwarranted.

## II.  **The IDEA**

To understand the issues presented by the plaintiffs' motion it is necessary at the outset to review the IDEA in some detail. "Congress enacted the IDEA 'to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and]

to ensure that the rights of children with disabilities and parents of such children are protected.' 20 U.S.C. § 1400(d)(1)(A)-(B)." <u>M.H. v. New York City Dept. Of Educ.</u>, ___ F.3d ___, 2012 WL 2477649,*1 (2d Cir. June 29, 2012).  "The IDEA offers federal funds to states that develop plans to assure 'all children with disabilities' [residing in the state] a 'free appropriate public education.' 20 U.S.C. § 1412(a)(1)(A)." <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 379 (2d Cir. 2003). State education agencies ("SEAs), like the Department, are responsible for carrying out the mandates of the IDEA.

"To meet [the IDEA's] requirements, a school district's program must provide 'special education and related services[,]' [20 U.S.C. § 1401(9)], tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits."  <u>Gagliardi v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 107 (2d Cir. 2007)(internal quotation marks omitted).  The IDEA requires states to provide disabled students with "appropriate education" in "the least restrictive environment." 20 U.S.C. § 1412(a)(1), (5).  This means that a child must not be placed in "special classes, separate schooling," or otherwise removed from the regular educational environment unless "the nature or severity" of the child's disability "is such that education in regular classes

7

with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).

State education agencies have a responsibility to take action to protect the right of students with disabilities to receive appropriate education in the least restrictive environment as mandated by the IDEA.  However, it is not up to the defendants to decide where students with disabilities will be served during the school day.  Under the IDEA, decisions concerning the setting in which a child will receive special education and other services must be made at the local level in accordance with an individualized education program ("IEP"), which school districts are required to develop and implement each year for every student with a disability.  20 U.S.C. § 1414(d)).

"The IEP is '[t]he centerpiece of the IDEA's educational delivery system.'"  M.H., 2012 WL 2477649,*1 (quoting D.D. ex rel. V.D. v. N.Y.C. Bd. Of Educ., 465 F.3d 503, 507 (2d Cir. 2006).  It is a written statement that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  D.D. ex rel V.D., 465 F.3d 503, 507-08 (2d Cir. 2006).  The IEP must be written by a team of people familiar with the student, known in

8

Connecticut as the Planning and Placement Team ("PPT"), who must follow certain procedures in developing the IEP.   PPTs must include the student's parents, a general education teacher, a special education teacher, and a representative from the Local Education Authority ("LEA") responsible for educating the student (usually the local school district).  20 U.S.C. § 1414(d)(1)(B).

In crafting the IEP, the PPT must consider the strengths of the child, the concerns of the parents, the results of the most recent evaluation of the child's disability status, and the academic, developmental and functional needs of the child.  20 U.S.C. § 1414(d)(3)(A).  The IEP must protect the substantive guarantees of the IDEA by being reasonably calculated to provide meaningful educational benefits to the student in a placement that is integrated with nondisabled students to the maximum extent appropriate.  Newington Board of Education, 546 F.3d 111, 119 (2d. Cir. 2008).  "Understandably, courts have recognized some tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow."  Id.

If a student is not satisfied with his or her IEP, the student has a right to appeal to a hearing officer.  Hearing officer decisions may be challenged in court.  Courts reviewing

9

hearing officer decisions must be careful not to "substitute their own notions of educational policy for those of the school authorities they review." Newington Board of Education, 546 F. 3d at 118. "To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Gagliardo, 489 F.3d at 113 (quoting Board of Educ. of Hendrick Hudson Central School v. Rowley, 458 U.S. 176, 206 1982).[5]

The IDEA provides for state level activities to help remove impediments to regular class placements for students with intellectual disabilities without trampling on the individualized nature of the IEP protocol. SEAs can provide technical assistance that teaches LEAs how to better meet the educational needs of students with intellectual disabilities in the regular classroom. And they must monitor LEAs to ensure that IDEA funds are appropriately used to enlarge the LEAs' capacity for educating students with intellectual disabilities in the regular

_____

[5] Although the Court is not presently reviewing individual placement decisions, deference may be even more appropriate here because the Court is reviewing state-level activities without reference to their impact on individual students, placing the issues farther afield from those traditionally encountered in cases arising under the IDEA.

classroom.  SEAs also can help educate parents about resources available to improve disabled students' access to the regular clasroom and teach them how to advocate for regular class placements in PPT meetings.  In addition, SEAs are obligated to provide a number of forums for seeking relief from adverse IEP determinations, including a due process hearing before a neutral officer.

The U.S. Secretary of Education monitors states' compliance with their obligations under the IDEA.  20 U.S.C. § 1416(a)(1). The primary focus of the Secretary's monitoring is on improving educational results and functional outcomes for all students with disabilities.  20 U.S.C. § 1416(a)(2).  States are required to collect information to report annually to the Secretary on priority areas.  20 U.S.C. § 1416(b)(2).  States are forbidden from reporting any information on performance that would result in disclosure of personally identifiable information about individual children.  Id.

The Secretary is required to review information provided by a state to determine whether the state meets requirements, needs assistance, needs intervention or needs substantial intervention. Each determination is linked to specific enforcement actions.  If the Secretary determines, for two consecutive years, that a state needs assistance, the secretary must take at least one of the

following actions: advise the state of available technical assistance; direct the State to use funds to address certain deficiencies; or impose condition's on the State's grant. 20 U.S.C. § 1416(e)(1).  If the Secretary determines, for three or more consecutive years, that a state needs intervention, the Secretary may take additional action, which may include withholding funds after providing the state with notice and an opportunity for a hearing or referring the matter to the Department of Justice.  20 U.S.C. § 1416(e).

III.  **The Settlement Agreement and the Defendants' Performance**

This section provides an overview of the provisions of the Settlement Agreement and the defendants' performance.

**-Class Membership/Plaintiffs' Right to Information (Section I)**

The Agreement required the defendants to "prepare and distribute to the parties and the court a list of public school students in Connecticut who on or after December 1, 1999, carry the label of either mental retardation or intellectual disability and who are eligible for special education: such list shall be updated periodically."  SA at 3 (§ I.1)  The Agreement gave the plaintiffs "a right to collect data relating to [the students thus identified] and to challenge the adequacy of that list."  Id.  It also obligated the Department to grant the plaintiffs "access to data and files relating to class members, to the

extent allowed by state and federal statute, for all purposes
relating to the enforcement and implementation of this
Agreement." Id.

Pursuant to this section of the Agreement, the Department
initially provided the plaintiffs with a paper list of non-unique
composite identifiers corresponding to students labeled ID at the
time the list was promulgated.  The plaintiffs objected that the
lists were insufficient for purposes of enforcement and
implementation of the Agreement because the plaintiffs were
unable to monitor the performance of LEAs.  The Department
responded that it could not provide better information without
running afoul of FERPA.  In due course, the plaintiffs filed a
motion for relief.  In November 2005, following a hearing before
Magistrate Judge Martinez, the defendants agreed to disclose
identifying information in a manner consistent with FERPA by
providing students labeled "ID" with an opportunity to opt out of
the disclosure.  In January 2007, the State provided the
plaintiffs with a longitudinal database that enabled the
plaintiffs to more effectively and efficiently evaluate the data.
However, they did not provide a list of all class members leading
to another hearing before Magistrate Judge Martinez in December
2007.  Following that hearing, the defendants disclosed
identifying information and data relating to all class members

13

after providing an opportunity for the class members not
currently labeled ID to opt out.

**-Expert Advisory Panel (Section IV)**

The Agreement provided that the "defendants shall establish
an Expert Advisory Panel to advise the parties and the Court
regarding the implementation of this Agreement."  The EAP was to
consist of four members, with each party nominating two members,
but with both parties agreeing to all four.  The EAP was directed
to "advise and serve as a resource to [the Department] with
respect to implementation of all aspects of [the Agreement]
including the design and conduct of technical assistance,
training and monitoring of LEAs."  SA at 11.  The Agreement
provided that "All advice and recommendations of the [EAP] shall
be made by consensus and represent the collective judgment of the
Panel as a whole.  The [Department] will not be bound by either
the individual or collective advice of the EAP."  Id. at 12.  In
furtherance of this advisory role, the EAP was directed to
identify difficulties in compliance, facilitate resolution of
compliance issues without court intervention, and refer to the
court any issues that could not be resolved by agreement.  The
Panel also was directed to "review annually and make
recommendations relating to progress towards the goals stated in
Section II, development of statewide technical assistance,

14

targeted monitoring, complaint resolution, parent training, and next steps."  Finally, the Panel was directed to "[c]ollect and analyze data it deems necessary relating to class members and the implementation of this agreement."  The State was required to convene the Panel within ninety days and the Panel was expected to meet at least three times per year.

The defendants established the EAP as required by the Agreement and the EAP carried out its specified role until May 2007, when it was discharged by the defendants.  The EAP issued recommendations as contemplated by the Agreement, including benchmarks regarding the goals in the Agreement.

**Goals and Outcomes (Section II)**

The Agreement obligated the defendants to "commit to achieving" progress toward "five main overall goals" representing a more inclusive system of public education.  <u>See</u> SA at 3-4.  The five goals were to: 1) increase the percentage of students spending 80% of the school day with non-disabled peers,[6] 2) reduce disproportionately high rates at which certain discrete groups were classified as intellectually disabled, 3) increase the mean and median percentage of the school day students with intellectual disability were spending with nondisabled peers, 4)

---

[6] A student is considered to be with nondisabled peers when 50% or more of the other students in the setting are not disabled and are of similar age.

increase the percentage of students with intellectual disability attending the school they would attend if they were not disabled (their "home school"), and 5) increase the percentage of students participating in extracurricular activities with nondisabled peers.  Id.

It is undisputed that the State met the second goal concerning classification practices having a disparate impact on some groups.  With regard to the other goals, the record shows the following:[7]

*Goal One*: *Increase the percentage of students with intellectual disabilities placed in regular classes*:

In 2002-2003, 13.6% of students with ID were in regular class placements.  In 2009-2010, 48.2% were in regular class placements.  The percentage of students in regular class placements increased every year during the eight-year term of the Agreement.  The greatest increase was between the 2004-2005 school year and the 2005-2006 school year, when the percentage of students in regular classes increased 60.7% from 20.6% to 33.1%.  The smallest increase was between the 2008-2009 school year and the 2009-2010 school year, when the percentage of

---

[7] The figures set forth in the text represent all students who were classified as ID at any point during the relevant period, including students who were reclassified to other disability categories.

students in regular classes increased 1.7% from 47.4% to 48.2%. There were increases of greater than ten percent every year with the following exceptions: between 2000-2001 and 2001-2002 (5%), 2001-2002 and 2002-2003 (7.9%), 2007-2008 and 2008-2009 (2.6%) and 2008-2009 and 2009-2010 (1.7%).[8]

*Goal Three: Increase the mean and median percentage of the school day students with intellectual disability spend with nondisabled students*:

In 2002-2003, the mean percent of the school day students with ID spent with nondisabled peers was 38.9%.  In 2009-2010 it was 67.9%.  The mean time increased every year except between 2008-2009 and 2009-2010, when it dropped 0.1% from 68% to 67.9%. The greatest increase was between the 2004-2005 school year and the 2005-2006 school year, when the mean time increased 17.8% from 51% to 60.1%.[9]

In 2002-2003, the median percent of the school day students with ID spent with nondisabled peers was 34.4%.  In 2009-2010, it was 77.6%.  The median time increased every year.  The greatest increase was between the 2004-2005 school year and the 2005-2006

---

[8] The EAP recommended the following targets or benchmarks for this goal: 40% placement by 2005 and 80% by 2007.

[9] The EAP benchmark for mean time with nondisabled peers was 75%.

17

school year, when the mean time increased 28% from 51.4% to 65.8%.[10]

*Goal Four: Increase the percentage of students with intellectual disability who attend their home school:*

In 2002-2003, 70.8% of students with ID were placed in their home school.  In 2009-2010, 80.9% of ID students were placed in their home school.  Progress was made every year except 2002-2003, when it dropped 0.2% from 71% in 2001-2002, and 2009-2010, when it dropped 1.9% from 82.5%.  The largest gain in home school placement was between 2004-2005 and 2005-2006, when it rose 7.9% from 75.4% to 81.4%.

*Goal Five: Increase the percentage of students with mental retardation or intellectual disability who participate in school-sponsored extra curricular activities with non-disabled students*:

In 2002-2003, 19.4% of students with ID participated in school-sponsored extracurricular activities with nondisabled students.  In 2009-2010, the participation rate was 44.4%. Progress was made every year except 2007-2008, when the rate dropped 1.9% to 44.2% from 45% in 2006-2007, and 2008-2009, when it dropped another 1% to 43.7%.  The largest gain was between

---

[10]  The EAP did not set a benchmark for median time with nondisabled peers.

2003-2003 and 2003-2004, when it rose 28.6% from 20.1% to 25.8%.[11]

**-Annual Reports/Court Oversight (Section III)**

The defendants were obliged to produce four annual reports detailing the Department's "activities related to the five goals and implementation of the agreement for the prior school year," including "all statewide and district-by-district data related to class members" and documenting "progress on each stated goal." The defendants produced four annual reports and the plaintiffs do not allege any deficiency in the defendants' compliance with this provision.

The defendants also were obliged to submit to the jurisdiction of the court for a period of eight years.  As discussed above, the Agreement provided that during the first five years (through August 15, 2007), the Court could take enforcement action on its own, but during the last three years (through August 15, 2010), the Court's enforcement authority was contingent on a showing by the plaintiffs of substantial noncompliance.  The Court did not issue any orders to enforce the terms of the Agreement during the first five years, although the

---

[11]  The EAP benchmark was that the percentage of participating ID students should equal or exceed the percentage of all participating students.  The record does not show the level of participation of all students.

Court did hear arguments on motions regarding the plaintiff's right to receive information, which were ultimately resolved by agreement.

**-Policy Statements (Section IV)**

The Agreement required the Department to issue policy statements to LEAs affirming: (1) the right of each student with disabilities to be educated with nondisabled children to the maximum extent appropriate and (2) the requirement that PPTs consider the placement of children with ID in the regular classroom with supplementary aids and services.  The Department issued a number of policy statements emphasizing the requirement that each student receive an individualized placement determination and notifying districts that they would be held accountable for progress toward the goals of the Agreement. There is no dispute that the Department satisfied its obligations under this section of the Agreement.

**-Program Compliance Review (Monitoring)(Section V)**

The Agreement required the Department to establish "a targeted, data-based monitoring system to facilitate continuous improvement in each of the stated goals." SA at 7 (§ V(1)).  The Department was directed "to collect, analyze, and use quantitative and qualitative information and data to identify problems and provide consistent feedback to all LEAs on their

20

performance in achieving the five stated goals." Id.  The
Department was required to "monitor the participation and
progress of students . . . in the general curriculum, use of out-
of-district placements, and use of, in [the Department's]
judgment, promising practices with respect to the education of
class members with non-disabled students." Id. (V(2)).  The
Agreement required the Department to focus on districts found
deficient and identify and provide solutions for their failure to
make progress.  § V(3).  The Department also was required to take
specific steps to closely monitor districts identified as being
"most in need" of assistance, starting with approximately eight
to twelve such districts.  Id.  § V(4).

 The defendants began their monitoring efforts in the 2002-
2003 school year.  They established three different levels of
monitoring: general monitoring applicable to every LEA, focused
monitoring of the LEAs in a geographical region, and "ID focused
monitoring" of eight districts identified as being "most in
need."

The general monitoring program required each district to
submit data regarding progress toward the five goals in the
Agreement.  Prior to the Agreement, LEAs submitted annual data
for all students with disabilities.  After the Agreement, LEAs
were also required to report separately on students with

intellectual disabilities and their progress toward the five goals in the Agreement.

As a result of the general monitoring, thirty-four districts were notified that action was necessary to correct over-identification of intellectually disabled students by race and ethnicity.  Six of these were required to develop action plans, invited to attend a summit on disproportionate identification and were provided with technical assistance to reduce over-identification.  In addition, sixteen districts were notified that their data fell below state averages relating to at least three of the four remaining goals, were required to submit action plans for each deficient element, were provided with technical assistance regarding the development of action plans and were provided with information about grant opportunities.

The Department also implemented a "program review system-ID specific."  This system was designed to review all the districts in one of the State's six geographical regions every year so that the districts in each region would be subjected to focused monitoring at least once every six years.  The program review system was already in place to monitor data regarding all students with disabilities, but the ID specific component was implemented to address the requirements of the Agreement.

The "ACES" region, comprised of twenty-six districts, was selected for focused monitoring during the 2002-2003 school year. Each district in the region was required to conduct a self-assessment of progress toward the five goals and develop an improvement plan.  The data for each of the twenty-six districts were subjected to a desk audit.  As a result of deficiencies identified in the audits, twelve districts were selected for site visits and three additional districts were selected at random for site visits.  The site visits included file reviews, interviews of students and staff, school tours and class observations.

The defendants worked on a protocol to use for all site visits.  The protocol was designed to collect qualitative data relevant to the Agreement.  In 2002-2003, the protocol required persons conducting site visits to focus on progress and participation of students with ID in the general curriculum, use of out-of-district placements, use of promising practices, and use of supplementary aids and services.  The tools developed to collect this information were disseminated to all districts for self-assessment purposes and formed the basis for a walkthrough protocol subsequently used to collect qualitative data from all districts.

The eight districts initially identified as being most in need of assistance were subjected to "ID focused monitoring."  ID

23

focused monitoring was implemented by the ID focused monitoring group.  It was the most comprehensive monitoring program administered by the defendants to oversee school districts' treatment of students with intellectual disabilities.  In the 2002-2003 school year, the program proceeded in two phases.  In phase one, a consultant from the Department visited each of the eight districts to gather information from interviews with faculty and staff and each of the eight districts was required to submit an action plan.  In phase two, the ID focused monitoring group conducted file reviews and interviewed staff members to verify the data reported in the districts' annual reports and then revised the districts' action plans to address data accuracy issues.  The ID Focused Monitoring Group also worked with the local districts to set reasonable targets for each of the five goals in the Agreement.

During the 2003-2004 school year, the defendants continued with each of the monitoring systems put in place the previous year.  The general monitoring was bolstered to require each district to attest in writing to the development of an action plan related to the goals.  The program review process was updated so all districts would be considered for focused monitoring on an annual basis.  Every district was notified of the change and provided with a copy of the review protocols used

in the site visits.  The sixteen problem districts identified in the prior year's annual review were placed in the ID Focused monitoring program originally designed for the eight districts most in need for a total of twenty-four heavily monitored districts.  These districts were subjected to site visits and required to develop action plans and participate in mid-year reviews on top of the regularly scheduled annual reviews. Twenty-three of the twenty-four were approved for grants to increase their regular class placement opportunities for students with ID.

During the 2004-2005 school year, the defendants continued to review the annual reports on data relating to the five goals and notify districts of areas of concern.  The program review system was modified to focus primarily on the goals of increasing mean time with nondisabled peers and reducing the disparate identification of students with ID by race and ethnicity.  The defendants began publishing color-coded state maps that assigned each district a color corresponding to how much progress it was making with respect to these two goals.  In addition, all the rural districts with fewer than twenty students with intellectual disabilities and seven other districts were added to the group of heavily monitored districts, including the eight most in need. These districts were required to develop action plans for

progress toward the goals and were given grants to implement those plans.  Some of the heavily monitored districts were selected for site visits.  The Department also began conducting audits of the annual reports.

During the 2005-2006 school year, the defendants continued with the general monitoring of districts' annual reports.  They also replaced the program review system with a new monitoring protocol called the "PJ Settlement Determination system."  The new system used data on regular class placement and mean time with nondisabled peers to organize all districts into one of six categories: meets requirements, needs assistance 1, needs assistance 2, needs intervention 1, needs intervention 2, and needs substantial intervention.  The criteria for each category related to a district's progress toward statewide targets for regular class placement and time with nondisabled peers.  A determination that a district belonged in any of the categories other than "meets requirements" triggered the applicability of certain enforcement procedures, ranging from a requirement that a district submit an improvement plans for progress on all five goals to a requirement that a district submit to site visits and report triennially on progress toward the five goals.

During the 2006-2007 school year, the defendants continued with the general monitoring of districts' annual reports.   As a

26

result of the PJ Determination system, forty-three districts were required to report triennially on their progress toward the goals, craft annual improvement plans and self-assessments, report on their involvement with the technical assistance programs offered by the Department, and submit to site visits.

Beginning in the 2007-2008 school year, the defendants subjected all 129 districts with fewer than twenty students with ID to targeted monitoring.  The defendants also completed the walkthrough program.  As a result of their findings, they undertook to devise a program to address inadequacies in the use of paraprofessionals.  The defendants also continued with the general monitoring of annual reports and the PJ determination system through the 2009-2010 school year.

In a 2005 Report, the EAP commended the defendants' targeted monitoring, noting that many of the targeted districts were making progress.  The EAP recommended instituting a triage, whereby the fourteen worst districts would be pressed hard, the best districts would be largely left alone aside from their annual reporting requirements, and the districts in the middle would be encouraged to improve.  The EAP recommended focusing primarily on the regular class placement goal and also looking for major discrepancies relative to the other goals.  See EAP

2005 report at 9.   The Department acted in accordance with these recommendations.

In a 2007 Report, the EAP again commended the defendants' monitoring efforts: "The CSDE has developed and refined an on-site monitoring process related to PJ that has reinforced both the goals of PJ and compliance with state and federal law.   This targeted monitoring has been a valuable tool for leveraging change towards the EAP Targets of PJ."   EAP 2007 Report at 8.

**-Technical Assistance (Section VI)**

"To support full implementation of [the] IDEA" and "fully implement [the] Agreement," the Department was required to "design and implement a system of technical assistance" to "enable" districts to "extend and improve education in regular classes for students with . . . intellectual disability."   SA at 9 (§ VI.I.1).   The Department was required to provide "a sufficient number of qualified specialists to assist LEAs in carrying out their training, supervision and support responsibilities."   Id. (§ VI.I.2).   In addition, The State Commissioner of Education was required to designate a staff person to "design, implement and coordinate all efforts under [the Agreement],including technical assistance."   Id.   The Agreement provided that the designated person  would be "responsible for the good faith efforts of the [Department] in

28

meeting the five stated goals set forth Section II"  and would also serve "as the liaison to the [EAP]."  Id.

**--Technical Assistance Programs**

To meet its obligations to provide districts with technical assistance, the Department used the Star program, the Coaches Academy and the State Education Resource Center ("SERC").  The Star program and the Coaches Academy were administered by the University of Connecticut and funded by a grant from the defendants.  SERC is a state-funded, non-profit provider of technical assistance for the education of all students with disabilities.

The Star program operated from the 2005-2006 school year until the 2007-2008 school year.  The program provided technical assistance regarding the education of individual students with ID in the regular classroom.  It addressed the needs of approximately 54 students per year.  The STAR program included observing the child's school, reading his IEP, interviewing the child, his family, and educators, bringing the PPT together, identifying problems, and agreeing on an action plan.  Once the action plan was delivered to the LEA, STAR's involvement usually ceased.  The EAP commended the defendants on the STAR program.

The Coaches Academy operated for the same time period as the Star program.  Its mission was to help transform general

educators with mainstreaming skills into coaches to work with general educators who lacked such skills.  Schools were not required to send teachers to the Academy, but they were strongly encouraged to do so.  The program was attended by over 355 employees from 54 school districts, two-thirds of them teachers. The training focused on use of supplementary aids and services and promising practices, including cooperative learning, differential instruction and collaborative learning.  Many of the teachers who attended lacked the foundational knowledge to be brought up to the level of competence necessary to coach other educators.  But these teachers were provided with valuable skills.  The EAP commended the defendants on the Coaches Academy.

SERC was the primary provider of ID-specific technical assistance to local districts prior to the Star program and Coaches Academy and it resumed the primary role of providing ID-specific technical assistance when those programs were discontinued.  SERC made many advances in the provision of ID-related technical assistance over the course of the Agreement. It published new guidelines for (1) classifying students with disabilities, (2) conducting PPT meetings and (3) working with paraprofessionals.  SERC trained district staff in the use of the Step-by-Step approach to inclusive education, which is highly-

regarded.  SERC also developed materials to assist districts with transition-aged students.

Many of the services provided by SERC were subsidized by the Department, but most districts were required to pay a portion of the cost of receiving technical assistance.  SERC personnel worked with the ID Focused Monitoring Group to determine whether districts needed fee waivers or other incentives to access technical assistance regarding students with ID.  Some poorly-performing districts were provided with assistance at State expense.

In accordance with a recommendation of the EAP, most of SERC's ID-specific efforts during the last three years of the Agreement were concentrated on the State's smallest districts. These districts do not have as much experience serving students with ID as larger districts and thus may be more reliant on out-of-district or non-home school placements.  SERC's focus on the small districts was consistent with the overall goals of the Agreement.

During the last three years of the Agreement, SERC provided a substantial amount of technical assistance to districts regarding the education of all students with disabilities.  It also began focusing on improving the performance of all disabled students on standardized tests, which included providing

31

technical assistance with teaching strategies for ID students. SERC provided assistance with co-teaching, differentiated instruction, use of supplementary aids and services and use of professionals.  The EAP consistently commended SERC on the quality of its technical assistance.

### --Coordinator/Liaison

Pursuant to § VI of the Agreement, the Department designated Anne Louise Thompson to be responsible for coordinating efforts under the Agreement and to serve as the liaison to the EAP.  Ms. Thompson credibly testified that the Agreement resulted in a welcome shift in emphasis toward inclusive education, that the EAP's recommendations concerning the goals of the Agreement were taken seriously, and that the EAP benchmarks were used to set targets for districts in a realistic position to try to achieve them.

During the term of the Agreement, Ms. Thompson administered a technical assistance budget of $1.8 million, of which $500,000 went to the STAR program and the Coaches Academy. In addition, twenty-four districts were given $50,000 grants to develop technical assistance plans, and five districts were given $50,000 grants to set-up model classrooms.

The Court has no doubt that Ms. Thompson and her colleagues at the Department who testified during the evidentiary hearing

embraced the goals of the Agreement, were committed to achieving the goals, and consistently made good faith efforts to try to meet them.

 **-Parent Involvement (Section VII)**

The Agreement required the Department to "allocate funds for training programs to enable parents of class members to effectively advocate for the education of their children in least restrictive environments."  SA at 10 (VII).  Funds were to be allocated to the Connecticut Parent Advocacy Center through June 2005 to conduct training.  The Department also was required to "work closely with other parent-centered groups, such as the Connecticut Coalition for Inclusive Education, in the design and conduct of this training."  Id. at 11.

 In accordance with the Agreement, SERC funded training programs with outside organizations to teach parents to be more effective advocates for integrated placements for their children. The training helped produce progress toward the goals: with parents able to advocate for integrated placements (and other PPT members considering regular class placements as the first option) many PPTs were able to take advantage of existing capacity within districts and the percentage of students in regular class placements increased significantly.

-**Complaint Resolution Process (Section VIII)**

The Agreement required the Department to establish and maintain a process to resolve complaints pursuant to 34 C.F.R. § 300.660.  SA at 11.  It is undisputed that the Department fully performed its obligations in this regard.

## IV.  Discussion

The Agreement's substantial compliance standard requires an inquiry into whether the essential purposes of the Agreement have been fulfilled.  It is undisputed that the Agreement's overall purpose was to protect the rights and enforce the obligations established by 20 U.S.C. § 1412(a)(5)(A).  However, the defendants' obligations are not always clear from the face of the Agreement and the parties disagree about what the Agreement required.  In particular, the plaintiffs contend that the Agreement required the plaintiffs to ensure that students with ID would have meaningful access to the general curriculum.  The Court respectfully disagrees for reasons set forth below.

## A. The Agreement's Essential Purposes Are Concerned With Increasing Integrated Placements

In construing the terms of the Agreement, it is important to place the Agreement in context by considering where the ID education movement stood at the time the Agreement was made.  The record shows that the ID education movement has progressed in

three phases.  The first phase, which began in the late 1980s and ended sometime in the 1990s, challenged the belief that students with ID were not entitled to any type of public education.  The second phase, beginning sometime in the 1990s and ending in the early 2000s, challenged the belief that students with ID, by virtue of their diagnosis, belonged in segregated placements. The third phase, which began in the early 2000s, challenges the belief that students with ID cannot obtain meaningful academic benefits in integrated settings.[1]

This case was filed toward the end of the first phase and tried toward the end of the second phase, when the focus of the ID education movement generally was still on desegregation.  At the trial, the plaintiffs undertook to prove that the Department was allowing districts to segregate students on the basis of the ID classification rather than on the basis of individualized consideration of the students' abilities and needs.  The plaintiffs' focus on increasing integrated placements was consistent with the interests of the class at the time.  The class is comprised of students with ID who are not educated in regular classrooms, in other words, students who are segregated

---

[1] The shift to the third phase was prompted by studies of integrated programs in Italy and England demonstrating that a larger percentage of students with ID could obtain more educational benefits from regular class placements than had been understood.

from their nondisabled peers.  For students with ID, integrated placements are meaningful in and of themselves as necessary predicates to obtaining academic benefits in integrated classes. Moreover, there are significant non-academic benefits that can be achieved with integration.

Against this background, it is not surprising that the Agreement states its essential purposes in terms focused on increasing integrated placements, rather than on improving the quality of education in integrated placements through access to the general curriculum.  Goal one is "an increase in the percent of students with [ID] who are placed in regular classes."  SA at 3.  The use of the term "placed," as opposed to "educated," suggests that improved educational outcomes are not necessary for progress toward the goal.  As plaintiffs have recognized, moreover, this goal could be "met through participation with nondisabled children in non-academic subjects."  <u>See</u> Plaintiffs' Rebuttal to Department's Response to 2010 EAP Report, doc. 682 at 3 (observing that the regular class placement goal could be "met through participation with nondisabled children in non-academic subjects such as music, art, lunch, recess, home economic, etc.") Goal two, dealing with the disparate impact of classification practices on members of certain groups, is not concerned with the quality of education in regular classes.  Goal three refers to

"an increase in the mean and median percent of the school day that students with [ID] spend with non-disabled students" without saying how the time should be spent. SA at 4. Goal four refers to "an increase in the percent of students with [ID] who attend [their home school]," id., an outcome that can be met even if the students are not in regular classrooms in their home schools. Finally, goal five refers to "an increase in the percent of students with [ID] who participate in school-sponsored extracurricular activities with non-disabled students," id., a goal that by its terms is not concerned with the general curriculum.

Despite the emphasis on integrated placements, the Agreement is not indifferent to the need to improve educational outcomes. Section VI of the Agreement required the Department to "design and implement a system of technical assistance . . . to enable [local districts] to extend and improve education in regular classes . . . ." SA at 9. Here, though, there is a distinction drawn between extending and improving education in regular classes. This distinction also appears in § V of the Agreement, concerning the Department's duties to monitor local districts. Section V(1) focuses on monitoring progress toward the five goals, whereas § V(2) focuses on monitoring education quality. Section V(3) maintains this distinction by describing two

circumstances that require focused monitoring: when districts are not making satisfactory progress toward the goals or when districts are "found deficient as a result of monitoring established pursuant to [§ V(2)]."  SA at 8.

The plaintiffs urge the Court to find that the word "meaningful," as used in § II of the Agreement, demonstrates that the goals are concerned with access to the general curriculum. Section II requires the Department to "commit to achieving meaningful continuous improvement annually with respect to goals #1 and #4 and continuous improvement with respect to goals #2, #3, and #5."  SA at 4.  The plaintiffs' position is inconsistent with the way "meaningful" is used in the Agreement.  "Meaningful" is used only in connection with goal one, concerning regular classroom placements, and goal four, concerning home schools. Notably, a student can be counted as being in his home school for purposes of goal four even if he is in a segregated setting.  To be consistent with the plaintiff's position, the Agreement would use "meaningful" in connection with goals one, three and five, and not in connection with goal four.

The plaintiffs suggest that meaningful access to the general curriculum is embedded in goal one, even if the term "meaningful" as used in the Agreement does not itself signify access to the general curriculum.  The evidence does not support a finding that

38

this was the understanding of the parties at the time the
Agreement was signed.  The parties entered into the Agreement
because it offered a "resolution that is consistent with the
requirements of the [IDEA]." SA at 2.  In other words, it offered
a means of resolving the litigation in accordance with the
State's existing duties under the statute.  See SA at 2.  In
entering into the Agreement, the State committed to achieving
improvement in (1) the percentage of students with ID in
integrated placements and (2) the percentage of the school day
students with ID spend in integrated placements.  If the
plaintiffs' interpretation of the Agreement is correct, the State
effectively committed to achieving meaningful access to the
general curriculum for most students with ID within a span of
eight years and at the risk of continued litigation and oversight
by the plaintiffs, the EAP and the Court beyond the eight year
period in the event this ambitious goal was not met.  It is
implausible that the State would knowingly agree to such a
resolution.  The plaintiffs have not shown that at the time this
case was tried, the IDEA required the defendants to secure
meaningful access to the general curriculum for most members of
the class within the eight year period covered by the Agreement,
and there is no evidence that the defendants believed it did.
Indeed, as discussed above, the evidence does not support a

finding that meaningful access to the general curriculum was a priority for class members at the time.

In summary, at the time the Agreement was negotiated and signed, the main concern of the parties was the class members' interests in obtaining integrated placements.  Consistent with that emphasis, the Agreement's goals are mainly concerned with increasing integrated placements.  Though some provisions of the Agreement address education quality, they are means for increasing integrated placements, not ends in themselves to which the State agreed to be bound subject to the risk of a finding of noncompliance.

## B. The Department's Data Are Reliable

The plaintiffs contend that in judging the State's performance under the Agreement, the Court should not rely on the State's data.  The plaintiffs attack the reliability of the data on two grounds: they argue that it does not account for students who no longer carry the ID label and that many districts over-report the amount of time students with ID spend in integrated settings.  The Court has addressed the first concern by calculating the relevant percentages for all students with ID.  The figures presented in this memorandum, including those addressing progress toward the goals, reflect the data for all students with ID.

40

The plaintiffs have not shown that over-reporting is so commonplace as to undermine the reliability of the data. Districts report data to the Department on the basis of what is required by the students' IEP, not based on direct observations of students.  The plaintiffs planned to conduct a statistically significant study of the extent to which the numbers in students' IEPs over-represent the amount of time students are actually in integrated placements.  However, as the plaintiffs' experts testified, they were unable to make statistically significant findings.  They observed eighty-six students in some of the State's least integrated districts and took notes on the extent to which those students' IEPs were inconsistent with their class schedules.  The evaluators found a number of discrepancies, most of which were cases of over-reporting.  But the reports from the site visits make it clear that the evaluators were not applying the same criteria in the same manner, so two evaluators could come to opposite conclusions about whether a student was in an integrated setting.  Given these infirmities, the reports from the site visits do not undermine the reliability of the data.

## C. The Department Did Not Frustrate Progress Toward the Goals

The plaintiffs argue that the State's own data show substantial noncompliance because the data reflect a pattern of reduced progress and even losses rather than steady progress.

41

The plaintiffs' argument has some force.  From 2003-2004 through 2006-2007, the annual percent change for goals one, three and five increased more than ten percent every year, but in 2007-2008 progress toward all three goals slowed: regular class placement increased 2.6%, mean time increased 2.3%, median time increased 3.5%, and extracurricular participation decreased 1.9%.  Progress slowed further in the 2008-2009 school year: regular class placement increased 0.4%, mean time increased 1.8%, median time increased 0.4%, and extracurricular participation decreased 1%.  The slump continued in the 2009-2010 school year: regular class placement increased 1.7%, mean time decreased o.1%, median time increased 0.5%, and extracurricular participation increased 1.5%.  The data on home school placement follow a somewhat similar pattern.  In the 2002-2003 school year, the percentage decreased 0.2%.  It increased 4.7% in 2003-2004, 1.8% in 2004-2005, 7.9% in 2005-2006, 1.1% in 2006-2007, 0.1% on 2007-2008, and 0.2% in 2008-2009.  It then decreased 1.9% in 2009-2010.

The plaintiffs contend that the declines, and in some instances actual losses, were caused by the Department's noncompliance with the Agreement.  They note that the Department mistakenly believed its obligations under the Agreement expired in the summer of 2007, about the same time the rate of progress began to decline.  The plaintiffs' concerns are understandable.

Department employees credibly testified, however, that progress toward the goals slowed because all the easy progress had been made.  Progress was easy when districts had the capacity to place students with ID in integrated settings but the capacity was not being used because of faulty placement determinations.  By improving the placement protocol and holding districts accountable for following it, the Department was able to make rapid progress by taking advantage of existing capacity within the State.  Once the easy progress was made, the Department was left with the more difficult task of building capacity, often in small districts that do not serve many students with ID.

Moreover, the evidence shows that the Department continued to pursue the goals of the Agreement and continued to implement most of the Agreement's provisions despite the mistaken belief that the Agreement was no longer binding.  Had it failed to do so, a finding that the State frustrated the Agreement's essential purposes might be warranted based on the data.  But that is not the case.  Indeed, it is undisputed that the State continued to make good faith efforts.  In view of the State's overall performance throughout the eight year term of the Agreement, a finding of substantial noncompliance is unwarranted.

## D, The State's Ability to Impact IEP Determinations Is Limited

Before turning to review the State's performance under specific sections of the Agreement, it is important to recognize that the IDEA imposes limits on the State's ability to place students with intellectual disabilities in regular classrooms. These limits flow from the requirement that each placement decision be based on individualized consideration of the child's abilities and needs.  Because of this requirement, the Department cannot impose a categorical presumption that students should spend a certain amount of time in an integrated setting. Newington, 546 F.3d at 119.  And while the Department can have an indirect influence on IEP determinations through monitoring and technical assistance,  its personnel do not participate in PPTs.

In addition, the IDEA limits the amount of money that can be withheld by the Department for state level activities.  In 2009, for example, Connecticut was authorized to withhold two percent of its IDEA funds for state level administration and nine percent for other state level activities.  The remaining eighty-nine percent of its IDEA funds had to be distributed to eligible LEAs. Funds withheld for state level activities are required to be used for monitoring, enforcement, and complaint investigation and the establishment of a mediation process.  § 1411(e)(2)(B).  And any remaining funds reserved under this provision may be used on a

discretionary basis for a number of activities, including building LEA capacity to improve educational results for children with disabilities.  Even so, the statutorily required allocation of IDEA funds limits the tools at the defendants' disposal to encourage and enable LEAs to provide class members with integrated placement options.

Similarly, the IDEA limits the defendants' ability to use funds in other ways that would further the purposes of the Agreement.  The defendants cannot base funding decisions on the type of setting in which a child is served in a manner that discourages LEAs from considering the unique needs of each child as described in the child's IEP.  20 U.S.C. § 1412(a)(5)(B)(I). This proviso, contained in the subpart of the Act affirming the State's responsibility to ensure that each child is educated in the least restrictive environment, cautions against the imposition of measures that could be regarded as providing a financial incentive to LEAs to emphasize regular class placements at the expense of considering students' individual needs.

## E. The Record Shows that the State Met Its Commitments

Under the terms of the Agreement, the Department agreed to make commitments to pursue each of the goals.  These commitments, set forth in § II, describe the Department's obligations and, in the absence of benchmarks, they describe the desired outcomes as

well.  The desired outcomes are not all possible progress in the
direction the goals point, but the progress that would result
from acting in accordance with the requisite commitments.
Therefore, the substantial noncompliance determination turns on
whether the plaintiffs have shown that the Department failed to
take an action required by the Agreement that would have produced
more progress toward the goals.  They have not done so.

## 1. Uncontested Provisions (§ IV, VII, VIII)

The plaintiffs do not allege noncompliance with §§ IV, VII
and VIII of the Agreement.  Pursuant to § IV, the Department
issued a number of policy statements setting forth the
requirement that each student receive an individualized placement
determination and notifying districts that they would be held
accountable for progress toward the goals.  The Department
improved the quality of parent advocacy by complying with § VII's
requirement to fund training programs to teach parents to
effectively advocate for the e3ducation of their children in the
least restrictive environment.  Pursuant to § VIII, the
Department established and maintained a system to resolve
complaints regarding district-level compliance with the IDEA.
The Department's undisputed compliance with these provisions
supports a finding that they substantially complied with the
Agreement, as do the data demonstrating that progress was made.

## 2. Monitoring (§ V)

The plaintiffs contend that the Department failed to adequately monitor the quality of education and also failed to maintain appropriate focus on goals four and five.  In addition, they contend that the Department's level three monitoring was insufficient and that the overall system was confusing.  These contentions do not provide a basis for relief.

### (a) Monitoring Education Quality

Through the 2004-2005 school year, the Department monitored education quality at the first level by conducting site visits of randomly selected districts and by reviewing the implementation of hearing officers' decisions.  In the 2005-2006 and 2006-2007 school years, the Department conducted 789 "walkthroughs" whereby each district was visited at least once to collect qualitative data.  The plaintiffs argue that the walkthrough data are not reliable because districts were notified in advance of the site visits.  The Department responds that the districts had to be notified in advance to ensure that students would likely be available for observation and that districts were rarely notified of the exact day students would be observed.  I credit the Department's response and find that the notice given was reasonable in the circumstances.

The plaintiffs also argue that the system was unreliable because the Department's findings were inconsistent with the plaintiffs' findings on their site visits.  For the reasons explained above regarding the impact of the plaintiffs' findings on the reliability of the quantitative data, the findings also do not impugn the accuracy of the walkthrough data.  The data revealed that general education teachers were improperly relying on paraprofessionals to educate students with ID, prompting the Department to address the issue through its program of technical assistance.

Although the walkthroughs stopped in 2006-2007, the Department continued to monitor education quality at the second and third levels through 2009-2010.  By 2006, and continuing for the duration of the Agreement, forty-three districts, serving approximately two-thirds of the class, were monitored at the second or third levels.  The more troubling districts received the closest scrutiny, with state employees conducting site-visits and classroom observations.  The least troubling districts were required to address and report on quality issues that impeded progress toward the goals.  In addition, beginning in the 2007-2008 school year, all 129 districts with fewer than twenty students with ID were targeted for monitoring.  The Department's allocation of resources was consistent with a recommendation of

the EAP to focus on the worst districts.  See EAP 2005 Report at 5.

Under the Department's system, the only districts that were not monitored for quality during the final three years were the large districts that were making adequate progress toward the goals.  The record does not support a finding that districts in this category would have made more progress toward the goals if they had received qualitative monitoring called for by the Agreement.  Accordingly, the Court cannot find that the Department's failure to subject these districts to qualitative monitoring during the last three years frustrated progress toward the goals.

### (b) The Department Otherwise Complied With § V

The plaintiffs contend that the Department's monitoring efforts did not appropriately focus on the fourth and fifth goals.  The Department emphasized goals one and three more than the other goals, but it monitored progress on all five goals, including goals four and five, every year through the annual reporting requirement.  The Department's conduct reflects reasonable policy.  It was not inconsistent with the terms of § V.  And it was consistent with the EAP's recommendation to focus on the goal regarding regular class placement and any major discrepancies in the other goals.  See EAP 2005 Report at 9.

Moreover, credible evidence presented by the Department shows
that rates of extracurricular participation for all students,
disabled or not, dropped across the state because of fiscal
constraints.  The plaintiffs have not shown that more progress
toward goal five would have been made if it had been emphasized.

The Department emphasized the home school goal by separately
focusing on 120 small districts.  As mentioned above, small
districts are more likely to rely on out of district placements
than larger districts because they serve fewer students with ID.
They also lack consistent funding.  The Department's efforts were
sufficient to meet the obligations imposed by § V to focus on the
home school goal.

The plaintiffs point to a number of poorly performing
districts as evidence that the Department failed to provide
adequate level-three monitoring required by the Agreement.
However, the plaintiffs have not shown that the Department failed
to take any of the actions required by § V(3).  In its last
report, the EAP concluded that "[m]any districts appear to be
simply refusing to comply, despite massive and very expesnive
interventions provided by SERC, and other initiatives like the
parent training component, STAR, and the coaching academy."  EAP
2010 Report at 22.  In light of the EAP's reasonable conclusion,
and the absence of evidence that more monitoring by the

Department would have produced more progress in these districts, the evidence relating to these districts does not provide a basis for a finding of substantial noncompliance.

Finally, the plaintiffs contend that the Department's monitoring system became confusing when the State started monitoring districts on progress for all disabled students as required by the IDEA. Under this dual system, a district could receive satisfactory reviews regarding its treatment of disabled students generally, but not regarding its treatment of students with ID. The Department argues with some force that its system was not unreasonable in light of the demands imposed on the State by the IDEA. In any event, the plaintiffs have not shown that doing things differently would have produced more progress toward the goals.

### 3. Technical Assistance (§ VI)

The Department adequately complied with the provisions of the Agreement governing technical assistance. As discussed above, the Department relied on SERC to provide most of the technical assistance. SERC published guidelines to ensure that students were not improperly classified, that they received individualized consideration, and that regular education teachers did not improperly rely on paraprofessionals to teach students

with ID in regular classes.  SERC also regularly held statewide
training in the Step-By-Step protocol.

SERC provided all districts with at least the following
customized assistance: revciew of data regarding time with
nondisabled peers, participation in extracurricular activities,
and regular class placement; review of responsible inclusive
practices and their alignment with the goals of the Agreement;
and a self-assessment tool to both identify training needs and
develop a plan to address them.  Underperforming districts
received narrowly tailored assistance, including assistance with
differentiated instruction, co-teaching, student work analysis,
positive behavior support, assistive technology, and other tools
to improve education for students with ID in regular classes.
Many districts received technical assistance at no charge.

During the Agreement's final three years, SERC addressed
§ VI in two ways.  Following the EAP's recommendation, it focused
on the State's smallest districts.  Twenty-five small districts
in need of assistance were provided with fee waivers for
statewide professional development opportunities and seventeen of
them received one day of free customized technical assistance.
See EAP 2007 Report at 4.

As discussed above, SERC also provided a significant amount
of statewide and district-specific technical assistance in the

final three years.  These efforts were not exclusively directed toward achieving the goals of the Agreement, but SERC was careful to draw links between the training and the five goals.

From 2005-2006 through 2007-2008, the Department also maintained the Star program and the Coaches academy in order to provide additional technical assistance to districts.  As discussed above, the Star program addressed the needs of approximately fifty-four students per year, helping district employees develop an action plan for each student.  And the Coaches Academy was attended by over 355 employees from 54 districts, two-thirds of them teachers.

The plaintiffs ask the Court to find that the system of technical assistance was deficient.  They contend that a list of private consultants the Department published did not satisfy its obligation to provide a sufficient number of qualified experts to assist districts.  In addition, they fault the Department for discontinuing the Star program and Coaches Academy, and for failing to provide more embedded technical assistance.  These contentions are unavailing.

The Department met the obligation to provide qualified experts by providing districts with the assistance of qualified personnel at the Department and SERC, in addition to publishing the list of private consultants.  The Department was not required

to continue the Star program or Coaches Academy or provide more embedded assistance in order to comply with § VI.  The efforts made by SERC were designed to extend and improve regular class placements and the data demonstrate that those efforts  were effective.  SERC continued to provide the training that was provided by the Coaches Academy.  The record does not support a finding that continuing the Star program would have produced more progress.  Provision of more embedded assistance might well  have produced more progress.  However, SERC's efforts to provide statewide training and district-specific technical assistance were sufficient to meet the requirements imposed by § VI and, for reasons discussed below, the Department's commitments under other parts of the Agreement, specifically the § II commitments, did not require it to provide more embedded support.

## 4.  EAP (§ IX)

The Department failed to comply with the Agreement by terminating the EAP in 2007, before the expiration of the eight year term of the Agreement.  The Department credibly maintains that it believed the Agreement permitted it to disband the EAP. The Court finds that the Department's position, although mistaken, was reasonable in the circumstances and that the Department did not intend to terminate the EAP in violation of the Agreement.

The plaintiffs, noting the correlation between the termination of the EAP and the decline in progress discussed above, urge that the termination of the EAP warrants a finding of substantial noncompliance.  However, the plaintiffs have not shown that more progress would have been made were it not for the termination of the EAP.  The evidence shows that the Department continued to pursue the goals in the EAP's absence and the EAP, in reviewing the Department's efforts over the final three years of the Agreement, blamed individual districts for resisting the Department's efforts.  See EAP 2010 Report at 22, 24.

## 5.  Plaintiffs' Right to Data on Students with ID (§ I)

The plaintiffs take issue with the Department's failure to provide them with a list of students with ID who were reclassified to another disability category.  Such a list was finally provided in December 2007.  The plaintiffs have not shown, however, that more progress would have been made toward the goals if the list had been provided earlier.  The plaintiffs also complain that the Department has failed to address high rates of reclassification that had the effect of moving students out of the "ID" category.  But the evidence shows that the Department's efforts have extended and improved integrated placements for all students with ID and the plaintiffs have not

shown that the reclassification rate provides a basis for a finding of substantial noncompliance.

## 6. The Department Complied With § II

The nature of the commitments in § II may have required the Department to go beyond the specific requirements set forth in other sections of the Agreement.  The plaintiffs suggest that the Department's failure to adopt or meet benchmarks established by the EAP demonstrates that it failed to substantially comply with its obligations under § II.  They also argue that the Department should have provided more embedded technical assistance, which likely would have produced more progress toward some of the goals.  Each of these issues is addressed separately below after a discussion of the § II commitments and a review of the evidence bearing on the commitment to each goal.

## (a) The Department Upheld the Commitment to the Five Goals

Under § II of the Agreement, the Department had to "commit to achieving meaningful continuous progress annually" toward goals one and four.  The terms contained in the quoted provision are best construed as follows.  "Annually" means a commitment to achieve progress each year.  "Continous" means a commitment to preventing any losses.  "Meaningful" means significant progress, in other words, more than nominal progress but less than all possible progress.  Under § II, the Department also had to

56

"commit to achieving continuous progress" toward the other three goals.  This provision required the Department to commit to preventing any losses with regard to those goals.  The record, viewed as a whole, supports a finding that the Department met its obligations.

The Department emphasized goal one in its monitoring system each year and it was the focus of most of the technical assistance provided by SERC and the other programs.  Although more progress was made in the early years, the smaller gains in the last three years still reflect a commitment to meaningful progress because the State had reached the point where it was necessary to build new capacity in order to make more progress.  The overall progress toward this goal was significant.

The Department emphasized the need to increase mean and median time with nondisabled peers in the monitoring system every year.  Although the majority of the technical assistance efforts were focused on increasing regular class placements, those increases directly contributed to progress toward this goal as well.  Here again, overall progress was significant.

The general monitoring system emphasized the home school goal during the first five years and the small district initiative addressed it during the last three years.  These districts were provided with customized technical support to

increase their capacity to place children in regular classes,
directly increasing the opportunities for students in those
districts to attend their home school rather than a segregated
setting in another location.  Some progress was lost.  But the
evidence does not show that this was the result of noncompliance.
Overall progress toward this goal was significant as well.

With regard to goal five, the Department went beyond the
specific requirements of the Agreement and made three annual
grants of $10,000 to the Connecticut Association of Schools to
support districts' work toward this goal.  Although some progress
was lost, the evidence shows that this was the result of budget
cuts affecting the participation rate of all students rather than
issues specific to students with ID.

### (b) Job-Embedded Technical Assistance

The plaintiffs' experts testified that the State's system of
technical assistance could have produced more progress toward the
goals of the Agreement by providing more job-embedded training.
The Court agrees.  In this context, job-embedded training is
provided by going into schools and assisting general education
teachers with the education of individual students.  To be
effective, the training must be followed up with site visits to
ensure that the lessons are consistently applied.  Although SERC
personnel were available to provide embedded assistance, such

assistance usually was provided only on request and at district expense.

Many districts were able to hold school employees accountable for applying the training provided by SERC, but some districts had difficulty doing so.  The evidence indicates that the Department may have been able to correct this by placing supervisory personnel in certain districts to oversee implementation of the Agreement.

As reviewed above, the Agreement did not specifically require the Department to take these steps and the Department's good faith efforts to implement the Agreement support a finding that the commitments were maintained.  The Department's policy is to take responsibility for providing district employees with the skills necessary to properly integrate students, but each district is responsible for ensuring that its employees apply those skills to meet the needs of individual students.  The Department believes that this division of responsibility is appropriately respectful of district autonomy.   The Department's policy seems reasonable.  At a minimum, it is consistent with the statutorily mandated allocation of IDEA funds.

The EAP's last report confirms that the Department provided a substantial amount of assistance to districts and thereby helped bring about significant progress.  The EAP acknowledged

59

significant progress as a result of the Department working
"thoughtfully and skillfully to transform[] its interventions
over time . . . . The tailoring and customized professional
development by district and in most cases by school is
commendable and time consuming." EAP 2010 Report at 24.  The EAP
went on to say that "local districts have to take up the
responsibility to carry-over that training into daily practice."
Id. at 24.  This supports a finding that the Department's
decision not to provide additional embedded assistance was a
reasonable policy choice.

**(c) EAP**

The Department ws not required to meet the EAP benchmarks or
adopt them as statewide targets.  The EAP benchmarks would
support a finding of substantial noncompliance if they
represented the amount of progress the State would have made in
eight years if the Department had maintained the requisite
commitments.  However, the EAP wrote that it "deliberately set
high benchmarlks" to convey "high expectations" and "stimulate
genuine effort" at the district level.  EAP 2004 Report at 7.
There is no indication that the EAP accounted for fiscal, legal
or any other constraints on the Department's ability to bring
about statewide change in placement rates.  Rather, it appears to

have set aspirational benchmarks at the highest possible levels
in light of data from other jurisdictions.  Id.

The plaintiffs' witnesses testified that the EAP benchmarks
were achievable, but the evidence does not support a finding that
the benchmarks could have been achieved in eight years, let alone
that they would have been achieved but for the Department's
noncompliance with the Agreement.

The evidence does not show that more progress would have
been made if the Department adopted the benchmarks as statewide
targets.  The Department published the EAP benchmarks in
connection with its efforts to bring about progress toward the
goals.  There is no indication that deficient districts would
have done better if the benchmarks had been explicitly adopted by
the Department as targets.  In any event, the Agreement did not
require the Department to adopt the benchmarks.  The Department
made a reasonable policy decision to tailor targets to the needs
and potential of districts.  Its approach reduced the risk that
districts would place students in integrated settings without
giving each student individualized consideration.  In light of
this reasonable policy determination, and the lack of evidence
that using the benchmarks would have produced more progress, the
decision not to use the benchmarks did not conflict with the
§ II commitments.

Conclusion

    For the foregoing reasons, the plaintiffs have not sustained their burden of showing substantial noncompliance.  In particular, they have not shown that the Department failed to take an action required by the Agreement that would have produced more progress toward the essential purposes of the Agreement.  Accordingly, their motion has been denied.

 

_____
          Robert N. Chatigny
     United States District Judge