UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

P.J., et al.,                          :
                                       :
        Plaintiffs,                    :
                                       :
        v.                             :    CASE NO.  2:91cv180(RNC)
                                       :
STATE OF CONNECTICUT, et al.,          :
                                       :
        Defendants.                    :


RECOMMENDED RULING ON PLAINTIFFS' MOTIONS FOR
ATTORNEYS' FEES AND COSTS

The plaintiffs commenced this litigation in 1991 against the Connecticut State Board of Education and certain local school districts alleging violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  In 2002, the parties entered into a settlement agreement resolving this complex and contentious class action.  In the final chapter of this protracted litigation, the plaintiffs move for attorneys' fees and costs.  (Doc. ##758, 786, 793.)  The plaintiffs seek $1,474,097.66 in fees and costs plus prejudgment interest.[1]  (Doc. #793 at 3.) The bulk of the fees and expenses requested are for time spent on activities plaintiffs describe as post-judgment monitoring and

---

[1]The plaintiffs' fee request consists of three motions: (1) plaintiffs' motion for attorneys' fees which seeks fees and costs incurred from November 29, 2000 to April 22, 2013 (doc. #758); (2) plaintiffs' "motion to supplement," which seeks fees and costs from April 23, 2013 to November 4, 2013 (doc. #786); and (3) plaintiffs' "second motion to supplement," which seeks fees and costs from November 5, 2013 to January 31, 2014.  (Doc. #793.) The defendants filed briefs in opposition (doc. ##773, 790, 797) to which the plaintiffs replied.  (Doc. ##781, 792.)

enforcement of the settlement agreement. Defendants contend that plaintiffs' requested fees are unreasonable and should be reduced substantially. For the reasons set forth below, the court recommends[2] that the plaintiffs' motions be granted in part and plaintiffs awarded attorneys' fees and costs of $325,152.57.

## I.    Background of Case

This case has a tortuous history. The following background, although lengthy, is relevant to the plaintiffs' fee request.

This class action was filed in 1991 by school-aged children with intellectual disabilities and their families against the Connecticut State Board of Education and certain local school districts. The complaint alleged violation of the IDEA's least restrictive environment requirement. In 2000, the court (Chatigny, J.) conducted a bench trial. Following trial but before the court made findings on liability, the parties entered into settlement negotiations. I was extensively involved with the negotiations and held numerous conferences.[3] In March 2002, the parties executed a

---

[2]U.S. District Judge Robert N. Chatigny referred the motions to me for a recommended ruling. (Doc. ##759, 787, 794.) See Fed. R. Civ. P. 54(d)(2)(D) (the court "may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.")

[3]Conferences were held on 3/2/00 (doc. #400); 5/22/00 (doc. #413); 9/12/00 (doc. #414); 9/26/00 (doc. #415); 10/2/00 (doc. #416); 10/12/00 (doc. #417); 10/20/00 (doc. #418); 11/13/00 (doc. #419); 12/20/00 (doc. #423); 2/13/01 (doc. #424); 3/20/01 (doc. #425); 5/14/01 (doc. #426); 5/18/01 (doc. #427); 7/12/01 (doc. #428); 8/16/01 (doc. #429); 9/12/01 (doc. #430); 11/30/01 (doc. #447); 1/25/02 (doc. #451); 2/8/02 (doc. #452); and 3/20/02 (doc.

settlement agreement.[4]  Judge Chatigny approved the agreement in May 2002 after a fairness hearing. (Doc. #462.)

A.  **Terms of the Settlement Agreement**

The Settlement Agreement was intended "to protect the rights and enforce the obligations established by 20 U.S.C. § 1412(a)(5)(A)." (Doc. #706, Crt's Post-Hearing Memorandum at 34.) The class was defined as "all school-age children labeled mentally retarded on or after February 20, 1991 who are not educated in regular classrooms . . . as well as all students with the label 'Intellectual Disability/Mental Retardation' who are not educated in the regular classroom." (Settlement Agreement § I.)  The essential purpose of the Agreement "involved increasing integrated placements for class members . . . ."  (Doc. #706 at 5-6.)  The defendants agreed to the following goals:

> (1) an increase in the percentage of students with mental retardation or intellectual disability who are placed in regular classes, as measured by the federal definition (80% or more of the school day with non-disabled students);
>
> (2) a reduction in the disparate identification of students with mental retardation or intellectual disability by LEA ["local education agency"], by racial group, by ethnic group or by gender group;
>
> (3) an increase in the mean and median percent of the school day that students with mental retardation or

_____

#453).

[4]The Settlement Agreement stated that the defendants denied the plaintiffs' allegations and admitted no liability. (Settlement Agreement at 2.)

intellectual disability spend with nondisabled students;

(4) an increase in the percentage of students with mental retardation or intellectual disability who attend the school they would attend if not disabled (home school); and

(5) an increase in the percentage of students with mental retardation or intellectual disability who participate in school-sponsored extra curricular activities with non-disabled students.

(Settlement Agreement § II.)

The parties did not set specific numerical objectives for these goals. Instead, they agreed that defendants would achieve "meaningful continuous improvement annually" with respect to goals #1 and #4 and "continuous improvement" with respect to goals #2, #3, and #5. (Settlement Agreement § II.)

Defendants further agreed, among other things, to "prepare and distribute to the parties and the court a list of public school students in Connecticut who on or after December 1, 1999 carry the label of either mental retardation or intellectual disability and who are eligible for special education; such list shall be updated periodically." (Settlement Agreement § I.2.) Defendants also agreed to issue annual written reports on their progress and activities related to the five goals. (Settlement Agreement § III.)

The Settlement Agreement had an eight year term, with a termination date of August 2010. During the first five years (through August 2007), the court retained jurisdiction for

"enforcement" of the Agreement.  During the final three years, the court's jurisdiction was limited to "entertain[ing] Plaintiffs' motions for substantial noncompliance."  (Settlement Agreement § III.)  Other pertinent provisions follow.

### 1.   <u>Expert Advisory Panel</u>

The Settlement Agreement provided that the "defendants shall establish an Expert Advisory Panel ["EAP"] to advise the parties and the Court regarding the implementation of th[e] Agreement." (Settlement Agreement § IX.)  The EAP was to consist of four members, with each party nominating two members and both parties agreeing to all four.  (<u>Id.</u>)  Its purpose was to "advise and serve as a resource to the CSDE [the Connecticut State Department of Education] with respect to implementation of all aspects of th[e] agreement . . . ."  (<u>Id.</u>)  The EAP's recommendations were to be advisory.  (<u>Id.</u>)  The EAP was charged with "facilitat[ing] the defendants' compliance with th[e] Agreement, identifying difficulties in compliance, facilitating resolution of compliance issues without court intervention, and referring to the court issues that cannot be resolved by discussion and negotiation." (<u>Id.</u>)  The EAP also was to provide annual written reports on defendants' progress toward the specified goals.  (<u>Id.</u>)  The defendants agreed to designate a staff person to "design, implement and coordinate all efforts under th[e] agreement" and "serve as the liaison" to the EAP.  (Settlement Agreement § VI.2)  Finally, the

EAP was to "[c]ollect and analyze data it deem[ed] necessary relating to class members and the implementation of th[e] agreement." (Settlement Agreement § IX.)  The EAP was expected to meet at least three times per year.  (Id.)

### 2.  **Plaintiffs' Involvement**

The Settlement Agreement contemplated certain involvement by the plaintiffs.  Plaintiffs were charged with nominating two of the four EAP members.  (Settlement Agreement § IX.)  The Agreement provided that "[t]he parties" were to meet annually to discuss the defendants' implementation and "ways to effectively increase progress toward[] the achievement of each of the stated goals." (Settlement Agreement § III.)  As indicated, defendants agreed to prepare a list of students "who on or after December 1, 1999 carry the label of either mental retardation or intellectual disability and who are eligible for special education." (Settlement Agreement § I.2.)  Plaintiffs had "a right to collect data relating to [the students thus identified] and to challenge the adequacy of that list." (Settlement Agreement § I.3.)  Defendants agreed to "cooperate with the plaintiffs to gain access to data and files relating to class members to the extent allowed by state and federal statute, for all purposes relating to the enforcement and implementation of th[e] Agreement." (Id.)  They also agreed to "cooperate with the Plaintiffs' reasonable requests to provide existing data to enable Plaintiffs to assess compliance during the

five-to-eight year period."  (Settlement Agreement § III.)

### 3.   Attorneys' Fees

The Settlement Agreement provided that defendants would pay plaintiffs $675,000 in attorneys' fees and costs.  (Settlement Agreement § X.)   This provision is discussed in greater detail below.

## II.   Summary of Events after the Settlement Agreement was Approved

After the court approved the Agreement in May 2002, the EAP was empaneled.  The defendants issued annual reports and provided extensive data to the plaintiffs and the EAP regarding their efforts and progress.  The EAP met with staff of the Connecticut Department of Education and representatives of local school districts, reviewed documents and data, and made recommendations to facilitate defendants' compliance with the Settlement Agreement. A representative of The Arc Connecticut, one of the plaintiffs, attended the EAP meetings.  (Doc. #637 at 42; doc. #800-1, Simeos Aff. ¶4.)  Plaintiffs' counsel also attended.

The EAP submitted periodic reports of its observations and recommendations.  It proposed benchmarks for the five goals in the Agreement.  The Agreement, however, did not require the defendants to adopt the EAP's suggestions and the defendants declined to do so.  The defendants disbanded the EAP in August 2007, before the

7

expiration of the eight year term of the Agreement.[5]  (Doc. #758 at 4 ¶11.)

Also during this time, the plaintiffs filed numerous motions seeking discovery, compliance with the Settlement Agreement and attorneys' fees.  See, e.g., doc. ##482, 495, 511, 519, 527, 532, 547, 549, 566, 579, 580, 684, 685, 701, 702.[6]

In April 2009, the plaintiffs filed a motion alleging that the defendants were in substantial noncompliance with the Settlement Agreement.[7]  (Doc. #580.)  They contended that the defendants failed to make sufficient progress toward the goals. (Doc. #580 at 55 ¶22f.)  They also argued, among other things, that the defendants failed to address high rates of reclassification of class members into different disability categories, which had the effect of moving students out of the "Intellectual Disability" ("ID") category and shrinking the class. (Doc. #633, Plaintiffs'

---

[5]The defendants believed that the Agreement permitted them to disband the EAP.  The plaintiffs correctly observe that the defendants were obliged to maintain the EAP for the full eight years of the Settlement Agreement.  As noted in the Second Circuit's affirmance, the district court found defendants' position, although mistaken, credible and was not persuaded by plaintiffs' claim that the termination of the EAP warranted a finding that the defendants were in substantial noncompliance with the Settlement Agreement. (Doc. #706 at 54-55; P.J. ex rel. W.J. v. Connecticut Bd of Ed et al., 550 F. App'x 20, 23 (2d Cir. 2013)).

[6]I was very involved with the resolution of plaintiffs' motions, which are discussed in greater detail herein.

[7]Plaintiffs' previously-filed motion alleging substantial noncompliance was denied without prejudice.  (Doc. ##549, 571.)

8

Proffer.)

In June 2010, the district judge (Chatigny, J.) conducted an evidentiary hearing on the plaintiffs' motion. The court denied the motion. (Doc. #707.) Judge Chatigny concluded that the defendants had made "significant progress" toward each goal and that "as a result of actions taken by the [Connecticut State Department of Education] following approval of the Agreement, in 2008 Connecticut ranked second in the nation in terms of the percentage of students with the ID [intellectually disabled] label who were placed in regular classrooms."[8] (Doc. #706 at 4.) As to plaintiffs' complaints about the reclassification of intellectually disabled students, the court determined that "plaintiffs ha[d] not shown that the reclassification rate provide[d] a basis for a finding of substantial noncompliance." (Doc. #706 at 55-56.)

The plaintiffs appealed. The Second Circuit affirmed the district court's ruling. The Second Circuit concluded that the defendants had "made significant progress toward accomplishing Section II's goals, posting large percentage gains on the integration of students with intellectual disabilities pursuant to the first, third, fourth, and fifth goals, and markedly reducing discriminatory identification of such students pursuant to the second goal." P.J. ex rel. W.J. v. Connecticut Bd of Ed et al.,

_____

[8]The court utilized the defendants' data, which it found to be reliable, in making its ruling. (Doc. #706 at 40.)

550 F. App'x 20, 23 (2d Cir. 2013) (summary order).

### III. **Plaintiffs' Pending Fee Request**

Plaintiffs seek compensation for 2545.8 hours expended by Attorneys David Shaw and Frank Laski from November 29, 2000 through January 31, 2014 at the rate of $500 per hour. (Doc. #793.) In all, they request $1,474,097.66 in attorneys' fees, costs, litigation expenses and expert fees as follows:

| | |
|---|---:|
| Attorney Shaw  1956.8 hours @ $500/hr | $978,400 |
| Attorney Laski  589 hours @ $500/hr | $294,500 |
| Paralegal 21.6 hours @ $150/hr | $3,240 |
| Attorney Shaw's Costs & Litigation Expenses | $194,846.86 |
| Attorney Laski's Costs | $3,110.80 |
| | $1,474,097.66 |

Plaintiffs also seek prejudgment interest.

Defendants strenuously object to the plaintiffs' fee request. They argue that the requested award should be reduced significantly because most of plaintiffs' attorneys' activities went far beyond compensable post-judgment monitoring. Defendants' other challenges are that the attorneys' billing records are not contemporaneous; the requested time is excessive; plaintiffs' expert fees are not reimbursable; and the hourly rates sought are unreasonable.

This case implicates an issue of public importance - the education of students with intellectual disabilities. Some measure of the complexity of this litigation can be derived from the

court's docket sheet, which contains more than 400 entries from 2000 through 2014, the period at issue.  The determination of compensation for class counsel is important and difficult.  The record is huge.  Plaintiffs' compendious fee application exceeds 1000 pages and their attorneys' billing statements contain more than 1500 entries.  (Doc. #793, Ex. A, C.)  That said, it is not the size of the record alone that makes the court's task in reviewing plaintiffs' fee request so challenging.  Case law provides little guidance in the determination of whether plaintiffs' attorneys' post-judgment activities are compensable. There is no crisp rule or easy formula to employ in making this very case-specific determination.  To adjudicate the plaintiffs' fee application, the court has carefully and methodically considered the parties' arguments, painstakingly combed through the filings, and scrutinized billing entries.

### A.   Prevailing Party

A prevailing plaintiff is entitled to recover reasonable attorneys' fees and costs.  20 U.S.C. § 1415(i)(3)(B).  "[T]o prevail for purposes of attorney's fees, a party must have gained through the litigation a 'material alteration of the legal relationship of the parties.'"  Carter v. Incorporated Village of Ocean Beach, 759 F.3d 159, 165 (2d Cir. 2014)(quoting Buckhannon Bd & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources, 532 U.S. 598, 604-05 (2001)).  A consent decree "is a court-ordered

chang[e] [in] the legal relationship between [the plaintiff] and the defendant."[9] Buckhannon, 532 U.S. at 604.  The plaintiffs here are "prevailing parties" for purposes of statutory attorneys' fees.

**B.   Calculating Attorneys' Fees**

Courts evaluating a request for attorneys' fees must "perform[] a lodestar analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." Kroshnyi v. U.S. Pack Courier Servs, Inc., 771 F.3d 93, 108 (2d Cir. 2014).  "Both [the Second Circuit] and the Supreme Court have held that the lodestar . . . creates a 'presumptively reasonable fee.'" Millea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir. 2011) (citing Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany, 522 F.3d 182, 183 (2d Cir. 2008)).  "[A] 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010).  "[T]he lodestar method yields a fee that is presumptively sufficient to achieve that objective." Id.

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Cruz v. Local Union No. 3 of Intern.

---

[9]The Second Circuit characterized the Settlement Agreement "as a consent decree given the district court's continuing jurisdiction over it." P.J., 550 F. App'x at 23.

<u>Broth. of Elec. Workers</u>, 34 F.3d 1148, 1160 (2d Cir. 1994). "[A]ttorney's fees are dependent on the unique facts of each case . . . ." <u>Baker v. Health Mgmt. Sys., Inc.</u>, 264 F.3d 144, 149 (2d Cir. 2001). The district court has "wide discretion in determining an appropriate fee award." <u>Carter v. Incorporated Village of Ocean Beach</u>, 759 F.3d 159, 167 (2d Cir. 2014).

The court turns to the merits of the plaintiffs' fee request.

**IV.   <u>Contemporaneous Time Records</u>**

Defendants raise a threshold argument that the court should reduce the time requested because Attorneys Shaw and Laski did not maintain contemporaneous billing records.

Defendants argue that Attorney Shaw did not affirmatively aver in his declaration that his "submitted records are contemporaneous."[10] (Doc. #773 at 27.) They also point to alleged discrepancies in both counsel's billing statements as evidence that the billing entries were not made contemporaneously.

"[A]bsent unusual circumstances attorneys are required to submit contemporaneous records with their fee applications." <u>Scott v. City of New York</u>, 626 F.3d 130, 133 (2d Cir. 2010) (per curiam).

---

[10]Attorney Shaw's initial declaration stated in pertinent part: "I have reviewed my time records in connection with this case. Attached . . . to this Declaration are my office's computerized time records of the time spent working on this case. This constitutes an accurate reflection of the time spent working on this case. . . . This computerized time record is prepared on a regular basis in the regular course of business in this office." (Doc. #758-2, Shaw Decl. ¶11.)

See In New York State Association for Retarded Children v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983)("any attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the application with contemporaneous time records.")

The court is not persuaded by defendants' argument. Attorney Shaw expressly avers in his supplemental declaration that his time entries were made contemporaneously. (Doc. #781, Ex. C, Shaw Decl. ¶3.) Similarly, Attorney Laski's declaration makes clear that his time records were contemporaneously maintained. (Doc. #758-2, Ex. B, Laski Decl.) The alleged discrepancies cited by the defendants are insufficient to conclude otherwise.

## V.    Reasonableness of the Hours Expended

The court next addresses the reasonableness of the hours claimed.

"In reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case. . . . If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation." Luciano v. Olsten Corp., 109 F.3d 111, 116 (2d Cir. 1997)(citations omitted). See Oklahoma Aerotronics, Inc. v. United States, 943 F.2d 1344, 1346 (D.C. Cir. 1991)("[T]here is a point at which thorough and diligent litigation efforts become overkill. The district court must disallow claims for 'excessive,

14

redundant, or otherwise unnecessary' charges.") (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 434 (1983)).  "In calculating the number of 'reasonable hours,' the court looks to 'its own familiarity with the case and its experience with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties.'"  <u>Clark v. Frank</u>, 960 F.2d 1146, 1153 (2d Cir. 1992)(quoting <u>DiFilippo v. Morizio</u>, 759 F.2d 231, 236 (2d Cir. 1985)).  "A court has broad discretion to trim the fat in an application for attorneys' fees, and to eliminate excessive or duplicative hours." <u>Mastrio v. Sebelius</u>, No. 3:08CV1148(JBA), 2013 WL 1336838, at *7 (D. Conn. Mar. 29, 2013)(internal quotation marks and citations omitted).

Plaintiffs categorize the time billed by their attorneys as follows:

| | Hours billed by Attorney Shaw | Hours billed by Attorney Laski |
|---|---|---|
| Negotiating Pre-Settlement Claim 11/29/00 - 3/20/02 | 117.3 | 30.4 |
| Notifying Class Members of Settlement 3/21/02 - 5/22/02 | 24 | 7.6 |
| Empaneling Expert Advisory Panel 6/4/02 - 8/14/02 | 23.7 | 14.2 |
| Monitoring Implementation of Settlement Agreement 8/15/02 - 4/22/13 | 1375.1 | 460.6 |
| Litigating Attorneys' Fees | 385.5 | 70.8 |

| Filing/Pursuing Writ of Mandamus | 31.2 | 5.4 |
|---|---|---|
| Total | 1956.8 | 589 |

(Doc. #793, Ex. A, C.)  The court examines each category in turn.

**A.    Negotiating Pre-Settlement Claim**
**November 29, 2000 - March 20, 2002**

In this first category, plaintiffs seek fees for 147.7 hours counsel expended from November 29, 2000 to March 20, 2002 -- before the parties signed the Settlement Agreement on March 28, 2002. Plaintiffs state that their attorneys spent this time

> (1) negotiat[ing] [the] claim for costs, expert fees and attorneys' fees incurred up to November 28, 2000 . . . and (2) pursu[ing] litigation to challenge and have removed from the Settlement Agreement unilateral changes that were made in the language of the Settlement Agreement by Defendants after a final agreement was reached.

(Doc. #758-2, Ex. A, Shaw Aff. ¶7.)

Familiarity with the relevant facts and procedural history of this period of time is assumed[11] but a brief summary follows.

The settlement negotiation process was bifurcated: the initial phase focused on the merits of the case and the second phase addressed attorneys' fees.  The discussions were lengthy and challenging.  After several months, the parties reached a settlement agreement on the substantive provisions.  They memorialized these terms in a draft settlement agreement dated

---

[11]The circumstances regarding this period of time are set forth in detail in the court's prior ruling.  See doc. #708.

November 1, 2000. (Doc. #690-1 at 2, Ex. A, Shaw Decl. ¶3; Ex. B.)
The parties then turned to the issue of attorneys' fees.  The
plaintiffs sought payment of more than $900,000 and provided the
defendants with a statement of attorneys' fees and costs from 1991
through November 28, 2000.  (Doc. #690, Ex. C.)   I oversaw
settlement discussions in December 2000 and March 2001 regarding
the plaintiffs' fee request.  After negotiations, plaintiffs agreed
to accept $675,000 in fees "to settle the case." (Doc. #431 at 3
¶11; doc. #690, Ex. A, Shaw Decl. ¶9.)

On May 18, 2001, I held a conference at which counsel
discussed language concerning the duration of the agreement.  They
agreed to certain changes (unrelated to fees) which they hand wrote
into the draft of the November 2000 settlement agreement.  At that
point, although counsel had agreed to $675,000 in fees, the draft
agreement was silent as to attorneys' fees.  (Doc. #431, Ex. D;
doc. #690-1 at 4.)

In June 2001, the plaintiffs learned that defense counsel had
submitted the proposed settlement agreement to the Connecticut
General Assembly and that it had been approved.  (Doc. #690-1 at
5.)   The settlement agreement that the legislature approved,
however, included a provision that was not in the November 1, 2000
agreement.  That provision - Section X - states:

> The Defendants shall make to the Plaintiffs . . . a
> one-time payment of $675,000 in attorneys' fees and
> costs, payable . . . within ninety (90) days of the
> effective date of the approval of this agreement.

Plaintiffs protested immediately when they saw the newly-added Section X.  They intended to request attorneys' fees for future work on monitoring and enforcing the settlement agreement.  (Doc. #432 at 6.)  Plaintiffs asserted that pursuant to Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air, 478 U.S. 546 (1986) "there was a well-recognized right" to such fees. (Doc. #432 at 8.) They stated that there had been no "discussion about the waiver of attorneys' fees for enforcement activities" and that they did not waive fees and costs relating to such activity.  (Doc. #690-12, Ltr dated 6/8/01; doc. #444 at 9.)   They also indicated that "if defendants had demanded during the negotiations that plaintiffs waive future attorneys' fees for enforcement activity, plaintiffs would not have agreed to the $675,000 figure."  (Doc. #431 at 7 ¶26.)

Defendants acknowledged that their counsel drafted and unilaterally inserted Section X into the Settlement Agreement, but maintained that it was proper to do so because "all that remained to be done" was "to insert the provision calling for the payment of $675,000 in attorneys' fees and costs, which was to be a single payment."  (Doc. #690, Ex. N.)  They agreed with plaintiffs that "[t]here were never any discussions" about "ongoing attorneys' fees for 'enforcement activities.'" (Doc. #690-13 at 2; Doc. #432, Ex. K, Ltr dated 6/18/01 at 2.)

The parties attempted to resolve the dispute.  There were

18

communications between them and more settlement conferences with the court.  In October 2001, when those discussions did not bear fruit, the plaintiffs filed a voluminous "Motion to Enforce the Settlement Agreement" in which they argued that the parties had an enforceable agreement "in the May 18, 2001 Settlement Agreement except for the words 'one time payment' in Section X."[12]  (Doc. ##431, 432 at 17.)  Defendants responded that there had been no discussions about attorneys' fees and costs for monitoring and that "each side held a totally different view of what had been tentatively agreed to, but not yet codified into the written document." (Doc. #441 at 6, 14.)  From that, they concluded that was "no meeting of the minds" on attorneys' fees, an essential and material term, and as a result, no agreement to enforce.  (Doc. #441 at 8, 11, 14.)

After several conferences with the court, the parties agreed to a "side letter" construing Section X.[13]  (Doc. #690, Ex. T,

_____

[12]Plaintiffs requested as relief that the court enter "an order approving the Settlement Agreement negotiated on May 18, 2001 and hold a hearing to determine the construction of the words 'one-time payment' in Section X as will make the Settlement Agreement conform to the intent of the parties."  (Doc. #432 at 24-25.)

[13]The letter stated in pertinent part:
[T]he defendants do not interpret Section X of the draft agreement to preclude the Court from awarding reasonable attorneys' fees and costs to the Plaintiffs upon a finding by the Court that the Defendants had failed to substantially comply with the consent decree.  The parties agree to be bound by controlling law on the issue of attorneys' fees and costs.
(Doc. #690, Ex. T, Ltr dated 3/1/02.)

Letter dated 3/1/02.)  With the side letter in place, the parties executed the Settlement Agreement with Section X intact on March 28, 2002.[14]

In July 2010, the plaintiffs moved for an award of attorneys' fees and costs for the period from November 29, 2000 through the June 2010 evidentiary hearing on the plaintiffs' motion alleging substantial noncompliance.  (Doc. #684.)  Most of the fees the plaintiffs requested were for post-judgment monitoring and enforcement, which they believed were compensable pursuant to Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air, 478 U.S. 546, 559 (1986).

The defendants objected, arguing, among other things, that (1) plaintiffs' request for further fees was barred by the text of the Settlement Agreement and in the alternative, (2) plaintiffs' post-judgment work did not result in a "judicially sanctioned change in the legal relationship of the parties" and therefore was not compensable pursuant to Buckhannon Bd & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources, 532 U.S. 598 (2001). Plaintiffs responded that they never waived their right to seek such fees.  They pointed out that there was no language in the Agreement that limited their entitlement to future fees and costs

---

[14]The court did not rule on the plaintiffs' motion to enforce. The court closed the case on May 22, 2002 after conducting the fairness hearing, which terminated the plaintiffs' motion to enforce.

and that they were entitled to fees for the remedial phase under controlling law. In an August 2012 recommended ruling, the court agreed. (Doc. #708.) The court concluded that neither the terms of the Settlement Agreement nor the Supreme Court's decision in Buckhannon barred an award of attorneys' fees.[15] (Doc. #708 at 20.) The court decided that further briefing was necessary before it could determine whether the particular costs and fees plaintiffs sought were properly compensable. The district court (Chatigny, J.) approved and adopted the recommended ruling over defendants' objection.[16] (Doc. #756.)

I now turn to the particular fees plaintiffs seek. Plaintiffs first request compensation for time counsel expended before the Settlement Agreement was executed in March 2002. Attorney Shaw billed 117.3 hours and Attorney Laski billed 30.4 hours. (Doc. #758 at 16.) This includes time plaintiffs' attorneys spent (1) negotiating and arriving at the $675,000 figure; (2) attending the May 18, 2001 settlement conference at which the parties discussed and agreed on the duration of the Agreement; (3) drafting

---

[15]More precisely, the court determined that Buckhannon Board & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources, 532 U.S. 598 (2001) did not overrule Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air, 478 U.S. 546 (1986). (Doc. #708 at 19-20).

[16]The court denied without prejudice the plaintiffs' pending supplemental motions regarding fees and directed the plaintiffs to file a new motion for attorneys' fees and costs setting forth "all the relief they seek." (Doc. #756 at 9.) These motions followed.

the motion to enforce; and (4) conferring and negotiating regarding Section X.

According to plaintiffs, they are entitled to reimbursement for work counsel performed during this "pre-settlement period" because the attorneys' fee provision awarding them $675,000 only reflected their fees up to November 28, 2000.  They argue that their attorneys' "actions were necessary to secure a court-ordered Settlement Agreement that provided a fair and reasonable resolution of the violations of law described in the complaint for the class as a whole and prevent the settlement negotiations from failing altogether."  (Doc. #758-1 at 2.)

Defendants argue that no fees should be awarded for pre-settlement work.  They assert that the $675,000 award was intended to compensate plaintiffs for all work done prior to the signing of the Settlement Agreement.  In the alternative, defendants contend that the amount of time expended by plaintiffs' counsel was unreasonable and excessive, warranting at least a 50% reduction.  (Doc. #773 at 31.)

I agree that the plaintiffs are not entitled to fees incurred before the parties executed the Settlement Agreement.

"A settlement agreement is a contract that is interpreted according to general principles of contract law."  Omega Eng'g, Inc. v. Omega, S.A., 432 F.3d 437, 443 (2d Cir. 2005).  A contract "must be construed to effectuate the intent of the parties, which

is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." Bass ex rel. Bass v. Miss Porter's Sch., 738 F. Supp. 2d 307, 321 (D. Conn. 2010)(quoting Remillard v. Remillard, 297 Conn. 345, 355 (2010)). "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." Hernandez v. Cavaliere Custom Homes, Inc., 511 F. Supp. 2d 221, 227 (D. Conn. 2007).

Plaintiffs' interpretation of the Settlement Agreement is unpersuasive. There is no indication that the parties intended for plaintiffs to receive more than $675,000 for their work up to the signing of the Settlement Agreement. A plain reading of the Agreement demonstrates that the $675,000 encompassed the attorneys' fees defendants agreed to pay and the plaintiffs agreed to accept for their work up to the date they signed the Agreement.[17]  The agreement manifests a clear intent that this payment resolved plaintiffs' fees to that point.

---

[17]The parties' negotiations and correspondence to the court demonstrate that the plaintiffs were concerned not about their fees during this period up to the signing of the Settlement Agreement, but about their ability to recover fees "incurred in the future related to enforcement activity." (Doc. #690-12 at 5; doc. #431 at 6.)

### B.  Notifying Class Members of Settlement
### 3/21/02 - 5/22/02

Plaintiffs next seek fees for the period of March 21, 2002 through May 22, 2002 - after the parties signed the agreement but before the court entered judgment.  Attorney Shaw billed 24 hours and Attorney Laski billed 7.6 hours.  During this period, plaintiffs' counsel worked on the notice of the proposed settlement to the class and appeared at the fairness hearing.  (Doc. #758 at 16.)  Plaintiffs claim that "[t]hese actions are compensable as they were necessary to secure the benefits of the Settlement Agreement to the class, secured substantial relief to the class and effected a material alteration in the legal relationship between the class and Defendants," citing, without elaboration, Texas State Teachers Ass'n v. Garland Independent School Dist., 489 U.S. 782, 791-92 (1989).  (Doc. #758 at 16.)

Plaintiffs' reliance on Texas State is misplaced and does not advance their claim to entitlement of fees for this period.  Texas State concerned "the inquiry which should be made in determining whether a civil rights plaintiff is a prevailing party within the meaning of § 1988." Texas State, 489 U.S. at 791.  Plaintiffs have not sustained their burden of proving entitlement to fees for this period.

### C.  Empaneling Expert Advisory Panel
### 6/4/02 - 8/14/02

Plaintiffs next seek fees for post-judgment work done from

June 4, 2002 through August 14, 2002.  Attorney Shaw billed 23.7 hours and Attorney Laski billed 14.2 hours for time spent selecting and empaneling the EAP.  (Doc. #758 at 17.)  Plaintiffs contend that this time is compensable pursuant to Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546 (1986).

In Delaware Valley, the Supreme Court held that "post-judgment monitoring of a consent decree is a compensable activity for which counsel is entitled to a reasonable fee."  Id. at 558.  In concluding that work done in that case was compensable, the Court reasoned:

> the work done by counsel . . . was necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured [plaintiff's] initial success in obtaining the consent decree. . . . Protection of the full scope of relief afforded by the consent decree was thus crucial to safeguard the interests asserted by [plaintiff]; and enforcement of the decree, whether in the courtroom before a judge, or in front of a regulatory agency with power to modify the substance of the program ordered by the court, involved the type of work which is properly compensable as a cost of litigation . . . . In a case of this kind, measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which [plaintiff] prevailed in securing the consent decree.

Delaware Valley, 478 U.S. at 558-59.

"Not all post-judgment efforts are compensable."  Ass'n for Retarded Citizens of N. Dakota v. Schafer, 83 F.3d 1008, 1011 (8th Cir. 1996).  Only work that is "useful and of a type ordinarily necessary to secure the final result obtained from the litigation" is compensable.  Delaware Valley, 478 U.S. at 561.  "Application of

25

this standard is left to the discretion of the district court."
Id. See Ass'n for Retarded Citizens of N. Dakota, 83 F.3d at 1011
("compensable post-judgment work must in any event be reasonable
and necessary"); Brewster v. Dukakis, 786 F.2d 16, 18 (1st Cir.
1986) (recognizing the difficulties in evaluating post-judgment
monitoring fees, noting that "[m]issing the refining fire of the
basic litigation, plaintiffs' attorney may slip into a mode of
spending too much time on too many matters").

The Settlement Agreement called for plaintiffs' involvement in
the selection of the members of the EAP.  (Settlement Agreement
§ IX.)   Attorney time spent selecting and empaneling the EAP
satisfies the Delaware Valley standard for compensability.  Having
reviewed the billing statements, I find that the time expended is
reasonable.

### D.    Monitoring Implementation of Settlement Agreement August 15, 2002 - April 22, 2013

Plaintiffs next seek reimbursement of legal fees for time
expended from August 15, 2002 through April 22, 2013.  (Doc. #793,
Ex. A and C.)  Attorney Shaw billed 1375.1 hours and Attorney Laski
billed 460.6 hours.  Plaintiffs describe counsel's work during this
post-judgment period as "monitoring the implementation of the
Settlement Agreement" compensable under Delaware Valley.  (Doc.
#758 at 17.)  Plaintiffs say their attorneys:

> review[ed] and comment[ed] on the four Annual Reports
> submitted to the Court by the Defendants; review[ed] and
> comment[ed] on the five Reports prepared by the EAP . .

.; attend[ed] EAP meetings; secure[d] and reviewed
documents that described Defendants' monitoring of local
school districts; conduct[ed] an evaluation by twenty
experts of the programming provided to a sample of 123
class members in twenty public schools to assess the
placement of a random sample of class members after the
EAP was unilaterally terminated by Defendants;
conduct[ed] multiple reviews of data supplied by
Defendants to assess progress on the five goals of the
Settlement Agreement; develop[ed] a longitudinal database
to demonstrate that a database could be developed to
track ID students from year to year and compel[led]
Defendants to produce data that enabled Plaintiffs to
assess the impact of local school districts'
reclassification of class members to other disability
categories. [They also] file[d] and litigat[ed] a motion
for orders to remedy substantial noncompliance.[18]

(Doc. #758-1 at 18.)  Plaintiffs maintain these activities were
"essential given the complexity of the case, the State Defendants'
refusal to accept the vast majority of recommendations of the EAP
and the State's summary dismissal of the EAP in August 2007."
(Doc. #758-1 at 19.)

Defendants vehemently disagree.  They argue that counsel's
enormous, unrestrained expenditure of time was neither reasonable
nor justified.  Defendants charge that plaintiffs' attorneys' time
largely was spent on "misplaced efforts and improper arguments"
seeking to "expand the Agreement" rather than work that was "useful

---

[18]Plaintiffs state they do not seek compensation for time their
attorneys spent on the appeal to the Second Circuit. (Doc. #758-1
at 46 n.1.)  They posit, however, that "in assessing the
reasonableness of [their] claim, the Court should take into
consideration that the Plaintiffs have made no claim for an award
of the 404.6 hours of time and $6,881.33 in costs incurred in
connection with the unsuccessful appeal to the Court of Appeals."
(Doc. #792 at 1.)

and of a type ordinarily necessary to secure the final result obtained from the litigation" as required by Delaware Valley. (Doc. #773 at 6.)   They contend that the court should make a substantial across-the-board percentage cut to the hours requested. (Doc. #773 at 3, 32.)

"Deciding how many hours should have been spent by counsel in relation to various tasks is an effort . . . fraught with difficulty." In re Terrorist Attacks on Sept. 11, 2001, No. 03 MDL 1570(GBD)(FM), 2015 WL 6666703, at *1 (S.D.N.Y. Oct. 28, 2015). Here, the court's task is complicated by the manner in which the fee request was organized.  "In determining how much attorney time should be compensated, the court looks initially to the amount of time spent on each category of tasks . . . and then decides how much of that time was 'reasonably expended.'" Tucker v. City of New York, 704 F. Supp. 2d 347, 354 (S.D.N.Y. 2010) (citation omitted).  The plaintiffs' memorandum provides the total number of hours expended from 2002 through 2013 (1835.7) and summarizes counsel's post-judgment activities.  They do not delineate the time spent on each category of tasks.  To adjudicate the plaintiffs' application and provide a record sufficient for review, the court examined, organized and tallied the plaintiffs' more than 1500 time entries.  The court's grouping and compilation is necessarily imprecise but the goal "is to do rough justice, not to achieve auditing perfection." Fox v. Vice, 563 U.S. 826, 131 S. Ct. 2205,

2216 (2011)("[T]rial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.")  The court's categorizations of the plaintiffs' post-judgment billing entries follow.

### 1.    Time Spent Reviewing and Responding to Defendants' Annual Reports

Plaintiffs seek compensation for time counsel spent reviewing, discussing and commenting on the defendants' four annual reports.[19] Based on the court's review of the billing statements, Attorney Shaw spent 109 hours and Attorney Laski spent 42 hours for a total of 151 hours on this work.  Plaintiffs assert that this work was "useful and of a type necessary to protect the full scope of relief afforded by the Settlement Agreement."  (Doc. #781 at 31.)

Defendants argue that plaintiffs should not be compensated for this legal work because it was unnecessary.  (Doc. #773 at 33.) They contend that the Agreement did not call for plaintiffs' counsel to submit comments and it was the responsibility of the EAP to respond to the defendants' annual reports.  (Doc. #773 at 33.)

Defendants are correct that the Agreement did not require the plaintiffs to give written responses to the defendants' reports. That, however, is not the standard under Delaware Valley by which to adjudge the compensability of the plaintiffs' post-judgment work.  Plaintiffs' responses to the defendants' annual reports

---

[19]See doc. #781, ex. D (plaintiffs' comments).

identified plaintiffs' concerns with defendants' performance so
that issues could be discussed and resolved through the EAP.
Plaintiffs say that the EAP encouraged them to provide comments to
the annual reports and that the EAP found such responses useful.
They offer as support the affidavit of a member of the EAP.  (Doc.
#781, Ex. E, Sailor Aff. ¶5, ¶¶8-9.)

I agree that this work satisfies the <u>Delaware Valley</u> standard.
Upon careful review of the billing statements, however, the time
plaintiffs' counsel spent reviewing the reports and drafting
responses is excessive.  The time billed should be reduced by 30%
to 105.7 hours and Attorney Shaw should be awarded 76.3 hours and
Attorney Laski 29.4 hours.

### 2.   **Preparation for and Attendance at EAP meetings**

Plaintiffs seek compensation for time counsel spent preparing
for and attending the EAP meetings.  Attorney Shaw attended all the
EAP meetings.  Attorney Laski attended nine EAP meetings.[20]  By the
court's calculation, Attorney Shaw spent 206 hours and Attorney
Laski spent 57.2 hours for a total of 263.2 hours preparing for and
attending EAP meetings.  In addition, Attorney Shaw spent 13.7
hours[21] and Attorney Laski 24 hours traveling to attend the

---

[20]Billing statements indicate that Attorney Laski attended
meetings on 12/22/02, 10/22/04, 1/12/05, 5/11/05, 9/23/05, 5/11/06,
2/28/07, 3/1/07 and 5/11/07.

[21]Attorney Shaw did not bill for all his travel to EAP
meetings.

meetings.[22]

Defendants argue that this time is not compensable because the EAP meetings "ha[d] no role for the attorneys" and the meetings were attended by a representative of one of the plaintiff organizations. (Doc. #773 at 42; Ex. 1, Thompson Aff. ¶4.)  In the alternative, defendants contend a reduction is warranted because Attorneys Shaw and Laski should not both have attended the EAP meetings.  (Doc. #773 at 42.)

Again, plaintiffs argue that time counsel spent participating in EAP meetings was work that meets the Delaware Valley standard of being "useful and of a type ordinarily necessary to protect the full scope of relief afforded by the Settlement Agreement." (Doc. #781 at 31.)  They further contend that it was appropriate for Attorney Laski, in addition to Attorney Shaw, to attend some of the meetings so that he might "inform himself and properly represent his clients." (Doc. #781 at 55.)

The court agrees that counsel's preparation for and attendance at the EAP meetings is compensable pursuant to Delaware Valley. Moreover, in light of the complex nature of this case, attendance by both attorneys at a portion of the EAP meetings was not unreasonable.  See New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) (decisions regarding

---

[22]Although he attended nine EAP meetings, Attorney Laski made one trip to attend the 2/28/07 and 3/1/07 meetings so that his billing statement reflects eight roundtrips.

use of multiple attorneys "are best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation.") However, upon careful review of plaintiffs' attorneys' time entries, the time billed is excessive. As a result, the time billed should be reduced by 20% to 210.6 hours.

Time counsel spent traveling to the EAP meetings (37.7 hours) should be billed at half of counsel's hourly rate. <u>See, e.g.,</u> <u>Barfield v. New York City Health & Hospitals Corn.</u>, 537 F.3d 132, 139 (2d Cir. 2008) (affirming district court's determination that "travel time by counsel should be compensated at half-rate, in accordance with established court custom"); <u>Douyon v. New York</u> <u>Medical Health Care. P.C.</u>, 49 F. Supp. 3d 328, 351 (E.D.N.Y. 2014) (describing a 50% billing rate for travel time as "governing law" in this circuit); <u>Brig v. Port Auth. Trans Hudson</u>, No. 12CV5371(RPP), 2014 WL 1318345, at *4 (S.D.N.Y. Mar. 28, 2014) ("Although it is within the Court's discretion to compensate counsel for travel time at full hourly rates, courts in the Second Circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rates."); <u>Mister Sprout, Inc. v. Williams</u> <u>Farms Produce Sales, Inc.</u>, 881 F. Supp. 2d 482, 490-91 (S.D.N.Y. 2012) (explaining that "courts in the Second Circuit often reduce attorneys' fees for travel time by 50 percent"); <u>Vereen v. Siegler</u>, No. 3:07CV1898(HBF), 2011 WL 2457534, at *4 (D. Conn. June 16,

2011) ("travel time is customarily billed at half-rate in the Second Circuit").  Attorney Shaw should be awarded 164.8 hours and 4.4 hours for travel and Attorney Laski should be awarded 45.8 hours and 14.4 hours for travel for a total award of 229.4 hours.

### 3.  Class List and Related Motions

Plaintiffs seek compensation for time spent obtaining information about the class list, including conferring with experts, engaging in motion practice and working on notices sent to the class by defendants.  The court has identified 60.9 hours expended by Attorney Shaw and 10.6 hours by Attorney Laski for a total of 71.5 hours associated with this category.

The Settlement Agreement required defendants to "prepare and distribute . . . a list of public school students in Connecticut who on or after December 1, 1999 carry the label of either mental retardation or intellectual disability and who are eligible for special education; such list shall be updated periodically." (Settlement Agreement § I.2.)  The Settlement Agreement gave plaintiffs "a right to collect data relating to the students identified [in the list] and to challenge the adequacy of that list."  (Settlement Agreement § I.3.)  Defendants agreed to "cooperate with the plaintiffs to gain access to data and files relating to class members, to the extent allowed by state and federal statute, for all purposes relating to the enforcement and implementation of th[e] Agreement."  (Settlement Agreement § I.3.)

33

Beginning with their first report in September 2002, the defendants provided the plaintiffs with a paper list using a 32 character identifier for each student.  (Doc. #469, Defs' First Annual Report, Appx G; doc. #495, Ex. D, Defs' Ltr to Pl.) Defendants did not identify students by name because they believed that such disclosure would run afoul of the Family and Educational Right to Privacy Act ("FERPA"), 20 U.S.C. § 1232g.  (Doc. #495, Ex. E.)

The defendants did not have a computer system in place capable of tracking a student across the years. (Defs' Evidentiary Hrg Ex. 2 at 4; doc. #773 at 35.)  The report provided an annual snap shot. (Doc. #722, tr. at 57.)   It showed "exit changes" (graduated, moved, deceased, aged out, dropped out, no longer labeled) but did not show information regarding reclassifications, that is, students with intellectual disabilities who were reclassified to a different disability category.  (Doc. #495, Ex. E.)

Plaintiffs argued that the lists were inadequate to monitor the defendants' performance and did not comply with the requirements of the Settlement Agreement.  They expressed concern that students had been removed from the class through reclassification and that they lacked data concerning these students.  As relief, plaintiffs sought a list that identified students by name. (Doc. #495, Ex. D, Pls' Ltr to Defs; Ex. F.)

Defendants maintained that the list they provided satisfied

their obligations under the Agreement. In September 2004, defendants informed plaintiffs that, based on their communications with the United States Department of Education, personally identifiable information could only be shared after notice to parents or guardians. (Doc. #504 at 8.) Defendants asked plaintiffs if they wanted the defendants to "proceed with the required notification and related requirements of FERPA that would allow compliance with [plaintiffs'] request." (Doc. #504 at 9.) Three months later, in January 2005, the plaintiffs filed a lengthy "Motion for Order to Enforce Settlement Agreement." (Doc. #495.) They claimed that defendants failed "to provide and update a list of class members, including, at a minimum, their names, address, birth dates, disabilities, school district and school of attendance" in violation of Section I.2 of the Settlement Agreement. (Doc. #496 at 14.)

The parties subsequently agreed that defendants would provide plaintiff with the requested information by providing class members with notice and the opportunity to opt out of the disclosure, a procedure defendants previously proposed. In light of the agreement, the court denied the plaintiffs' motion. (Doc. ##505, 506.)

Students' personally identifiable information was helpful to plaintiffs' efforts to monitor compliance with the Settlement Agreement and plaintiffs' legal fees in this regard are compensable

under <u>Delaware Valley</u>.    However, upon careful review, the time spent on this category is unreasonable under the circumstances.  As a result, the time spent on this category (71.5) should be reduced by 20% to 57.2 hours.  Attorney Shaw should be awarded 48.7 hours and Attorney Laski 8.5 hours.

### 4.    Development of a Longitudinal Database

Plaintiffs seek compensation for time counsel expended and fees incurred in engaging experts to assess defendants' data and to create a longitudinal database.   The court has identified 13.6 hours expended by Attorney Shaw and 3.2 hours expended by Attorney Laski associated with this effort.

In 2006, plaintiffs retained Dr. Hammer, Ph. D. ("Hammer"), an expert on statistical and data analysis, and Adam Robison ("Robison"), a computer and data analysis expert.  (Doc. #758 at 32; doc. #533 at 1.)  Plaintiffs asked Hammer and Robison to review defendants' computer data and develop "a database so that ID [intellectually disabled] students could be tracked from year to year." (Doc. #758 at 33.)  Plaintiffs' experts completed the project in the fall of 2006.  (Doc. #758, Ex. K at 61.)  Plaintiffs paid Robison $16,000 and Hammer $28,050.[23]  (Doc. #758-1 at 50 n.7).

Plaintiffs served defendants with discovery requests regarding

---

[23]Plaintiffs also engaged another computer expert, Dr. Conroy, but subsequently withdrew their request for his fee.  (Doc. #781 at 72.)   They did not withdraw the time their attorneys spent consulting with him.

the defendants' computer data, including data on students who had "exited the class."    (Doc. #533 at 3.)    Plaintiffs subsequently filed a motion to compel in August 2007.    (Doc. ##532-2, 538.) Defendants responded, among other things, that they were in the process of developing a FERPA compliant longitudinal database that would "provide the plaintiffs with what they need to answer their questions regarding how many class members have changed disability category and/or been permanently exited." (Doc. #541 at 4.)    In December 2007, defendants disclosed their longitudinal database that allowed tracking of students from year to year and included information about students who had been reclassified.    (Doc. #758 at 25.)    The court denied the plaintiffs' motion to compel without prejudice.[24] (Doc. #547.)

Plaintiffs argue that their retention of Robison and Hammer was necessary because until December 2007, defendants did not have the capacity to track reclassified intellectually disabled [ID] students or "explain why large number of ID students were floating in and out of the State's database."  (Doc. #758 at 50 n.7.)  They say that the time counsel spent "trying to force the defendants to provide data on the reclassified students should be compensated because the Settlement Agreement required the Defendants to supply

---

[24]Plaintiffs do not contend that defendants' longitudinal database was flawed. (Doc. #781 at 37 n.16.)

such data throughout the life of the Agreement."[25]    (Doc. #781 at 37 n. 16.)

Defendants respond that the activities of plaintiffs' counsel in creating the database, including the retention of experts, fall outside the parameters of Delaware Valley.  They point out that the parties knew at the time they executed the Settlement Agreement that the defendants did not possess a computerized system able to track students over time.  (Doc. #773 at 35.)  Moreover, defendants contend, the Agreement did not obligate them to do so.  They maintain that the list they regularly provided complied with their contractual obligations.  In any event, defendants notified plaintiffs that they were in the "process of initiating a system to retroactively track Class members" which they subsequently provided in 2007.  (Doc. #773, Ex. 7.)

Under the circumstances of this case, the court cannot conclude that engaging experts to evaluate defendants' data and create a database constitutes work that is "useful and of a type ordinarily necessary to secure the final result obtained from the litigation." Delaware Valley, 478 U.S. at 561.  Plaintiffs should

---

[25]In their motion alleging substantial noncompliance with the settlement agreement, plaintiffs claimed that the defendants failed (1) to provide them with a list of students with Intellectual Disability ("ID") who were reclassified to another disability category and (2) to address high rates of reclassification that had the effect of moving students out of the "ID" category. (Doc. #580 at 5.)  The district court was not persuaded that these alleged failures constituted substantial noncompliance.  (Doc. #706 at 55-56.)

not be awarded the expenses and attorney time (16.8 hours by the court's calculation) associated with this effort.

### 5. **2007 Site Visits**

Plaintiffs next seek compensation for time counsel expended and fees incurred in an expert review of 120 class members. The court has identified 126.2 hours and expert fees of $90,773.29 associated with this category. (Doc. #758 at 30 n.8.) Attorney Shaw billed 94.3 hours and Attorney Laski 31.9 hours.

In January 2007 (while the EAP was still operational) plaintiffs filed a motion seeking, among other things, an order permitting them to conduct an expert review of a sample of 120 class members. (Doc. #519.) As grounds, plaintiffs said that "the central goals of the Settlement Agreement are not being implemented satisfactorily and that [defendants] are not taking the steps necessary to ensure that class members are afforded the opportunity to participate in regular classes with adequate supplementary aides and services and modifications to the general education curriculum." (Doc. #519 at 3.) The defendants did not object to the motion. After a conference with the court, plaintiffs withdrew their motion and the parties agreed to a "stipulated discovery order" permitting plaintiffs to conduct their requested site visits. (Doc. #527.)

In May 2007, plaintiffs launched teams of experts[26] to visit
Connecticut classrooms. (Doc. #758 at 50 n.8.)  The site visits
included a review of the individual schedules of each of the 120
students selected, observations of each student, and interviews
with teachers and other staff. (Doc. #633 at 6 ¶18.)

Plaintiffs argue that they should be compensated for time
their attorneys spent associated with this endeavor.  They claim
their attorneys' efforts were necessary because "the Defendants
discontinued the EAP despite the EAP's strong concerns about the
lack of teaching staff with training on how to educate ID students
and the lack of a strong State response to opposition of local
school districts to the P.J. Settlement Agreement."[27]  (Doc. #758
at 50 n.8.)  Defendants hotly disagree and assert that "it is hard
to think of a more excessive and unnecessary expenditure."  (Doc.
#773 at 49.)  They contend that the visits were not post-judgment
monitoring aimed at seeking defendants' compliance because the
plaintiffs did not share the results of the visits with them until
the evidentiary hearing in 2010.  Defendants observe that the court

---

[26]The experts plaintiffs engaged were:  Roberta Schnoor, Ph.D.,
Wanda Blanchette, Ph.D., Deanna Adams, Amanda Fenlon, Ed.D., Nicole
DeClouette,  Alison  Ford,  Ph.D.,  Jan  Nisbet,  Ph.D.,  Cheryl
Jorgensen, Ph.D., Mary Schuh, Ph.D., Michael McSheehan, Patricia
Rogan, Ph.D., Mary Jo Dare, Mary Fisher, Mary Held, Beverly Evans,
Ph.D., Linda Lengyel, Ph.D., Linda Lockett, Ed.D., Lisa Jo Vernon-
Doston, Ph.D., and Denise Morelli.  (Doc. #758 at 50 n.8.)

[27]Several time entries associated with the site visits pre-date
the termination of the EAP.

ultimately declined to rely on the results.[28]

The court does not doubt that plaintiffs undertook this initiative with the best intentions.  That said, the compensability of this ambitious undertaking must be viewed through the lens of Delaware Valley.  On this record, the court cannot conclude that plaintiffs have demonstrated that counsel's activities were "useful and of a type ordinarily necessary to secure the final result obtained from the litigation."  Delaware Valley, 478 U.S. at 561.  Therefore, the time (126.2 hours) and expenses ($90,773.29) associated with the site visits should be disallowed.

### 6.  Discovery and Motion Practice

Plaintiffs seek compensation for time counsel expended on discovery and motion practice.  By the court's calculation, Attorney Shaw expended 138.2 hours and Attorney Laski 9.5 hours for a total of 147.7 hours.  Defendants argue that plaintiffs should not be compensated for this time because plaintiffs' discovery requests and motions were "rooted in . . . a faulty understanding of what the Agreement required" and were unsuccessful.  (Doc. #773 at 35-36.)

Defendants provided plaintiffs with extensive data in their annual reports and at the EAP meetings.  In addition, defendants

---

[28]In its ruling, the court concluded that because plaintiffs' experts did not "apply the same criteria in the same manner," they "were unable to make statistically significant findings."  (Doc. #706 at 41.)

41

provided plaintiffs with student files and various computer databases containing student information. (Defs' Evidentiary Hrg Ex. 2 at 8.) They also provided responses to numerous requests by plaintiffs. (Id., Appendix A.)

Plaintiffs served defendants with discovery requests seeking, among other things, information about the class and defendants' data. (Doc. #532; doc. #566 Ex. B.) In July 2008, the plaintiffs filed an 82-page motion to compel defendants to comply with plaintiffs' discovery requests. (Doc. #566.) As relief, plaintiffs sought a court order ordering defendants to make their employees and contractors available for interviews with the plaintiffs' experts, comply with notices of deposition and interviews, and comply with the plaintiffs' request to conduct an expert review of class attrition. Plaintiffs argued that they were entitled to such discovery by virtue of "the text of the Settlement Agreement" as well as the "inherent power of the Court." (Doc. #566 at 7.) I denied the motion, determining that the Agreement limited the plaintiffs' right to discovery to "existing data" in the final three years of the Agreement.[29] (Doc. #581.) Plaintiffs appealed the ruling to Judge Chatigny, who affirmed.[30] (Doc. ##579, 582, 593.)

---

[29]The court encouraged some limited informal discovery.

[30]Plaintiffs subsequently appealed to the Second Circuit, which concluded that the "district court properly denied [plaintiffs'] motion to compel discovery." P.J., 550 F. App'x at 24.

I cannot conclude that plaintiffs have met their burden of demonstrating that this work falls within the parameters of Delaware Valley. Therefore, the time (147.7 hours) should be disallowed.

### 7.    Communication

Plaintiffs seek compensation for time counsel spent reviewing data and on conferences and communications with clients, their experts, opposing counsel, one another, and the court. The court has identified 111.2 hours expended by Attorney Shaw and 33.1 hours by Attorney Laski for a total of 144.3 hours. This category of work is compensable. However, in light of the fact that some of these communications concerned activities that have been determined to be beyond the scope of Delaware Valley (such as motion practice, the development of the database, and the site visits), the time billed should be reduced by 30%. Attorney Shaw should be awarded 77.8 hours and Attorney Laski 23.2 hours for a total of 101 hours.

### 8.    Motions    for    Substantial    Noncompliance    and Evidentiary Hearing

Plaintiffs seek compensation for time counsel spent on the motions alleging substantial noncompliance and the evidentiary hearing. By the court's calculation, plaintiffs' counsel billed 859 hours in conjunction with these efforts. Attorney Shaw expended 609.5 hours and Attorney Laski expended 249.5 hours.

In April 2008, plaintiffs filed a "Motion for Orders to Remedy Substantial Noncompliance with the Settlement Agreement." (Doc.

#549.)  As relief, the motion sought, among other things, discovery, an order requiring the defendants to implement the five goals of the Settlement Agreement, the appointment of the EAP as Special Master, extension of time of the court's jurisdiction over the settlement agreement, and an award of attorneys' fees and costs.  The court denied the motion without prejudice to renewal after the court ruled on the plaintiffs' pending discovery motion. (Doc. ##566, 571.)  In April 2009, the plaintiffs renewed their motion.  (Doc. #580.)  In June 2010, the district court conducted an evidentiary hearing.  (Doc. ##664-667, 669-674, 677.)

Defendants argue that time plaintiffs' attorneys expended on the motions for substantial noncompliance and the evidentiary hearing is not compensable because the motions were unsuccessful and "had no effect on the defendants' compliance with the Agreement or benefit [to] the class in any way."  (Doc. #773 at 37.)

Plaintiffs reply that defendants' objections should be overruled because defendants have not properly quantified the number of hours at issue and as a result, plaintiffs "cannot respond fully to the defendants' argument if they cannot determine what defendants want disallowed." (Doc. #781 at 43.)  Plaintiffs also assert that the outcome of their efforts is not determinative because "the time spent on the evidentiary hearing was necessary to protect the rights of the class members and secure the full scope of relief secured through the Settlement Agreement." (Doc. #781 at

44.)  They claim that the hearing resulted in disclosure of information concerning reclassified students and an additional report by the EAP. (Doc. #781 at 46.)

The court is not persuaded that this category of work was "useful and of a type ordinarily necessary to secure the final result obtained from the litigation" pursuant to <u>Delaware Valley</u>, 478 U.S. at 561.  Accordingly, plaintiffs should not be awarded fees for time their attorneys spent time on these activities.

### 9.    **Fundraising**

Plaintiffs seek compensation for time counsel spent "raising funds." (Doc. #781 at 54.)  They claim that they "should be compensated for this work as it was necessary to ensure that Plaintiffs' counsel were able to engage in effective monitoring during the remedial phase of this lawsuit." (Doc. #781 at 55.) The court has identified 16.9 hours expended by Attorney Shaw with this category.[31]  Defendants object and argue that such time is not compensable. (Doc. #773 at 41.)  The court agrees.  Fundraising is outside the parameters of compensable post-judgment monitoring pursuant to <u>Delaware Valley</u>, 478 U.S. at 561.

### 10.   **Vague Entries**

Defendants argue that certain of plaintiffs' entries should

---

[31]The plaintiffs list 12.4 hours in their reply brief. (Doc. #781 at 54.)  The court identified an additional 4.5 hours. <u>See</u> entries dated 7/31/07 (.8), 8/1/07 (.6), 1/31/08 (1.5), 7/29/09 (.3) and 10/26/09 (1.3).

not be reimbursed because they are vague. "Fees should not be awarded for time entries when the corresponding description of work performed is vague and therefore not susceptible to a determination of whether the time [billed] was reasonably expended." Perez v. Lasership, Inc., No. 3:15MC00031(CSH), 2015 WL 8750965, at *7 (D. Conn. Dec. 14, 2015). Upon review of the entries identified by defendants, one entry - that of March 15, 2005 for 1.0 hour by Attorney Shaw - should be disallowed due to vagueness.

### E.    Litigating Attorneys' Fees

Plaintiffs seek compensation for 456.3 hours counsel spent "litigating attorneys' fees." (Doc. #793, Ex. A, C.) Attorney Shaw billed 385.5 hours and Attorney Laski billed 70.8 hours. (Id.)

Plaintiffs' initial fee application sought fees and costs for the period of November 29, 2000 through September 24, 2004.[32] (Doc. #482.) The motion was denied without prejudice after oral argument. (Doc. #530.) Plaintiffs' subsequent motion sought fees from November 29, 2000 to July 2010.[33] (Doc. #684.) That application was followed by a flurry of motions to "supplement" as

---

[32]In that motion, plaintiffs sought compensation for 518.1 hours at $375/hour for a total of $194,287.50 plus costs of $723.65. (Doc. #482.)

[33]Plaintiffs sought compensation for 2202 hours and an "enhanced" rate of $537.11 for time spent from November 29, 2000 to October 1, 2004. In total, plaintiffs requested fees of $906,010.85 and costs of $197,181.15.

well as a motion for prejudgment interest. (Doc. ##685, 687, 701, 702.) After the court issued its recommended ruling, plaintiffs' counsel expended time opposing defendants' (1) objection to the court's recommended ruling and (2) request for an interlocutory appeal. The plaintiffs subsequently filed the present fee application, which is an updated version of their 2010 fee application. Two motions to "supplement" followed. (Doc. ##786, 793.)

Time expended in litigating a fee petition is reimbursable. See, e.g., Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999) ("a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for § 1988 fees"). The factual and legal issues underlying the plaintiffs' fee entitlement are complicated. That said, the time billed by plaintiffs' counsel - the equivalent of 57 work days - is excessive and unreasonable. A "district court may deduct a reasonable percentage of the hours claimed as a practical means of trimming fat from a fee application." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998). To adjust for unnecessary and inefficient work, the time claimed should be reduced by 60% to 182.5 hours. Attorney Shaw should be awarded 154.2 hours and Attorney Laski 28.3 hours.

### F.    **Filing/Pursuing Writ of Mandamus**

Plaintiffs seek compensation for 36.6 hours counsel spent on a writ of mandamus. Attorney Shaw billed 31.2 hours and Attorney

Laski billed 5.4 hours.  (Doc. #793, Ex. A, C.)

After the evidentiary hearing, the court denied the plaintiffs' motion alleging substantial noncompliance in an endorsement order and indicated that a written memorandum of decision would follow.  (Doc. #686.)  Plaintiffs thereafter filed a writ in the Second Circuit seeking an order compelling the district court to issue its written opinion.  (Doc. #758 at 43.) This work is compensable, plaintiffs say, because it was "necessary to secure the benefits of the Settlement to the class."[34]  (Doc. #758 at 18.)

Defendants object and argue that this category of work falls outside the parameters of Delaware Valley.  The court agrees.

## G.   **Paralegal Time**

Plaintiffs seek compensation for 21.6 hours billed by Attorney Shaw's paralegal. (Doc. #858, Ex. A, Attachment 1; doc. #781, Ex. B.)  This time was spent coordinating the 2007 site visits, which the court has concluded is not compensable under Delaware Valley. As a result, plaintiffs should not compensated for this work.

A table reflecting the hours awarded is attached as an appendix.

---

[34]As it happened, the district court issued its opinion one business day after the writ was filed.  The Second Circuit denied the writ as moot.  In re P.J., No. 12-3091 (2d Cir. Nov. 20, 2012).

## VI.  **Reasonableness of the Hourly Rate**

Plaintiffs seek an hourly rate of $500 for Attorney Shaw and Attorney Laski.[35]  (Doc. #793 at 3.)  Attorney Shaw attests to forty years' experience in complex federal civil rights cases brought on behalf of persons with disabilities.  (Doc. #758, Ex. A, Shaw Aff. ¶2.)  Attorney Laski avers that he has more than forty years' experience representing individuals with disabilities with a focus on class representation and complex civil litigation.  (Doc. #758, Ex. B, Laski Aff.)  Plaintiffs assert that the "current prevailing market rate for an attorney with over forty years of experience for working on complex litigation is $500 per hour."  (Doc. #793 at 4; Ex. A, Shaw Decl.)  In addition to the affidavits of Attorneys Shaw and Laski, they offer the affidavit of Attorney John Yavis. Attorney Yavis, a partner at Murtha Cullina from 1966 through 2003 and now of counsel, states that he is "familiar with rates charged by Connecticut law firms" and opines that "the prevailing rate currently charged by Connecticut attorneys in complex civil litigation for an attorney with more than forty years experience is within the range of $500 to $550 per hour."  (Doc. #793, Yavis Decl. ¶12.)  Plaintiffs also submit the affidavit of Attorney Mark Carta, who has more than thirty years of experience.  He avers that

---

[35]Plaintiffs requested an hourly rate of $475 in their motion. (Doc. #758.)  In their subsequent "Second Motion to Supplement," they requested that the court "use the current rate of $500 per hour." (Doc. #793 at 3.)

based on his experience, the prevailing rate for complex civil litigation for an attorney with more than thirty years experience is $475 - $550.  (Doc. #758, Ex. X, Carta Aff. ¶14.)

In response, defendants agree that Attorneys Shaw and Laski should receive the same hourly rate.  They do not agree, however, that they should be awarded current rates.  Defendants assert that the "prevailing hourly rate awarded [both] counsel should be from 2010" when plaintiffs filed their second motion for attorneys' fees.  (Doc. #773 at 12.)  They appear to argue that an increase in counsel's hourly rate during the pendency of a fee application should not inure to plaintiffs' benefit.  (Doc. #773 at 14.)  According to defendants, plaintiffs' counsel should be awarded $375, which they contend was the prevailing rate in 2010 for IDEA cases.  (Doc. #773 at 14.)  In support of their argument that $375 is reasonable, they cite M.K. ex rel. K. v. Sergi, 578 F. Supp. 2d 425, 427 (D. Conn. 2008), an IDEA case in which Attorney Shaw requested $400 and was awarded $375[36] by Judge Garfinkel and P. ex rel. Mr. P. v. Newington Bd. of Educ., 512 F. Supp. 2d 89 (D. Conn. 2007), an IDEA case in which Attorney Shaw requested $375 and was awarded $315 per hour by Judge Thompson.[37]

---

[36]In that case, Attorney Shaw offered the affidavit of Attorney Yavis, who averred that the prevailing rates charged by Connecticut law firms in complex civil litigation for attorneys with more than thirty years of experience ranged from $400 to $450 per hour.

[37]In this case, the court noted that Attorney Shaw submitted an affidavit from a partner in a law firm who participated in

"[I]n order to provide adequate compensation where the
services were performed many years before the award is made, the
rates used by the court . . . should be 'current rather than
historic hourly rates.'" Gierlinger v. Gleason, 160 F.3d 858, 882
(2d Cir. 1998).[38]  See LeBlanc-Sternberg v. Fletcher, 143 F.3d 748,
764 (2d Cir. 1998) ("[C]urrent rates, rather than historical rates,
should be applied in order to compensate for the delay in
payment[.]").  Mindful of this authority, current rates should be
used to compute the fee award.

The rates used in calculating the lodestar are the market
rates "prevailing in the community for similar services by lawyers
of reasonably comparable skill, experience, and reputation." Blum
v. Stenson, 465 U.S. 886, 896 n. 11 (1984).  "[D]etermination of a
reasonable hourly rate 'contemplates a case-specific inquiry into
the prevailing market rates for counsel of similar experience and
skill to the fee applicant's counsel,' an inquiry that may 'include
judicial notice of the rates awarded in prior cases and the court's
own familiarity with the rates prevailing in the district.'"
Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 59 (2d Cir.

---

setting billing rates in his firm and who reviewed market analysis
and attorney billing rates.  The affiant opined that the prevailing
rate charged for complex civil litigation for an attorney with 30
years experience is within the range of $385 to $415.

[38]The Second Circuit noted an exception to this general rule
when the delay was due in whole or in substantial part to the fault
of the party seeking fees.  Gierlinger, 160 F.3d at 882.  That
situation is not present here.

2012)(quoting <u>Farbotki v. Clinton Cnty</u>, 433 F.3d 204, 209 (2d Cir.
2005)).  <u>See</u> <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 551
(2010)  ("the lodestar looks to 'the prevailing market rates in the
relevant community'"); <u>Cohen v. W. Haven Bd. of Police Comm'rs</u>, 638
F.2d 496, 506 (2d Cir. 1980) ("The fees that would be charged for
similar work by attorneys of like skill in the area [is] the
starting point for determination of a reasonable fee award."); 20
U.S.C. § 1415(i)(3)(C) (under the IDEA, a reasonable hourly rate
"shall be based on rates prevailing in the community in which the
action or proceeding arose for the kind and quality of services
furnished").

Plaintiffs' requested rate is unreasonable.  Within the past
year, after an examination of attorneys' fees awards in this
district, Judge Arterton determined "that $450/hour is on the high
end and is generally reserved for particularly distinguished
attorneys successfully taking on difficult or novel cases."
<u>Crawford v. City of New London</u>, No. 3:11CV1371(JBA), 2015 WL
1125491, at *3 (D. Conn. Mar. 12, 2015)(citing cases) (awarding
civil rights litigators with more than 30 years experience $410).
Plaintiffs point to no cases in which they have been awarded the
rate they request.  To the contrary, courts in this district have
awarded Attorney Shaw a range of fees.  <u>See</u> <u>Messier v. Southbury</u>
<u>Training School</u>, No. 3:94CV1706(VAB), 2015 WL 1439288, at *1 (D.
Conn. Mar. 27, 2015) (civil rights class action in which Attorneys

Shaw and Laski were awarded $450 by Judge Burns)[39]; <u>Doe v. Darien Bd. of Educ.</u>, No. 3:11CV1581(JBA), 2015 WL 8770003, at *6 (D. Conn. Dec. 14, 2015) (civil rights case in which Attorney Shaw was awarded $350 by Judge Arterton).  Based on the court's familiarity with the prevailing rates in the community, with the subject matter and the amount and quality of work performed by the attorneys in this case, the court finds $450 per hour is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n. 11 (1984).  See <u>Doe v. Darien Bd. of Educ.</u>, No. 3:11CV1581(JBA), 2015 WL 8770003, at *1 (D. Conn. Dec. 14, 2015) (awarding $450/hour to civil rights attorney with 35 years experience); <u>Jaeger v. Cellco P'ship</u>, No. 3:11CV1948(SRU), 2015 WL 1867661, at *1 (D. Conn. Apr. 23, 2015) (awarding $425/hour to law firm partner who was cochair of the firm's litigation section and had twenty years experience).

**VII. <u>Expert Fees</u>**

Plaintiffs seek reimbursement of $134,823.29 in expert fees pursuant to the Rehabilitation Act, 29 U.S.C. § 794a.[40]  (Doc. #758

---

[39]Attorney Shaw filed a motion for reconsideration of the court's ruling on the grounds that he should have been awarded an hourly rate of $500.  See doc. #1205 in 3:94CV1706(VAB).  That motion is pending.

[40]Conceding that expert fees are not recoverable under the IDEA, <u>see</u> <u>Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy</u>, 548 U.S. 291, 301 (2006), the plaintiffs assert their claim for expert fees pursuant to the Rehabilitation Act.  Defendants argue that the

at 1, 50.)  Plaintiffs utilized the services of numerous experts in their development of a longitudinal database, conducting the 2007 site visits and litigating the 2010 evidentiary hearing. (Doc. #793, Attachment 2.)  The court has already addressed the compensability of these activities.  As set forth herein, plaintiffs should not be awarded these fees because the work for which these experts were retained is not compensable.

## VIII.    <u>Costs and Litigation Expenses</u>

Attorney Shaw seeks costs of $63,118.57 in post-judgment "costs and litigation expenses."  (Doc. #793, Attachment 2.)

Defendants argue that the court should not award Attorney Shaw: (1) costs associated with the 2007 site visits including experts' flights, hotels and expenses and costs of photocopying and mailings to experts; (2) disputed balances of $6852.92 charged by three of plaintiffs' experts for time they billed for collecting documents and preparing for their depositions taken in conjunction

---

plaintiffs' claim is foreclosed because the case was settled under IDEA.  The Rehabilitation Act, defendants contend, does not appear in either the Settlement Agreement or the plaintiffs' request for relief in their amended complaint.  Nor was it raised during the evidentiary hearing.  In the alternative, defendants argue that expert fees are not recoverable under 29 U.S.C. § 794a(b), the provision plaintiffs cite in their motion.  Plaintiffs respond that they invoked the Rehabilitation Act in the complaint and that the Settlement Agreement encompassed all their federal law claims, which would encompass those under the Rehabilitation Act.  They also clarify that their request is predicated on § 794a(a).  (Doc. #781 at 62-63.)  The court need not address these arguments in light of its conclusion that the work for which these experts were retained falls outside the scope of <u>Delaware Valley</u>.

with the evidentiary hearing[41]; (3) expert fees and expenses related
to the evidentiary hearing; (4) reimbursement of plaintiffs' share
of the final 2010 EAP report commissioned by the court for use in
the evidentiary hearing;[42] (5) the fee for filing the plaintiffs'
writ of mandamus in the Second Circuit and (6) the cost of
transcripts of the evidentiary hearing.[43]   (Doc. #773 at 50-51.)
The court agrees.  These costs are associated with the site visits
and plaintiffs' motion for substantial noncompliance, which the
court has concluded are not compensable.  In addition, the expert
fee of Michael Blezard, CPA, whose opinion plaintiffs proffered in
support of their request for prejudgment interest, is not
reimbursable because as set forth herein, prejudgment interest is
not warranted in this case.  After these adjustments, plaintiffs
should be awarded Attorney Shaw's costs of $2149.27.[44]

Attorney Laski seeks costs of $3110.80 for mileage and tolls.

---

[41]Defendants paid these witnesses for their depositions.  This
amount reflects balances that the experts charged but defendants
disputed.

[42]Judge Chatigny appointed the EAP to prepare a report for use
in the evidentiary hearing.  The court ordered the parties to
"share the EAP's fees and costs equally."  (Doc. #634.)

[43]The defendants, as the prevailing party on the motion for
substantial noncompliance, were awarded costs of these same
transcripts.  (Doc. #799.)

[44]This figure reflects costs incurred on 5/31/02, 8/26/02,
11/11/02, 12/18/03, 1/30/04, 9/30/04, 12/6/04, 12/7/04, 7/26/05,
and 1/19/06 and includes the costs of the fairness transcript,
travel, postage and mailings.

Attorney Laski's costs should be reduced to $1838.20 to reflect only those trips (26) that involved work within the penumbra of Delaware Valley.[45]

## IX.  **Prejudgment Interest**

Plaintiffs request an award of prejudgment interest from July 27, 2010 at "the long-term (20 year) U.S. Treasury Constant Maturities rate, compounded annually." (Doc. #758 at 50; Ex. W, Blezard Aff.)  Plaintiffs argue that even if the court uses current rates in awarding attorneys' fees, prejudgment interest is warranted to make them "whole for the $201,052.66 in costs and litigation expenses" they have incurred. (Doc. #793 at 74.)

"District Courts have broad discretion to grant prejudgment interest based on considerations of fairness rather than a rigid theory of compensation." S.E.C. v. Contorinis, 743 F.3d 296, 207-08 (2d Cir. 2014) (internal quotation marks omitted).  Courts consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."  Wickham Contracting Co. v. Local Union No. 3, Int'l Broth. of Elec. Workers, AFL-CIO, 955 F.2d 831, 833-34 (2d Cir. 1992).

---

[45]The 26 trips were made on 12/6/02, 12/22/03, 9/9/04, 10/22/04, 1/12/05, 3/11/05, 5/11/05, 9/23/05, 1/10/06, 5/11/06, 2/28/07, 5/14/07 and 1/28/08.

Having considered the factors underlying such an award, including the fact that most of the costs and expenses for which plaintiffs seek an award of prejudgment interest have been disallowed, the court concludes that prejudgment interest is not warranted under the circumstances of this case.

**X.    Conclusion**

For these reasons, plaintiffs' motions (##758, 786, 793) should be granted in part.  Plaintiffs should be awarded 713.7 hours at $450/hour for a total of $321,165 in fees and $3987.57 in costs.

| Category | Total Hours Awarded |
|---|---|
| Negotiating Pre-Settlement Claim 11/29/00 - 3/20/02 | |
| Notifying Class Members of Settlement 3/21/02 - 5/22/02 | |
| Empaneling Expert Advisory Panel 6/4/02 - 8/14/02 | 37.9 hours |
| Monitoring Implementation of Settlement Agreement 8/15/02 - 4/22/13 | 493.3 hours |
| Litigating Attorneys' Fees | 182.5 hours |
| Filing/Pursuing Writ of Mandamus | |
| Total | 713.7 hours |

Attorney Shaw is awarded 549.9 hours and Attorney Laski 163.8 hours as follows:

| Category | Hours awarded to Attorney Shaw | Hours awarded to Attorney Laski |
|---|---|---|

| Empaneling Expert Advisory Panel 6/4/02 - 8/14/02 | 23.7 | 14.2 |
|---|---|---|
| Monitoring Implementation of Settlement Agreement 8/15/02 - 4/22/13 | 372 | 121.3 |
| Litigating Attorneys' Fees | 154.2 | 28.3 |
| Total | 549.9 | 163.8 |

Attorney Shaw is awarded $247,455 in fees (549.9 hours @ $450/hour) plus $2,149.27 in costs for a total award of $249,604.27. Attorney Laski is awarded $73,710 in fees (163.8 hours @ $450/hour) plus $1838.30 in costs for a total award of $75,548.30.

Any party may seek the district court's review of this recommendation. See 28 U.S.C. § 636(b) (written objections to proposed findings and recommendations must be filed within fourteen days after service of same); Fed. R. Civ. P. 6(a), 6(d) & 72; Rule 72.2 of the Local Rules for Magistrate Judges; Thomas v. Arn, 474 U.S. 140, 155 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992) (failure to file timely objections to Magistrate Judge's recommended ruling waives further review of the ruling).

Dated this 31st day of March, 2016 at Hartford, Connecticut.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge

58